JOSEPH P. RUSSONIELLO
United States Attorney
BRIAN STRETCH
Chief, Criminal Division
THOMAS M. NEWMAN
Assistant United States Attorney

 9th Floor Federal Building
 450 Golden Gate Avenue, Box 36055
 San Francisco, California 94102
 Telephone:   (415) 436-6805
 Fax:         (415) 436-6748

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>   v.<br><br>LUKE D. BRUGNARA,<br><br>           Defendant. | No. CR-08-222-WHA<br><br>UNITED STATES' TRIAL BRIEF<br><br>Trial Date: March 1, 2010<br>Pre-Trial:  February 22, 2010 |

The United States submits this pretrial conference statement pursuant to Local Rule 17-1.

## I. INTRODUCTION

Defendant Luke Brugnara is charged with three counts of making and subscribing false federal tax returns for the 2000, 2001, and 2002 tax years in violation of 26 U.S.C. § 7206(1).[1] The pre-trial conference is set for February 22, 2010. Trial is scheduled to commence on March 1, 2010. The government's case-in-chief is estimated to last nine days.

## II. STATEMENT OF FACTS

Luke Brugnara has amassed a fortune as a real estate investor. Since 1993, he has profited from purchasing, leasing, and selling large-scale commercial real estate in this district and elsewhere. Brugnara has boasted at numerous interviews that he is a self-made millionaire

---

[1] Brugnara is also currently under indictment for making false statements to a federal agent, and for Endangered Species Act violation related to conduct alleged to have occurred at one of his properties.

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                                -1-

who accumulated a net worth exceeding $200 million in only five years.

One of his acquisitions included the old Silver City Casino in Las Vegas in 1999. As part of that purchase, Brugnara submitted an application for a gaming license to operate the casino. He was required to undergo a background investigation as part of the process. The Nevada Gaming Commission's investigation revealed Brugnara's duplicity. Early in the process, Brugnara's paradoxical claims of exorbitant wealth baffled the investigating agents who eventually received copies of his tax returns that claimed multi-million-dollar losses for each year. The Gaming Agent also learned of an ongoing IRS audit – a fact Brugnara hid from the agents through misleading if not outright false statements.

Brugnara repeatedly denied he was under audit and simply characterized the IRS's efforts as requests for information. In fact, the audit had been ongoing for years, but the IRS's examination was stalled at the beginning stages because Brugnara had not even filed tax returns for more than eight years.[2] As early as February 1998, the IRS requested copies of his past-due 1992-1996 individual income tax returns, including those of his corporation. In response, Brugnara returned the IRS mailing with his (false) claim that the corporate returns, Forms 1120, and his own tax returns were "filed" for each year. Over the next two years, the IRS Revenue Agent auditing Brugnara made numerous requests for the purportedly "filed" tax returns.

Brugnara finally provided those returns after the Nevada Gaming Agents questioned whether he had filed them at all. During a transcribed hearing, Brugnara explained to the Gaming Agents that "I send [sic] in my tax returns that were not filed. These were readily available in my office." Moreover, both Brugnara's attorney and his real estate broker mailed numerous letters confirming that his tax returns were knowingly filed late each year. But Brugnara consistently blamed the IRS for losing his returns and maintained that each was timely

---

[2] Brugnara's failure to file tax returns is not limited to his personal returns. His "corporations" – there are at least six – have never filed tax returns despite repeated requests from the IRS, and instructions to do so from his own advisors. By 2003, Brugnara was required to file some 50 tax returns but has refused to do so.

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                -2-

filed.[3]

Brugnara's late-filed returns raised more questions during the investigations. In at least two instances, the Gaming Agents retrieved from lenders income tax returns that reported income in amounts that varied from his filed returns. For example, in 1994 he reported sustaining a loss exceeding $400,000 in return filed with the IRS. In 1996, Brugnara sent to Fremont Investment a tax returning reporting he earned net income exceeding $400,000 during 1994. As part of the loan application, Brugnara reaffirmed under a separate jurat provided by Fremont Investment that the tax return reporting positive income was "true and correct." On the return provided to Fremont, Brugnara also reported having earned $120,000 of rental income from the properties located at 36/38 San Jacinto Way – *his personal residence*. Brugnara explained to the Gaming Agents that $10,000/month of income for those properties equaled the fair rental value of his residence. Brugnara made these claims despite acknowledging he did not pay rent nor did he report as income the fact that his companies' paid his personal expenses.[4]

Defendant repeated this same pattern with documents sent to other lenders and agencies. In one instance, Brugnara reported having $3,000/month of net income in a financial disclosure document related to a petition for child support payments, while his tax return reported negative $6 million of net income. In 1999, Brugnara reported earning net income of $5 million on his Nevada Gaming Application. His 1999 tax return, which is also signed under penalties of perjury, reports a $9.8 million loss for the same year.

