JOSEPH P. RUSSONIELLO
United States Attorney
THOMAS M. NEWMAN (NYSBN 4256178)
Assistant United States Attorney
  Tax Division
  9th Floor Federal Building
  450 Golden Gate Avenue, Box 36055
  San Francisco, California  94102
  Telephone:   (415) 436-6805
  Fax:            (415) 436-6748
  Email: thomas.newman2@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  CR-8-222-WHA |
| | ) | |
| Plaintiff, | ) | |
| | ) | UNITED STATES' |
| v. | ) | SENTENCING MEMORANDUM |
| | ) | |
| LUKE D. BRUGNARA, | ) | |
| | ) | Date:   May 4, 2010 |
| | ) | Time:  2:00 p.m. |
| Defendant. | ) | |
| | ) | |

Plaintiff, United States of America, by and through its counsel of record, Thomas M. Newman, Assistant United States Attorney, files its Sentencing Memorandum pursuant to Crim. L. R. 32-5(b).  The Memorandum consists of two parts: (1) a review of the Defendant's history, and (2) Sentencing considerations.

Sentencing is currently scheduled for May 4, 2010.

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*

1

## TABLE OF CONTENTS

2   I.       SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

3   II.      FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

4            A.    DEFENDANT'S BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

5            B.    DEFENDANT'S REPORTED INCOME & ASSETS . . . . . . . . . . . . . . . . . . . . . . . . -4-

6            C.    DEFENDANT'S POST-INDICTMENT CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . -6-

7   II.      THE SERIOUS NATURE OF DEFENDANT'S OFFENSE CONDUCT . . . . . . . . . . . . . . . . -7-

8            A.    DEFENDANT'S MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

9            B.    GUIDELINES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

10  III.     DETERRENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

11           A.    GENERAL DETERRENCE - RESPECT FOR THE LAW . . . . . . . . . . . . . . . . . . . . -9-

12  IV.      OTHER SENTENCING FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

13           A.    SUBSTANTIAL IMPRISONMENT WILL AVOID SENTENCING DISPARITY . . . . . . . -11-

14           B.    SUFFICIENT, BUT NOT GREATER THAN NECESSARY . . . . . . . . . . . . . . . . . . . -12-

15  V.       IMPOSITION OF A FINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

16  VI.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

17

18

19

20

21

22

23

24

25

26

27

28

***U.S.' Sentencing Memorandum***
***Case No. 08-222-WHA***

# TABLE OF AUTHORITIES

## FEDERAL CASES

United States v. Ture,
  450 F.3d at 359  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12

U.S. v. Mukai,
  26 F.3d 953 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

United States v. Bergman,
  416 F. Supp. 496 (S.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

United States v. Burgos,
  276 F.3d 1284 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

United States v. Cunningham,
  429 F.3d 673 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

United States v. Pugh,
  515 F.3d 1179 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

United States v. Cutler,
  2008 WL 706633 (2d Cir. Mar. 17, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

United States v. Rosin,
  2008 WL 142037 (11th Cir. Jan. 16, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

## FEDERAL STATUTES

26 U.S.C. § 7206(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Title 18 U.S.C. § 3553(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 11

***U.S.' Sentencing Memorandum***
***Case No. 08-222-WHA***

# I. SUMMARY

On April 3, 2008, the Defendant, Luke Brugnara, was charged with three counts of making and subscribing false federal tax returns for the 2000, 2001, and 2002 tax years in violation of 26 U.S.C. § 7206(1).  The Defendant pled guilty to Count 1 of the Indictment on May 15, 2009, which alleged that he failed to report the sales of two properties located in San Francisco.  The Defendant subsequently withdrew his guilty plea on September 2, 2009, and a March 1, 2010 trial date was set.  The trial date was vacated after the Defendant pleaded guilty for a second time.  The Defendant pled open to the first three charges of the Superseding Indictment filed on January 12, 2010.  (PSR ¶¶1-4).

# II. FACTUAL BACKGROUND

## A.   DEFENDANT'S BACKGROUND

Brugnara began purchasing and leasing commercial real estate in 1993.  According to the Defendant, he has earned significant profits from his real estate endeavors.  During several interviews, Brugnara has claimed that his net worth exceeds $200,000,000.  (PSR ¶10).