---

[3] Aside from his federal returns, Brugnara also filed each of his state income tax returns late. Moreover, the state returns were also filed only after Brugnara's gaming license was jeopardized stemming from his unwillingness to file any tax returns.

[4] In a recently filed bankruptcy case filed by Brugnara Properties I, Brugnara confirmed that his companies' business accounts were used to pay his "primary living expenses." Case No. 08-32073 (Dkt. No. 35.) During the charged years, this has included paying for, *inter alia*: (1) his $1.5 million residences at 36/38 San Jacinto Way, (2) defendant's Mercedes, (3) a $45,000 piano, (4) $19,000 for "elephant tusks [and a] white rhino head," (5) $3,000/month child support for one of his children, (6) a $3 million parcel of real property in Gilroy, and (7) a Sea Cliff home that he purchased for over $8 million. In February 2000, the IRS Revenue Agent spelled out that these payments constituted income to defendant in a detailed letter. However, Brugnara never included receiving these amounts in income.

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                -3-

Notably, Brugnara omitted the sale of the commercial rental property located at 171 2nd Street, San Francisco, on that same 1999 federal income tax return. Defendant purchased the 171 2nd Street property on June 15, 1993, for $502,345 and sold for $4,022,248 in 1999. On his delinquent 1999 tax return, Brugnara does not even report owning the property much less the $3.5 million he earned from the sale. His state tax returns are also silent on owning, renting, or even receiving rent from the 171 2nd Street property.

In that regard, Brugnara was notified in both letters and hearings of the requirement to report sales of his properties from 2000 through 2001. First, the IRS Revenue Agent notified Brugnara in letters and requested information related to the property sales in 2000. Second, Brugnara hired an accounting firm as part of his gaming application in 2001. Between February and March 2001, those accountants sent Brugnara at least ten letters asking him for detailed information related to the properties he sold in order to compute the gain for tax purposes.

On February 28, 2001, the accountants specifically asked Brugnara for the purchase and sales price related to the disposition of the 490 Post Street, 814 Mission Street, and 939 Market Street properties. Brugnara responded in a letter dated March 1, 2001, reporting purchase prices of the properties as follows: (1) basis of "$34.5 million" and "$12.5 million gain" related to the sale of 490 Post Street in 2001, (2) "$7.2 million gain" from the sale of 814 Mission Street in 2000, and (3) "$2.4 million gain" from the sale of 939 Market Street in 2000. Brugnara's letter further estimates that "$1.92 million" and "$2.5 million" of capital gains tax should be reported on his 2000 and 2001 tax returns, respectively. These sales, representing Counts 1-2 of the Indictment, went unreported on Brugnara's tax returns.

During this period, the same accountants drafted and sent to Brugnara letters detailing the problems with defendant's 1993 - 1999 tax returns. The accountants told Brugnara that he was improperly claiming his spouse as dependent, omitted a schedule for the alternative minimum tax, and omit a schedule for reporting net operating losses. Moreover, Defendant's accountants told him that his corporations and partnerships (the Brugnara entities) had an obligations to file tax returns whether or not the entity earned income. The accountants also spelled out that Defendant was required to reported sales or exchanges of any property on a Form 4797 and

*U.S.' Trial Brief*
*Case No. 08-222-WHA*               -4-

capital gains related to sales on a Form Schedule D.[5]

Brugnara never filed any of these documents. However, Brugnara's communications with these accountants occurred in March 2001, weeks before his 2000 tax return was due. In response to these letters, Brugnara called the accountants demanding that they cease sending him letters explains faults in his tax returns, not show the letters to the Nevada Gaming Commissions, and delete the letters from their files.[6]

Moreover, Brugnara testified before the Nevada Gaming Commission after providing these statement. At those March 2001 hearings, Brugnara's tax returns were addressed. The Gaming Commissioners specifically told Brugnara that he needed to file corporate returns and report the sales of these properties. In response to these concerns, Brugnara stated that he intended to file more detailed returns and corporate returns for his businesses. His license was denied and shortly after Brugnara made the following statement:

> I've proven my business acumen, by producing a $200 million net worth. The one gentleman making the decision about me scratches his head and says how can you have a $200 million net worth, if his tax returns show minus $9,000,000.00 of loss carryover. The guy doesn't know the fundamentals of accounting, because I can sell my properties tomorrow, *pay capital gains* and have about $170 million in the bank. [emphasis added.]