From 1994 to the present, the Defendant's lifestyle is consistent with his claimed wealth. In fact, the Defendant has acknowledged using his companies' business bank account to pay for all of his personal expenses and some extravagant purchases.  For example, the Defendant purchased, *inter alia*, a $45,000 piano, $19,000 elephant tusks, and numerous luxury cars over a period of years.  The Defendant also paid $1.5 million for the home he lived in (as well as the adjacent house), $3 million for personal property in Gilroy, and $8 million for a large home located in Sea Cliff.[1/]  During an IRS audit started in 1998, the Defendant was told these expenses should be treated as income.  (PSR ¶18).[2/]

---

[1/]The Defendant's mortgage payments on his homes located at San Jacinto Way were about $18,000/month over a period of about eight years (1995 - 2002).  In 2002 - 2003 after he purchased the Gilroy and Sea Cliff properties, his monthly mortgage payments were $80,000 for at least five years.  None of the income related to these payments was ever reported.

[2/]As noted in the PSR, one of the Defendant's paintings was recently sold for $4 million and he filed a complaint to have a number of his other works of art returned.  (PSR ¶18, p. 6).  The money expended on these personal items was never reported as income either.

1    The IRS audit started in 1998 around the same time the Defendant was applying for a

2    gaming license in Nevada.  The license related to his acquisition of the old Silver City Casino in

3    Las Vegas in 1999.  Brugnara was required to undergo a background investigation as part of the

4    licensing process.  In 2000 - 2001, the gaming agents and the Nevada Gaming Commissioners

5    focused on the problems with the Defendant's federal tax returns.  The issues raised regarding

6    the Defendant's tax returns at the hearings in 2000 - 2001, included: (1) that the returns were all

7    delinquent, (2) the IRS audit was not disclosed to them, (3) property sales from 1993 - 1999

8    were not reported on any tax returns, (4) checks were drafted for personal expenses with the

9    notation "supplies" in the memo section, (5) the substantial income and assets were reported to

10   the Nevada Gaming Commission while large net losses are claimed on his tax returns, (6) no

11   corporate tax returns were filed, and (7) that Brugnara filed tax returns with the IRS reporting

12   negative income while submitting tax return to lenders reporting significant positive income.

13   (PSR ¶¶11-14).

14   In one example, the Defendant provided Fremont Investment & Loan with a 1994 tax

15   return that reported more than $400,000 of income.  The Defendant re-affirmed, under oath, as to

16   the correctness of that tax return in 1996 when he applied for the loan.  However, the Defendant

17   reported earning significant negative income on the tax return he filed with the IRS.  Brugnara is

18   aware these actions are criminal.  In 1991, Brugnara was employed as a loan broker.  While

19   working there, one of his customers gave him a federal tax return that inflated her income in

20   order support the loan application.  Brugnara's employer insisted that he ask the customer for a

21   canceled check proving the six-figure tax payment listed on the return.  In response, the

22   customer provided a check that was stamped as cashed by the IRS, but with another check glued

23   to the front in the six-figure amount that, although consistent with the return, was not what the

24   IRS was paid.[3]  In fact, the return and the check were both false and Brugnara's license was

25

26        [3] During an investigation of the scheme, the customer testified that Brugnara assisted her in
27   preparing the false return in order to justify the loan.

28

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*          -2-

1   suspended for his part in the scheme.  His participation in this scheme tends to prove an absence

2   of mistake regarding his own inconsistent returns.  (PSR ¶14; Dkt. No. 20).  Notably, these

3   events were all addressed at the hearing before the Nevada Gaming Commission.

4          After it was clear that his failure to file tax returns was jeopardizing his application for a

5   gaming license, he supplied the IRS with copies of his delinquent tax returns.[4]  During the audit,

6   and at gaming hearings, Brugnara consistently blamed the IRS for losing his tax returns each

7   year.[5]  (PSR ¶¶12-13).

8          When Brugnara finally filed his tax returns, he failed to report a single sale of any

9   property he owned.  Notably, Brugnara omitted the sale of the commercial rental property

10  located at 171 2nd Street, San Francisco, on his 1999 tax return.  Defendant purchased the 171 2nd

11  Street property on June 15, 1993, for $502,345 and sold for $4,022,248 in 1999.  On his

12  delinquent 1999 tax return, Brugnara does not even report owning the property much less the

13  $3.5 million he earned from the sale.  His state tax returns are also silent on owning, renting, or

14  even receiving rent from the 171 2nd Street property.  (PSR ¶16).