Six months after making this statement, Brugnara filed a delinquent 1999 tax return reporting no sale or capital gains from property he sold. A year later, he filed a delinquent 2000 tax return and a 2001 tax return that reported no sales, gains, or exchange of properties. Despite his assurances, he also failed to list details regarding each transaction for the properties he owned. Brugnara also ignored his accountants' advice and refused to file corporate tax returns.

During the same hearings, the Nevada Gaming Commissioners questioned how Brugnara claimed to have a $250 million net worth when he never reported taxable income over a fifteen year period. Since then, Brugnara purchased an $8 million home in Sea Cliff, and $3 million of

---

[5] In fact, Brugnara acknowledged in 1996 the need to report capital gain income on a Schedule D attached to a tax return.

[6] Brugnara's call demanding that the letters be concealed and destroyed was taped and transcribed.

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                       -5-

real property in Gilroy. As recent as 2006, Brugnara also claimed to have over $468 million in artwork in support of a loan application submitted to Gramercy Capital.[7]

Brugnara's loan application to Gramercy contained other evidence of his willingness to supply false documents. First, defendant submitted income statements purportedly prepared by a nonexistent tax service located in one of his building. The statements also contain the forged signature of the janitor in that building to support the claimed income. Second, the loan application contains federal tax returns that Brugnara never filed. This includes several partnership returns and Brugnara's 2004 federal income return.[8]

On April 3, 2008, a Grand Jury return an Indictment charging him with three counts of filing a false income tax return for 2000-2002. As alleged in the Indictments, Brugnara willfully failed to report the information required on a Forms Schedule E and Schedule K, and he omitted information related to the sales of his properties during these years.

### III.  LEGAL BACKGROUND

**Making And Subscribing False Federal Income Tax Returns**

Title 26, United States Code, section 7206(1), provides in pertinent part:

> Any person who willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000.00 . . . or imprisoned not more than 3 years, or both, together with the costs of prosecution.  Id.

To establish a violation of Section 7206(1), the government must prove the following three elements beyond a reasonable doubt: (1) the defendant made and signed an income a tax

---

[7] In fact, Brugnara filed a complaint to have some of his art collection returned on December 17, 2009. In an adversary complaint, Brugnara requested that 5 paintings, that he bought for $1 million, be returned. Brugnara contends that the property was improperly included in the bankruptcy estate of his corporation. No doubt, Brugnara omitted this asset when he told this Court he was a pauper in an effort to have the Federal Public Defender represent him. Sotheby's sold another painting over the last two years for $4 million.

[8] The evidence at trial will also show Brugnara submitted other false tax returns in support of loan applications that are fully discussed in the United States' Notice of Intent to Offer Evidence Under Fed. R. Evid. 404(b).

*U.S.' Trial Brief*
*Case No. 08-222-WHA*              -6-

return for the calendar year that he knew contained false information as to a material matter; (2) the return contained a written declaration that it was being signed subject to the penalties of perjury; and (3) in filing the false return, the defendant acted willfully. United States v. Bishop, 412 U.S. 346, 350 (1973); United States v. Marabelles, 724 F.2d, 1374, 1380 (9th Cir. 1984).

### 1. Made And Subscribed Income Tax Returns

Section 7206(1) expressly applies to "any return, statement, or other document" signed under penalties of perjury. To meet its burden that the defendant made and subscribed a return, the United States must prove that the return was filed with the IRS. United States v. Hanson, 2 F.3d 942, 945 (9th Cir. 1993). In this case, Brugnara acknowledged making and subscribing to the tax returns charged in the Indictment to IRS agents.

### 2. The Returns Are False As To A Material Matter

In order to sustain a conviction under Section 7206(1), the government must establish that the relevant documents were false as to a material matter. Materiality may be established under one of two tests. First, any item required on an income tax return that is necessary for a correct computation of the tax is a material matter. United States v. Strand, 617 F.2d 571, 574 (10th Cir. 1980); United States v. Null, 415 F.2d 1178, 1181 (4th Cir. 1969); Siravo v. United States, 377 F.2d 469, 472 (1st Cir. 1967). Second, a false item is material if it has a natural tendency to influence or impede the IRS in ascertaining the correctness of the tax declared or in verifying or auditing the returns of the taxpayer. See United States v. Fawaz, 881 F.2d 259, 264 (6th Cir. 1989); United States v. Greenberg, 735 F.2d 29, 31 (2d Cir. 1984).

In this case, the tax returns filed by Brugnara were false as to a material matter under both of the tests. First, Brugnara's omission of nearly $40 million in capital gains from his 2000 and 2001 returns renders the correct computation of tax for those years impossible. The materiality of his omissions are underscored through defendant's accountants. In March 2001, his accountants issued a report concluding that they could not determine defendant's tax liability or whether his returns were true and correct – the definition of materiality under either test.