15         In fact, Brugnara himself made the following statement regarding his own wealth, and

16  obligation to pay taxes related to the sale of properties:

17                 I've proven my business acumen, by producing a $200 million net worth.
                   The one gentleman making the decision about me scratches his head and
18                 says how can you have a $200 million net worth, if his tax returns show
                   minus $9,000,000.00 of loss carryover.  The guy doesn't know the
19                 fundamentals of accounting, because I can sell my properties tomorrow,
                   *pay capital gains* and have about $170 million in the bank.
20  (PSR ¶21).

21         Brugnara was notified in both letters and hearings of the requirement to report sales of

22  his properties from 2000 through 2001.  His own accountants filed declarations confirming they

23

24         [4]The IRS obtained other returns from the Nevada Gaming Commission, which were received
    from the Defendant's lenders.

25

26         [5] Aside from his federal returns, Brugnara also filed each of his state income tax returns late.
    Moreover, the state returns were also filed only after Brugnara's gaming license was jeopardized
    stemming from his unwillingness to file any tax returns.

27

28

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*              -3-

1    told Mr. Brugnara that he was required to report the sale of exchange of any property he owned.

2    (Nelson Decl. ¶7; PSR ¶17).  Brugnara's professionals told him this long before the first tax

3    return charged in this case was even due.  Brugnara ignored the professional advice[6] of his

4    accountants and, in 2002, filed a 2000 tax return that omitted the sale of two commercial

5    buildings.  As related to Count 2, the Defendant filed a 2001 tax return that omitted the sale of

6    the 490 Post Street property despite the advice he received in 2001.  (PSR ¶ 19).

7         As related to both Counts 1 - 2, Brugnara supplied the following information related to

8    the disposition of 490 Post Street, 814 Mission Street, and 939 Market Street properties: (1) basis

9    of "$34.5 million" and "$12.5 million gain" related to the sale of 490 Post Street in 2001, (2)

10   "$7.2 million gain" from the sale of 814 Mission Street in 2000, and (3) "$2.4 million gain" from

11   the sale of 939 Market Street in 2000.  Brugnara's letter further estimates that "$1.92 million"

12   and "$2.5 million" of capital gains tax should be reported on his 2000 and 2001 tax returns,

13   respectively.  None of the sales, exchanges, or tax due that Brugnara reported to his professionals

14   ended up on his tax returns.  (Nelson Decl. ¶¶2-6; PSR ¶19).

15        As to Count three, the Defendant filed a delinquent 2002 tax return with the IRS in June

16   2004.  Nearly seven years after the audit started, the Defendant filed a delinquent tax return

17   omitting the sale of the casino property he owned.  (PSR ¶31).  According to his own statements,

18   Brugnara made more than $36 million from these sales, excluding the casino.  On his resume, he

19   claims he sold the casino and realized a $17 million profit.

20        **B.    DEFENDANT'S REPORTED INCOME & ASSETS**

21        Defendant has submitted numerous income and asset statement related to his career as a

22   commercial landlord.  Those statement include, *inter alia*, information supplied to lenders, state

23   and federal tax authorities, state courts, and the Nevada Gaming Commission.  The information

24   is summarized as follows:

25   _____

26        [6]As a separate matter, the Defendant not only ignored other advice from his professionals
     during the same period, he also asked them to "delete" the clear instructions he was given.
27   (Crowther Decl. ¶¶3-4).