Second, Brugnara's material false omissions of underlying detail on each of the 2000-2002 satisfy this element. As noted in the Indictment, omitting the detail required on a form

*U.S.' Trial Brief*
*Case No. 08-222-WHA*               -7-

Schedule E, Schedule D, or Form 4797 from the 2000 - 2002 returns impedes the IRS' ability to ascertain the correctness of the tax that Brugnara reported for those years. Moreover, failing to report over $40 million in gains for those years, the IRS would not be able to correctly determine Brugnara's tax liability.

Third, an individual taxpayer is required to use forms prescribed by the Secretary of Treasury. IRC § 6011. Alteration or substitution of those forms is not permitted. Id. For that reason, Brugnara's failure to report income required on forms Schedule D (capital gains), Schedule E (reporting rental income on a property-by-property basis), or a 4797 (reporting sales or exchanges or business property) is a materially false omission.

### 3. Brugnara Did Not Believe That The Returns Were True As To A Material Matter And Acted Willfully

Willfulness in the context of tax crimes is defined as "voluntary, intentional violation of a known legal duty." United States v. Bishop, 412 U.S. 346, 360-61 (1973); see also Cheek v. United States, 498 U.S. 192 (1991); United States v. Pomponio, 429 U.S. 10, 12 (1976). As the definition implies, willfulness requires more than a showing of careless disregard for the truth. Pomponio, 429 U.S. at 12. To establish this element, the government must show that a taxpayer was aware of his or her obligation under the tax laws, United States v. Conforte, 624 F.2d 869, 875 (9th Cir. 1978), and intended the return to be false when he subscribed to it. United States v. Engle, 458 F.2d 1017, 1019-20 (8th Cir. 1972). Knowledge of the falsity of a return's contents can be established by a defendant's signature on the return once the return has been shown to be false. United States v. Drape, 668 F.2d 22, 26 (1st Cir. 1974); United States v. Romanow, 509 F.2d 26 (1st Cir. 1975). Willfulness is typically established by circumstantial evidence. United States v. Marabelles, 724 F.2d 1374, 1379 (9th Cir. 1984); United States v. Clairborne, 765 F.2d 784, 798 (9th Cir. 1985).

Proof of Brugnara's willfulness is manifest. First, he did not simply refuse to report gains from the sales of the properties enumerated in the Indictment. Rather, he outright ignored clear instructions from the IRS, his accountants, and Nevada Gaming officials. As early as 1999, the IRS notified Brugnara of the necessity to report the detailed information required on a Schedule

K. To further educate Brugnara, the IRS Agent mailed him a blank Schedule K, and one that was previously issued to him, with instructions that he needed to report that information. The same IRS Agent notified Brugnara that he is required to report as income the amounts paid for his personal expenses.[9]

In 2001, Brugnara's accountants informed him of the requirement to file corporate tax returns, file Schedules K, and report the sales or exchanges related to real property transactions. The accountants conveyed this information in at least ten letters. The Nevada Gaming Commission also expressed to Brugnara the need to file corporate returns and report the sales from these properties. Brugnara ignored these warnings.

Second, Brugnara provided his attorney with false invoices.[10] In one instance, Brugnara provided his attorney with invoices from "Maisari Tax Services," which according to the letterhead, conducted business at 351 California Street – another property defendant owns. No such tenant exists in defendant's building. Moreover, the documents contain the forged signature of "Sal Maisari" who is, in fact, a janitor in that building. Brugnara has also maintained that he has always been the sole officer of his corporations. But defendant has presented corporate minutes with forged signatures of other individuals claiming to be officers. He has also produced income statements reporting amounts different than his tax returns.

Third, defendant has demonstrated a general pattern disdain for reporting taxable income. Brugnara has refused to file over 30 corporate income tax returns over a 15-year period. With only one exception, defendants returns were all delinquent. In that regard, Brugnara has lied

---

[9] See United States v. Garcia, 762 F.2d 1222, 1225 (5th Cir. 1985) (Willfulness can be proven by evidence that the defendant had been repeatedly advised by IRS agents that he could not deduct personal, non-business expenditures on his tax returns.)

[10] United States v. Bishop, 264 F.3d 535, 550 (5th Cir. 2001); United States v. Wilson, 118 F.3d 228, 236 (4th Cir. 1997); United States v. Chesson, 933 F.2d 298, 304 (5th Cir. 1991); United States v. Walker, 896 F.2d 295, 296, 298 (8th Cir. 1990) (use of false invoices is evidence of willfulness.)