28

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*          -4-

| Year | Income Reported on Form 1040 | Net Income Reported to Others | Net Assets Reported to Others |
|------|------------------------------|-------------------------------|-------------------------------|
| 1994 | -$   142,721 | $489,778 (Form 1040 to lender) | NA |
| 1995 | -$   376,938 | - | - |
| 1996 | -$    53,526 | 1. $182,899 (lender) | 1. $13,570,000 (lender) |
| 1997 | -$2,254,723 | 1. -$1,897,150 (Form 1040)<br>2.  $200,000 (lender) | 1. $4,000,000 (loan appl.) |
| 1998 | -$5,855,358 | 1. $0 (state return) | |
| 1999 | -$9,851,377 | 1. $2,726,589 (lender);<br>2. $5,000,000 (NV Gaming);<br>3. $0 (state return) | 1. $136,805,000 (NV Gaming)<br>2. $508,000 (Cal.Sup.Ct.) |
| 2000 | -$20,390,709 | 1. $2,651,772 (lender) | 1. $138,735,000 (NV Gaming) |
| 2001 | -$29,475,184 | 1. $2,854,954 (lender) | 1. $200,000,000 (testimony) |
| 2002 | -$3,300,000 | 1. $448,840 (1065 provided to lender);<br>2. $2,934,339 (lender) | - |
| 2003 | -$6,409,000 | 1. $507,648 (1065 provided to lender);<br>2. $2,946,902 (lender) | - |
| 2004 | none filed | 1. $172,624 (1065 provided to lender);<br>2. $3,258,465 (lender) | - |
| 2005 | none filed | 1. $310,292/month (lender)<br>2. $3,002,612 (lender)<br>3. $3,122,654 (lender) | - |
| 2006 | none filed | 1. $308,435/month (lender);<br>2. $3,004,088 (lender) | $468,425,000 (of art) (to lender) |
| 2007 | none filed | 1. $250,447/month (lender);<br>2. $250,276/month (lender) | - |

Defendant's statements regarding his income and wealth fall into separate categories.  In instances when the Defendant is applying for a loan his income and assets increase.  When the claimed income can result in a liability, the amount decreases.  This is evident from several examples.

1    First, all of Defendant's income tax returns report negative income since at least 1993.

2    Defendant's state returns simply report zeroes, whether or not appropriate, on every line.

3    Turning to the right-hand column in the chart above, Defendant's reported assets jump from $13

4    million in 1996 to $468 million in 2006, a net increase of $453 million, without ever reporting

5    positive income (to the IRS).

6    Second, the Defendant reported having a $136 million net worth to the Nevada Gaming

7    Commission in 1999 and 2000.[7]  Notably, between those submissions Defendant claimed his net

8    worth was $508,000 in a financial statement submitted to the California Superior Court.  That

9    statement was used to compute a fine.  The California Superior Court calculated his fine as a

10   function of his net worth, which was less than 1% of the amount provided to the Gaming

11   Commission.

12   Third, the Defendant gave lenders tax returns that report more income than those he

13   supplied to the IRS.  In one case, the Defendant supplied corporate tax returns to a lender that

14   not only reported positive income, but it is also inconsistent with the Defendant's failure to ever

15   file a corporate tax return with the IRS.

16   **C.    DEFENDANT'S POST-INDICTMENT CONDUCT.**

17   While the Defendant was released in this matter, and while awaiting trial, he engaged in

18   numerous instances of misconduct.  First, the Defendant signed a voluntary bankruptcy petition

19   under penalties of perjury indicating that his business bank account was closed.  That account

20   was not closed.  The Defendant then diverted payments due to his other entities (and creditors) to

21   the supposedly closed bank account.  (Dkt. No. 86).

22   Second, the Defendant made false statements to, or about, this Court.  In order to modify

23   his release conditions, he signed a declaration stating he needed to "open" a shopping plaza that

24   had been operating for years.  Moreover, the Defendant sold the property in 2002 as noted in

25

26   _____

     [7]Defendant's submissions to the Nevada Gaming Commission were made under penalties

27   of perjury.

28

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*                    -6-

Count 3 of the Indictment.  Next, the Defendant testified at a bankruptcy hearing that this Court issued an order authorizing him not to file tax returns.  He mentioned the Court by name despite no order being issued by the Court.  As related to that claim, a debtor that is delinquent in tax filings may not proceed in bankruptcy.

Lastly, the Defendant told this Court his he had no means to pay an attorney and had no assets.  However, in December 2009, the Defendant filed an adversary action in bankruptcy court requesting the return of artwork he purchased for more than $1 million in 2003.  (Dkt. No. 86).

## II.   THE SERIOUS NATURE OF DEFENDANT'S OFFENSE CONDUCT

Title 18, U.S.C. § 3553(a)(1), requires that "the nature and circumstances of the offense" be considered in sentencing.  As detailed below, the nature and circumstances of Defendant's offenses demonstrate that his crime is a not "garden variety" tax evasion case.  The Defendant willfully failed in his federal tax filing for more than a decade.  Nearly all of his tax returns were late, he left sales of large commercial buildings off the returns he did file, and at the same time he boasted about his wealth to others.