*U.S.' Trial Brief*
*Case No. 08-222-WHA*               -9-

under oath about having filed his returns on time.  Contrary to his claims,[11] his attorney and real estate broker stated in letters that his returns were not filed with the IRS.  Moreover, Brugnara filed delinquent tax returns with the Franchise Tax Board for each year.  In addition, his state tax returns mandate reporting of the sale of any business property, including real property.  Brugnara similarly failed to report these transactions on his state tax returns.

Fourth, defendant's tax returns cannot be reconciled with his personal conduct.[12] Brugnara reported negative six to seven income for the last fifteen years.  Put another way, his 1994-2002 tax returns report <u>negative</u> income totaling $40-50 million.  During that same period, Brugnara lived in million dollar homes, drove luxury cars, and bought extravagant gifts for himself.  Brugnara paid a mortgage of over $15,000 per month for his San Jacinto property and bought his Sea Cliff residence for $8 million while declaring himself a pauper to the IRS.  In other documents, Brugnara bragged that his artwork alone was valued at $468 million. Brugnara further boasted to Gaming Agents that his net worth was over $170 million.  Simply stated, Brugnara's dual claims regarding his wealth cannot be reconciled but his assertions that he earned no income.

The evidence above shows that Brugnara understood his duty under the tax laws. Brugnara knew he had to report gains or exchanges, and details of each transaction.  He also knew that he was required to report as income the payment of his personal expenses.  Brugnara intentionally failed to do so.  As such, Brugnara acted willfully when he failed to file correct federal income tax returns for the years 2000, 2001, and 2002.

---

[11] For example, under a jurat Brugnara signed his Nevada Gaming Application stating that his 1998 income tax return was timely filed in April 1999.  In an October 1999 letter, his real estate broker stated that Brugnara's return was not even prepared.  In 2000, defendant's attorney sent him letters in 2000 asking him complete and filed his 1993-1998 tax returns.  In 2004, Brugnara testified none of these returns were delinquent, and the IRS simply lost them.

[12] <u>United States v. Bishop</u>, 264 F.3d 535, 550 (5th Cir. 2001); <u>United States v. Simonelli</u>, 237 F.3d 19, 30 (1st Cir. 2001); <u>United States v. Olbres</u>, 61 F.3d 967, 971 (1st Cir. 1995); <u>United States v. Kim</u>, 884 F.2d 189, 192 (5th Cir. 1989) (Spending large amounts which could not be reconciled with the amount of income reported is evidence of willfulness.)

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                -10-

## IV.  EVIDENTIARY MATTERS

A.       **Preliminary Matters**

The parties have discussed stipulations concerning facts and exhibits and hope to reach and file those stipulations prior to the February 22, 2010 pretrial conference.

B.       **Summary Testimony & Schedules**

Three types of summaries and charts are typically used in criminal cases: (1) summaries of voluminous records, admissible pursuant to Fed. R. Evid. 1006; (2) summaries of a summary expert which may be admitted pursuant to Fed. R. Evid. 611(a); and (3) demonstrative or pedagogical charts that are used as testimonial aids, but which are not themselves introduced into evidence.  In this case, the government will use summaries and charts that fall within all three categories.

1.       **Fed. R. Evid. 1006 Summary Exhibits**

At trial, the United States intends to introduce several summary exhibits into evidence pursuant to Fed. R. Evid. 1006.[13]  Rule 1006 of the Federal Rules of Evidence permits party to introduce summary exhibits at trial provided that the proponent of these materials establishes the admissibility of the underlying documents.  United States v. Johnson, 594 F.2d 1253, 1256-57 (9th Cir. 1979).  While the admissibility of the underlying documents is a precondition to admitting the summary evidence, those documents are not themselves required to be admitted as evidence.  Johnson, 594 F.2d 1253, 1257 fn. 5; United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir. 1989); United States v. Meyers, 847 F.2d 1408, 1411 (9th Cir.1988); United States v. Johnson, 594 F.2d 1253, 1254-57 (9th Cir. 1979).

The United States intends to introduce summary exhibits regarding two categories of documents.  The government has prepared a summary chart detailing the amount of income the Defendant reported on his tax returns as compared to the amounts reported to others.  Second, the government prepared charts summarizing the amounts and subject of the personal expenses

---

[13] These documents are unquestionably voluminous.  The bank records and tax filing comprise hundreds of pages.

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                             -11-

Defendant paid during the charged years. Third, the government intends to offer a summary chart detailing the dates that the IRS and Franchise Tax Board received Defendant's tax returns.

This evidence summarizes voluminous bank records, and tax filing by the Defendant These are addressed in turn.