The tax matters aside, the Defendant also engaged in other financial misconduct.  He supplied lenders with letters from a non-existent tax service as late as 2006.  The signature on those documents, in the name of a security guard at his building, are forged.  The Defendant also supplied lenders with tax returns that were never filed, or were different from those he filed with the IRS.  Moreover, he was questioned by the Nevada Gaming Commission about all these actions in 2000 - 2001.  In 2006, this (mis)conduct was repeated after their warnings.

### A.   DEFENDANT'S MISCONDUCT

The Defendant has bought and sold real estate from at least 1993.  The properties were all purchased using single-purpose entities that nominally held title to one property.  This included entities that purported to own the houses that Brugnara lived in from 1993 to the present.  The Defendant's treatment of those personal assets is troubling and, in part, forms the basis for the obstruction charges.

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*                    -7-

In January 2001, the IRS explicitly told the Defendant that "monies paid from the corporation bank account for the benefit of" Mr. Brugnara are all income. In addition, the Nevada Gaming Commissioners made similar statements and noted that he has lived his life by writing himself checks with the notation "supplies" while calling the payments business expenses, but not income. Many of these checks were written to his spouse, who used the "supply" checks to buy personal items, pay tuition, or go shopping. There is no question the checks were not for supplies. Brugnara's actions demonstrate that he is aware that placing ownership of exclusively personal assets in the name of a corporation does not transform the payments into deductible expenses. That is precisely the reason the payments are disguised as "supplies," and his homes are placed in the names of other entities.

Indeed, from 1993 forward the Defendant has owned each of his homes through a corporate entity. His "rent-free" lifestyle is not accounted for despite the fact that his homes were purchased for more than $10 million. There is no question he knew he was required to report the value of these assets either. He admitted to the Nevada Gaming Agents that he was required to report as income the fair rental value of his homes. Brugnara even gave a lender his tax return where he did just that, and supported that with own testimony. The problem with that claim is that the Defendant never reported the fair market value of the rent on his filed returns with the IRS. In that regard, the Defendant has willfully omitted payments of personal expenses from at least 1996 – the date he made that tax return.

This same line of misconduct also includes the Defendant's failure to report as income the payments for: (1) a $45,000 piano, (2) $19,000 elephant tusks, (3) $80,000 for a Mercedes in 2003, (4) $1.5 million for artwork in 2002 - 2003, (5) $1.5 million for San Jacinto Way houses he bought, (6) $3 million for personal property in Gilroy, or (7) his $8 million Sea Cliff home. In fact, the Defendant recently sold one painting for more than $4 million. But the payment related to the purchase of that artwork went unreported.

Along those lines, Defendant's lifestyle is grossly incompatible with his reported income.

He has not reported federal taxes due for a period of 20 years.  His tax returns give the false impression he is a pauper.  But he has also claimed that he purchased artwork valued at over $465 million.  Moreover, it is self-evident that someone living in an $8 million home in San Francisco, complete with a $80,000/month mortgage, has income.

In fact, the Defendant himself boasted in 2001 that he has a "$200 million net worth" and he "can sell [his] properties tomorrow, *pay capital gains* and have about $170 million in the bank."  As noted in the Indictment, that is exactly what the Defendant did in 1999, 2000, 2001, and 2002.  He sold numerous large-scale office buildings in San Francisco and Las Vegas.  He reported none of the sales.  However, his statements and actions show he did profit from these endeavors.

He told his own accountants that he sold the Mission and Market Street properties in 2000 at a gain of $7.2 million and $2.4 million, respectively.  (Nelson Decl. ¶3).  Defendant further told his accountants that he earned $12.5 million of gain from the sale of 490 Post Street.  (Nelson Decl. ¶4).  Moreover, he provided these figures in order to have his 2000 and 2001 tax returns prepared reporting the sales.[8]  The Defendant ignored their written advice telling him to report the sales.

Notably, the Defendant did more than ignore warnings from his accountants.  After getting advice from them showing his prior tax filings were inappropriate, he insisted they delete the letters conveying that message.  (Crowther Decl. ¶¶3-4).  But, on his own resume provided to a lender, the Defendant boasts purchasing and selling these properties.