First, the IRS received records from third-parties, including banks, the Nevada Gaming Commission, and the Franchise Tax Board. These documents are admissible as business records under Fed. R. Evid. 803(6), which permits records generated in the regular course of an ongoing business to be exempted from the hearsay exclusionary rule. The proponent of the records at issue must show that the records were "made at or near the time by, or from information transmitted by, a person with knowledge, [that they were] kept in the course of a regularly conducted business activity, and [that] it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Fed. R. Evid. 803(6). The United States is prepared to make this showing regarding the summoned records by various means, including the testimony of agents.

Proof that proffered records qualify as business records under Rule 803(6) may be introduced through "the testimony of the custodian *or other qualified witness*," who can explain the record keeping of the organization. Fed. R. Evid. 803(6) (emphasis added). "It is not necessary that the person who actually prepared the business record testify, nor that the document be prepared by the business which has custody of it, so long as other circumstantial evidence suggests the trustworthiness of the record." United States v. Hawkins, 905 F.2d 1489, 1494 (11th Cir. 1990) (citing United States v. Parker, 749 F.2d 628, 633 (11th Cir. 1984)); accord United States v. Metallo, 908 F.2d 795, 799 (11th Cir. 1990.)

Thus, the foundation for the application of Rule 803(6) may be laid, in whole or in part, "by the testimony of a government agent or other person outside the organization whose records are sought to be admitted." United States v. Hathaway, 798 F.2d 902, 906 (6th Cir. 1986). The only requirement is that the "witness be familiar with the record keeping system." Id. In Hathaway, the Court of Appeals upheld the admission of records including transaction statements, advertising material, copies of checks, correspondence and client files seized from

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                -12-

the offices of a fraud perpetrator. The government established the foundation for the business record exception in part by the testimony of a special agent involved with the case. Id. at 906.

Moreover, documents received from third parties that are incorporated into the business records of the recipient also satisfy the business records exception if they were relied upon by the recipient for their accuracy. United States v. Childs, 5 F.3d 1328, 1334 (9th Cir. 1993); Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1342 (Fed. Cir. 1999); see also United States v. Ullrich, 580 F.2d 765, 772 (5th Cir. 1978) (automobile manufacturer's documents kept and relied upon by dealership obviously admissible under Rule 803(b)); Parker, 749 F.2d 628, (government export documents kept by importer).

Second, the summary of Defendant's personal expenses is derived almost exclusively from his bank records. These include both checks drafted by the Defendant, and his spouse. In each case, the record custodian provided a written declaration attesting to the authenticity of these documents, which satisfies the requirements of Fed. R. Evid. 902(11). Thus, the underlying documents for these expenses are also admissible.

### 2. Fed. R. Evid. 611(a) Testimony & Schedules

In addition to testifying concerning the Rule 1006 summaries, Revenue Agent Tonna will also present to the jury various tax computations and summaries that he has prepared from the evidence that was admitted during trial. The purpose is to assist the Court and the jury through what may be at times complex financial evidence

Rule 611(a) of the Federal Rules of Evidence authorizes the court to "exercise reasonable control over the mode...of...presenting evidence so as to (1) make the... presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time." United States v. Gardner, 611 F.2d at 776 (9th Cir. 1980) (summary chart admissible in tax evasion case under Rule 611(a)); United States v. Paulino, 935 F.2d 739, 752-54 (6th Cir. 1991) (testimony of nonexpert summary witness regarding cash generated from cocaine sales in drug conspiracy case admissible under Rule 611(a) where trial court gave limiting instruction and defense had full opportunity to cross-examine); United States v. Scales, 594 F.2d 558, 563-64 (6th Cir. 1979) (summaries of testimonial evidence designed "to aid the jury in its examination of the evidence

already admitted" do not come within Rule 1006, but are authorized by Rule 611(a)), 5 Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, at ¶ 1006[03] (summary "prepared by a witness from his own knowledge to assist the jury in understanding or remembering a mass of details... is admissible, not under Rule 1006, but under such general principles of good sense as are embodied in Rule 611(a)").

Among the summaries and schedules that the government intends to offer into evidence during Revenue Agent Tonna's testimony are exhibits related to Defendant's tax computations for each year. These summaries of Revenue Agent Tonna's tax calculations will be based on evidence admitted during the trial. Such summaries themselves can also be properly admitted into evidence. See e.g., United States v. Shirley, 884 F.2d 1130, 1133-34 (9th Cir. 1989). In Shirley, the summary expert witness compiled a summary of telephone records based on information already introduced into evidence. "Summary evidence 'can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses'." Shirley, 884 F.2d at 1133-34, citing United States v. Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983); and United States v. Meyers, 847 F.2d 1408, 1412 (9th Cir. 1988) (properly admitting chart detailing long distance calls made by various co-conspirators); United States v. Marchini, 797 F.2d 759, 766 (9th Cir. 1986).