The Defendant's misconduct is not limited to the failure to report those sales.  To the contrary, he engaged in other economic misdeeds.  As noted above, the Defendant was advised to file corporate tax returns, regardless of whether his entities earned any income.  In 2004, he even testified he understood he was obligated to file these returns and ignore that duty.  The PSR

---

[8]United States v. Daniel, 956 F.2d 540, 543 (6th Cir. 1992) (notice by CPA relevant to willfulness); United States v. Dack, 987 F.2d 1282, 1285 (7th Cir. 1993) (willfulness inferred from proof that a knowledgeable person warned defendant of tax improprieties).

1  notes the Defendant's action resulted in an estimated 30 violations of 26 U.S.C. § 7203.[9]

2       As related to the unfiled corporate tax returns, the Defendant actually supplied a lender

3  with corporate returns reporting positive income.  Along with those documents, the Defendant

4  supplied forged letters from a non-existent tax service.  The letters actually contain the name of

5  an individual who worked as a security guard in the Defendant's building who never operated a

6  tax service.

7       After being charged in this case, the Defendant testified under oath that this court

8  authorized him not to file tax returns.  That statement is materially false as the bankruptcy court

9  requires a debtor to file tax returns in order to proceed in bankruptcy.  Separate from those

10 misstatements, the Defendant also signed the bankruptcy petition indicating his corporate bank

11 account was closed, as required, when it was open and he misdirected payments to the account

12 (rather than the bankruptcy debtor-in-possession account).  This had the net effect of evading

13 creditors while the Defendant used the funds for his own personal benefit.

14      As recent as March 2010, the Defendant submitted a declaration that he needed to go to

15 Las Vegas to "open" a shopping plaza that he sold years ago.  In fact, the shopping plaza was

16 open from at least 2001, and the Defendant has no current interest in it.

17      **B.   GUIDELINES**

18      The PSR and the plea agreement calculate and adjusted offense level of 24.  That

19 corresponds to a sentence of 57-71 months.  The base level offense is calculated as 22 that

20 corresponds to a tax loss exceeding $1 million.  U.S.S.G. § 2T4.1.  That tax loss is computed in a

21 simple manner: the building that were sold were put back onto the Defendant's tax returns.

22 (Tonna Decl ¶¶5-14).  The only other adjustment made was to depreciation.  That adjustment

23 was made because the Defendant made no effort to report depreciation on a property-by-property

24 basis.  Moreover, his prior returns make clear that he was depreciating his homes, which is not

25

26      [9]IRC § 7203 punishes individuals who willfully fail to file tax returns.  Here, the Defendant
   testified he knew had to, but failed file corporate tax returns from at least 2001 for seven entities.

27 This conduct may form the basis for an upwards departure pursuant to U.S.S.G. § 4A1.3(E).

28

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*          -10-

1  allowed.  The depreciation changes allow the Defendant the full depreciation permitted for the

2  building he actually placed in service, and the adjustments are minimal.

3       Moreover, the IRS calculations allow the Defendant the full benefit of a loss

4  carryforward from 1998 and 1999.  The 1999 loss carryforward is reduced because the

5  Defendant also failed to report a building on that tax return.  (Tonna Decl. ¶¶ 4-10).  The final

6  calculations accept the remaining figures on the Defendant's tax returns for each year after

7  adding back the property sales.  The result is a tax loss of $2,465,764.72.  Were the Defendant

8  allowed a loss carry back from 2003, as reported on his tax return, the tax loss equals

9  $1,904,625.35.  (Tonna Decl. ¶14).[10/]  The difference has no impact on the guidelines, and the

10  Defense has no apparent objection to the lower figure being used.

11       The sentencing calculation also includes an enhance for obstruction of justice pursuant to

12  U.S.S.G. § 3C1.1.  There is not disagreement about the enhancement.  The Defendant testified

13  that he filed all of his tax returns on time.  The government submitted evidence showing that his

14  tax returns were mailed using stamps that were not created until after the returns were due.  The

15  Defendant's testimony was knowingly false.

16       Lastly, the probation report does not provide an adjustment for acceptance of

17  responsibility.  Indeed, such an adjustment does not appear warranted.  As noted in Comment 4

18  to U.S.S.G. § 3E1.1, an obstruction enhancement, while not precluding a reduction for

19  acceptance, indicates that extraordinary circumstances are necessary to warrant the reduction

20  when both § 3C1.1 and § 3E1.1 apply.  This is not such a case for several reasons.