The use of summary expert witnesses has long been approved by the courts. United States v. Johnson, 319 U.S. 503, 519-20 (1942) (reversing Court of Appeals; concluding that summary witness's testimony was admissible in a tax evasion prosecution); United States v. Baker, 10 F.3d 1374, 1411 (9th Cir. 1993) ("this Circuit has often allowed the use of summary charts and summary witness testimony based on testimonial evidence (most commonly in tax cases)"), cert. denied, 513 U.S. 934 (1994), overruled on other grounds, United States v. Nordby, 225 F.3d 1053 (9th Cir 2000).

The introduction of an expert summary witness and summary schedules has been approved by the Ninth Circuit in tax cases. See United States v. Marchini, 797 F.2d 759, 766 (9th Cir. 1986); Goldberg v. United States, 789 F.2d 1341, 1343 (9th Cir. 1986). See also, United States v. Voorhies, 658 F.2d 710, 715 (9th Cir. 1981) ("[T]he fact of a tax due and owing may be

established by documentary evidence of tax liability, accompanied by a summary by an expert"). "The nature of a summary witness testimony requires that he draw conclusions from the evidence presented at trial." United States v. Esser, 520 F.2d 213, 218 (7th Cir. 1975).

The summary witness may review the evidence in a manner that advocates the government's theory of the case, and need not give effect to the contentions of the defendant. Barsky v. United States, 339 F.2d 180, 181 (9th Cir. 1964). Copies of the summaries may be published to the jury while the expert testifies concerning them. Id.

### 3. Demonstrative Charts

The government also intends to introduce various demonstrative or pedagogical summaries and charts as testimonial aids during the testimony of several witnesses. For instance, one chart and summary is a visual depiction of evidence that chronologically shows instances when Defendant was "educated" regarding his tax filing requirements. Another depicts income being paid to Defendant's organizations and spent by him for personal purposes. The records upon which the Government's charts are based are voluminous and, based on the discussion above, may be admitted pursuant to Rule 1006 or Rule 611(a).

The government also intends to use various demonstrative charts during its opening statement, examination of witnesses, and in closing argument. The government does not intend to offer these charts into evidence. Courts have repeatedly allowed the use of charts similar to the ones the United States intends to use in this case. See, e.g., United States v. Scales, 594 F.2d 558, 561-562 (6th Cir.) (summary of indictment); United States v. Jennings, 724 F.2d 436, 441-443 (5th Cir.) (compilation of 200 pages of material involving substantial amount of mathematical calculations), cert. denied, 467 U.S. 1227 (1984); United States v. Stephens, 779 F.2d 232, 238 (5th Cir. 1985) (simple flow charts tracing the defendant's use of loan proceeds).

The Ninth Circuit has determined that three precautionary measures should be taken when demonstrative charts are used. First, the court should carefully examine the charts, out of the presence of the jury, to determine that everything contained in them is supported by proof. United States v. Soulard, 730 F.2d at 1300; United States v. Abbas, 504 F.2d 123, 125 (9th Cir.

1974). Second, the court should allow the charts to be used as a testimonial aid for witnesses and as a visual aid for counsel in argument, but should not admit the charts in evidence or allow their use during jury deliberation. Id. Third, the Court should instruct the jury that the charts are an explanation of other evidence and not proof per se. The jury should be told that the charts were presented as a matter of convenience and to the extent the jury finds that they are not in truth summaries of facts and figures shown by the evidence in the case, the jury should disregard them entirely. Id.

### C. Certified Records

The United States anticipates offering into evidence certified copies of certain Internal Revenue Service records. These records are self-authenticating and admissible pursuant to Federal Rules of Evidence 902(4), 803(8), and 1005.

### D. Defendant's Statements

The government anticipates introducing statements made by Defendant Brugnara, including public statements made at interviews, written and signed materials submitted to government agencies, and sworn testimony. These statements constitute admissions by a party-opponent and are admissible under Fed. R. Evid. 801(d)(2). If offered by the defendant for the truth of the matters asserted, however, they are not admissible over a hearsay objection.

#### 1. Recording of Defendant

The United States will also introduce a video recording of Defendant's statements regarding his requirement to pay and report capital gains tax. During this interview, the Defendant bragged that "The guy doesn't know the fundamentals of accounting, because I can sell my properties tomorrow, *pay capital gains* and have about $170 million in the bank. This recording is admissible under Fed. R. Evid. 801(2) and 901(6).