21       First, the Defendant appears only to accept responsibility when it suits him.  In the last

22

23       [10/]The PSR recommends restitution in the amount of $2,466,764.  Restitution is typically a
civil liability and calculated differently from the tax loss computations.  The Defendant 2003 tax

24  return report a loss that, if carried back, wold reduce the civil liability to $1,904,625.35.  The
restitution should be fixed at that amount, which assumes the 2003 is correct.  Carry back losses are

25  not typically allowed in computing tax losses.  United States v. Valentino, 19 F.3d 463 (9th Cir.
1994).  However, because the lower figure resolves any objection, has no impact on the guidelines,

26  and is the appropriate restitution amount it may be used for tax loss purposes as most accurate
determination of the tax loss.  USSG § 2T1.1(c)(1)(A).  Stated simply, the defense takes no issue

27  with this figure.

28

*U.S.' Sentencing Memorandum*
*Case No. 08-222-WHA*          -11-

few weeks he has indicated a desire to proceed to sentencing and admit guilt as long as he is released.  Specifically, he stated he want to "settle" this case.  The Defendant knows, as the Court indicated, a guilty plea is not accepted unless a defendant is guilty.  But he is treating it as a bargaining chip.  For that reason, he has not accepted responsibility for his actions.

Second, the Defendant appears to take the position that prior testimony of guilt is a nullity.  That simply is not the case.  The Court told him, more than once, he cannot testify that he is guilty and simply recant without being subject to perjury claims.  That is exactly what he is doing.  For that additional reason, he has not accepted responsibility.

### III. DETERRENCE

#### A.  GENERAL DETERRENCE - RESPECT FOR THE LAW

The need for deterrence in this case is apparent.  The Defendant has been a tax cheat for over a decade.  He ignored clear warnings from his own professionals telling him to file corporate tax returns, report alternative minimum tax due, and the gains from the sales of the assets he sold or exchanged.  He did not just ignore them, the Defendant told them to "delete" the materials rending this advice and then ignored them.

The IRS and the Nevada Gaming Commission issued similar warnings.  At various times, he was told of the requirement to file corporate tax returns and that he needed to report payments related to personal expenses by his corporation.  The Defendant ignored those edicts.

Most notably, the Defendant advertised his wealth to others while reporting no positive income to the IRS for 20 years.  In loan applications, he claimed that he had hundreds of millions in income, artwork, and assets in order to purchase, *inter alia*, an $8 million home.  Defendant's dual claims or wealth and his pauper status cannot be ignored.  In fact, his inconsistent claims to lenders and the IRS indicated a need for specific and general deterrence for anyone willing to engage in similar conduct.

General deterrence is one of the prescribed goals of every sentencing, United States v. Pugh, 515 F.3d 1179,1194 (11th Cir. 2008), but it occupies an especially important role in

sentencing for criminal tax offenses, because criminal tax prosecutions are relatively rare:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch 2, pt. T, introductory cmt. See also United States v. Burgos, 276 F.3d 1284, 1290 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence").

In that regard, a term of imprisonment of 68-months should be imposed against Defendant to deter others and to promote respect for the law. Similarly a term that is completely non-custodial would fail to achieve that purpose. A purely non-custodial term would send a message that the punishment for criminal tax evasion and a civil tax case are no different. A taxpayer must pay taxes in either situation.

The Sentencing Recommendation 64-months does promote deterrence. The government believes a 68-month sentence is appropriate due to the misconduct that occurred after this case was filed. Specifically, the apparent willingness to file false financial statements in bankruptcy court, provide misleading information to this court, and hiding significant assets when the Defendant claimed he had no money. Moreover, a more strict sentence is warranted given the evidence demonstrating the Defendant prepared and gave to lenders corporate tax returns he never filed. As noted in the PSR, this would form the basis for an upwards departure and confirms the Defendant has engaged in numerous violations of 26 U.S.C. § 7203.

General deterrence in this case depends upon the public seeing some consequence for Defendant's crimes. General deterrence is achieved only if Americans who do honestly file and pay their taxes are assured that tax scofflaws will be imprisoned once convicted for their crimes.