### E. Fed. R. Evid. 404(b) Evidence

The United States intends to offer evidence which defendant might argue falls under Rule 404(b). Such evidence includes Defendant past tax-filing history and tax returns that he provided to lenders. This also includes false statements defendant made to the Nevada Gaming Commission. Defendant told an individual with whom he had a relationship that he got ahead by

omitting information on various government forms and answered what he wanted to. Defendant also threatened to kill this person. These threats came to the attention of the Nevada Gaming Officials. After getting questioned by the Gaming Agents about the threats, defendant then threatened to stop paying child support unless she changed her testimony. Soon after, defendant's former girlfriend recanted and said she was not threatened. Defendant lied under oath in stating he did now know why she recanted her early statements.

To the extent any of these matters fall outside of the charges in the Indictment, they are nonetheless admissible because they are "inextricably intertwined" with the charged crimes and, therefore, admissible as direct proof thereof, rather than as "other act" evidence under Rule 404(b). United States v. Ripinsky, 109 F.3d 1436, 1441 (9th Cir.), cert. denied, 522 U.S. 1084 (1998), quoting United States v. Soliman, 813 F.2d 277, 278 (9th Cir. 1987); United States v. Santiago, 46 F.3d 885, 889 (9th Cir.), cert. denied, 115 S.Ct. 2716 (1995); United States v. Williams, 989 F.2d 1061, 1070 (9th Cir. 1993); United States v. Sitton, 968 F.2d 947, 958 (9th Cir.), cert. denied, 113 S.Ct. 478 (1992); United States v. Booth, 926 F.2d 811, 815-16 (9th Cir.), cert. denied, 500 U.S. 959 (1991).

In addition, evidence of other crimes, wrongs, or acts is not admissible to prove "the character of a person in order to show that he acted in conformity therewith." Fed. R. Evid. 404(b). The defendant's history failing to file tax returns and providing inconsistent returns to lenders is admissible under Rule 404(b) when offered for any other relevant purpose, including "proof of [the defendant's] opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. As the Ninth Circuit has emphasized, Rule 404(b) is a rule of inclusion – not a rule of exclusion. United States v. Pitts, 6 F.3d 1366, 1370-71 (9th Cir. 1991); United States v. Ayers, 924 F.2d 1468, 1472-73 (9th Cir. 1991); United States v. Diggs, 649 F.2d 731, 737 (9th Cir.), cert. denied, 454 U.S. 970 (1981); United States v. Sangrey, 586 F.2d 1312, 1314 (9th Cir. 1978) (Rule 404(b) is "one of inclusion"); United States v. Long, 574 F.2d 761, 766 (2d Cir. 1978) (Rule 404(b) is "intended to emphasize admissibility of 'other crime' evidence"); United States v. Rocha, 553 F.2d 615, 616 (9th Cir. 1977); United States v. Papadakis, 510 F.2d 287, 294 (2d Cir. 1975) ("we are by now firmly wedded to the inclusory

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                              -17-

form of the rule, that evidence of other crimes is admissible, if relevant, except when offered solely to prove criminal character"); see also Huddleston v. United States, 485 U.S. 681, 688-89 (1988) (Congress intended Rule 404(b) to avoid placing restrictions on the admissibility of similar acts evidence). Cf. United States v. Mayans, 17 F.3d 1174, 1181 (9th Cir. 1994). For this reason, the district court is accorded "wide discretion in deciding whether to admit such evidence," and such decision will not be reversed absent an abuse of that discretion. Huddleston, 485 U.S. at 690; Diggs, 649 F.2d at 73; United States v. Blitz, 151 F.3d 1002, 1007 (9th Cir. 1998).

Here, the government is not offering the tax returns as evidence of defendant's character. To the contrary, the government maintains that defendant's reporting of higher income amounts on other returns is a simple admission that his income did not equal the large seven-figure losses he reported. Additionally, Brugnara reported on one unfiled tax return, that was given to a lender, that he received rental income of $120,000 related to his residence.[14] He did not pay rent to the corporation nominally holding title to his house. At a hearing, Brugnara explained that there was an inherent value related to living there in that amount ($120,000). The government agrees, and this explanation confirms his *knowledge* that payment of personal expenses through his corporation is income. Lastly, defendant's utter refusal to file timely tax returns is properly admissible to demonstrate his willful defiance of the tax laws.

Moreover, the government provided written notice of its intent to offer this evidence in August 2008. The defense has never raised any objections.

---

[14] Inconsistent income statements provided to lenders are typically admitted in false returns cases as willfulness evidence. United States v. Ahee, 5 Fed. Appx. 342, 355 (6th Cir. 2001).

*U.S.' Trial Brief*
*Case No. 08-222-WHA*                -18-

Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


*/s/ Thomas M. Newman*
THOMAS M. NEWMAN
Assistant United States Attorney

*U.S.' Trial Brief*
*Case No. 08-222-WHA*               -19-