The importance of imprisonment in tax cases was highlighted in United States v. Ture, where the Eighth Circuit vacated a non-prison sentence in a $250,000 tax evasion case because

1   the district court "failed to consider the importance of a term of imprisonment to deter others

2   from stealing from the national purse."  450 F.3d 352, 358 (8th Cir. 2006).  The admonition of

3   the Court of Appeals in <u>Ture</u> applies: "the goal of deterrence rings hollow if a prison sentence is

4   not imposed in this case."  <u>Id</u>.  Here , the need for a 68-month sentence is warranted.

## IV.  OTHER SENTENCING FACTORS

### A.   SUBSTANTIAL IMPRISONMENT WILL AVOID SENTENCING DISPARITY

7        Title 18, U.S.C. § 3553(a)(6), provides that one of the factors to be considered in

8   sentencing is "the need to avoid unwarranted sentence disparity among defendants with similar

9   records who have been found guilty of similar conduct."  When the sentencing guidelines were

10  promulgated, the goals included reducing the sentencing disparity between tax offenders and

11  reducing the number of probationary sentences.[11/]  The introduction of the Tax Table at U.S.S.G.

12  § 2T4.1 has helped to achieve this goal by placing defendants with the same tax loss at the same

13  initial offense level prior to any adjustments.  <u>See</u> <u>United States v. Cutler</u>, 2008 WL 706633 (2d

14  Cir. Mar. 17, 2008) (the need for deterrence, and for imprisonment, increases as the tax loss

15  increases, citing U.S.S.G. § 2T1.1 (background)).

16       The Defendant should not avoid substantial imprisonment based upon a claim that

17  imprisonment would impede his ability to pay the tax debt.  First, such an impediment is

18  common to most defendants and thus is not an atypical factor warranting leniency.  Second, such

19  a result would clearly be bad policy.  If prison sentences decreased as the amount of tax loss

20  rose, the lesson would then be that the more you cheat, the more lenient your sentence.  The

21  opposite, however, should be true.  <u>See</u> <u>Ture</u>, 450 F.3d at 359.  Third, elevating the goal of

22  collecting defendant's tax debt at the expense of imprisonment is inconsistent with the fact that

23  the United States, which was the victim of defendant's crimes and would be the recipient of any

24  tax payment, elected to prosecute this matter as a criminal (not civil) case.

---

[11/]The sections of the guidelines applicable to tax offenses were "intended to reduce disparity in sentencing for tax offenses[,] ... to somewhat increase average sentence length," and to reduce "the number of purely probationary sentences."  U.S.S.G. § 2T1.1, cmt. background.

**B.    "SUFFICIENT, BUT NOT GREATER THAN NECESSARY"**

Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Application of the phrase "sufficient, but not greater than necessary" to a particular defendant's situation does not produce one single "correct" term of imprisonment, nor mandate a rule that a defendant should be sentenced at the bottom of a calculated range.  That conclusion follows from the interdependence of a district courts' obligation to impose a sentence that is "sufficient, but not greater than necessary," and an appellate court's obligation to review sentences for reasonableness.  Just as "reasonableness" is a range, not a single point, United States v. Cunningham, 429 F.3d 673, 679 (7th Cir. 2005), so is a sentence that is "sufficient, but not greater than necessary."  For the reasons set forth above, a sentence of at least 68-months imprisonment, and a fine of $100,000 is by no means "greater than necessary" to achieve the purposes of sentencing as to defendant.

**V.  IMPOSITION OF A FINE**

The fact that defendant remains liable for his civil tax obligations does not reduce the appropriateness of a criminal fine.  The two are distinct and have different purposes.  See United States v. Rosin, 2008 WL 142037, No. 06-15538 (11th Cir. Jan. 16, 2008) (Because the goal of restitution is to compensate victims for their losses, while the goal of forfeiture is to punish, the fact that "[t]hat a defendant may ultimately be ordered to pay in restitution and forfeiture more than he took is of little consequence").

## VI. CONCLUSION

WHEREFORE, the United States respectfully urges the Court to punish defendant by imposing a 68-month term of imprisonment, a $100,000 fine, and $1,904,625.35 restitution.

Respectfully submitted,
JOSEPH P. RUSSONIELLO
United States Attorney


*/s/Thomas M. Newman*
THOMAS M. NEWMAN
Assistant United States Attorney
Tax Division