BRIAN H GETZ, ESQ. (CSBN 85593)
LAW OFFICES OF BRIAN H GETZ
44 Montgomery Street, Suite 3850
San Francisco, CA 94104
Telephone: (415) 912-5886
Facsimile: (415) 438-2655

Attorneys for Defendant
LUKE BRUGNARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LUKE BRUGNARA, <br><br> Defendant. | Case No. CR 08-0222-WHA <br><br> **SENTENCING MEMORANDUM OF DEFENDANT BRUGNARA** <br><br> Date: May 4, 2010 <br> Time: 2:00 p.m. <br> Ctrm: Courtroom 9, 19th Floor |

## INTRODUCTION

### *PRESENTENCE REPORT PARAGRAPHS 83-84*

Luke Brugnara is a dedicated and loving family man to four school-aged children: Luke Jr. in 8th grade, Vincent in 5th grade, Lavern in 3rd grade, and Brianna in 1st grade. Defendant married his college sweetheart Kay the year after they graduated in 1989. They have been happily married for twenty years. Defendant's family is very close. Defendant and Kay spend their free time with their children, engaging in walks and hikes, going to museums and bookstores, throwing and hitting the baseball, dining out, and watching productive television shows. Defendant helps his children with their homework and makes them lunch in the morning. Defendant coaches his son's Little League baseball team which won a championship game. Defendant dedicates his life to his wife and children and cares for them deeply.

# HISTORY

## *PRESENTENCE REPORT PARAGRAPHS 85-86*

Defendant was born in San Francisco October 18th, 1963 to Victoria and Alex Brugnara. Alex Brugnara worked at Juvenile Hall in San Francisco for thirty-six years, from 1959-1995, as a protection officer and then a supervisor. Alex was an accomplished artist who gave away all of his drawings and printings for free. Alex loved art and passed on that love to his children. Alex also loved to hike. Alex died in a head on car crash years after he retired in 1997 in Napa County on Highway 29. Defendant's mother, Victoria, was a housewife until her children graduated from high school. After receiving her teaching credentials, Victoria taught 5th grade for twenty-five years and was a loved and respected teacher during that time. Victoria (Vickie) is a dedicated mother and grandmother and is well known in San Francisco for her charity work at homeless shelters.

Defendant has two brothers and one sister. Alex Brugnara Jr., who is two years older then Defendant, has been a Federal Agent with the NSA/Customs for the last twenty years. The second brother, Eric, is one year older than Defendant and is currently unemployed. Alex is married to Elizabeth Lee, a Superior Court Judge in San Mateo, and they have one child. Eric is unmarried. Defendant has a strained relationship with his brother Alex which goes back several years. Defendant's relationship with Eric is "off and on" good but for the most part is generally good. Defendant also has a sister, Kristen, who is six years younger than Defendant. Kristen is the Director of Exhibits for the De Young and Legion of Honors Museum in San Francisco. Kristen has held that position for ten years and was previously employed at the Getty Museum in Malibu. Kristen is not married, has no children, and currently lives with her mother Vickie and Eric. Defendant has a very good relationship with Kristen and his mother Vickie. Defendant had a very good relationship with his father Alex. Defendant's uncle was Chief of Police for San Francisco, and Defendant's great uncle was Attorney General for California.

Defendant attended Holy Name Elementary and St. Ignatius High School in the Sunset District. Defendant was on the student council at Holy Name and was an "A" student. Defendant was an accomplished tournament fly-caster representing the Golden Gate Casting Club in National and International casting competitions in his teenage years. Defendant still holds casting accuracy records for the American Casting Association. Defendant was also excellent in track and field in grade school and high school, setting records in the long jump in high school. Although broken, these records still list in the top three after thirty years. Defendant attended San Diego State University and was involved in track. Defendant took 2nd place at the NCAA Division I WAC championships in the

1987 400 meters. Defendant was a good athlete and very good student in college and received a degree in Communications in 1988. Defendant met his future wife Kay at San Diego State University in 1986 and they were married in December 1989, a year after graduation. Defendant briefly attended law school for a year, 1988-1989 at San Francisco Law School, but chose to begin working at a private mortgage company later that year.

### DEFENDANT'S WORK HISTORY
#### *PRESENTENCE REPORT PARAGRAPHS 99-101*

Defendant placed private investors into private deeds of trust in 1990 and 1991. Defendant met and provided valuable opportunities to many investors and they appreciated Defendant's hard work. One TD investor, Harry Blumenthal, took a particular liking to Defendant. Blumenthal was a well-known philanthropist in San Francisco. He donated the funds to build the Koret Center at USF and the Jewish Community Center. Blumenthal lent Defendant the funds to purchase his first office building/commercial property in 1992, a 100,000 sq foot office/retail building at 939 Market Street. Defendant purchased the note from the RTC holding company at a 90% discount with Blumenthal making the new loan. Defendant quickly leased up the property in a few months and refinanced, providing a handsome return for Blumenthal. Blumenthal then provided additional funds to Defendant to help purchase more office buildings at distressed prices. Blumenthal would provide the gap-equity loans to facilitate the purchases. Defendant purchased six office buildings worth tens of millions of dollars in the first year, 1993-1994. Blumenthal was paid a 25% interest rate for his loans. Another equity lender named David Pick, from Beverly Hills, also lent Defendant equity funds at similar rates from 1994-2004. Both Pick and Blumenthal were astute businessmen and earned huge returns from Defendant.

Fortunately for Defendant the office/commercial market rose 400% from 1993-2001. Defendant had bought a dozen offices and retail properties in San Francisco and sold several of them to consolidate in 2000-2002.

### DEFENDANT'S LAS VEGAS PROJECTS
#### *PRESENTENCE REPORT PARAGRAPH 21*

Defendant purchased the Silver City Casino in Las Vegas in October 1999 at the suggestion of his broker George Connor who had recently opened a Collier International office in Las Vegas. The property was on eight acres on the strip and had a small mall as well. Mandalay Bay, then Circus Circus, was leasing the casino, but told Defendant it was upgrading its image with the 2000 opening of Mandalay Bay Casino and was not going to renew the lease. Defendant applied to the

Nevada Gaming Commission to open the Silver City Casino himself once the Mandalay Bay lease expired in November 1999. Defendant did not realize at the time that Silver City Casino was the last " parasite casino" on the strip (a casino that has no rooms and "feeds" off the room-base customers of other casinos), and that the casino owners and gaming commission had no intention of letting anyone open Silver City Casino. Defendant hired John Moran, formerly on the gaming commission and Lt. Governor, and was not successful in getting the license to open Silver City. Defendant was given the opportunity to withdraw the application at the hearing, (an offer never previously given to anyone by the gaming commission), yet Defendant chose to continue forward for "the principle of the matter" because he was qualified. Moran suggested Defendant withdraw the application, as did esteemed architect Lee Pinton who drew the designs for the improvements to the casino for Defendant, as they both knew that gaming did not want Silver City opened any longer "feeding" off the room – customers of the surrounding casinos.

After not receiving the licenses, Defendant signed a lease with Walgreens & Ross and sold the property to a New York City investment firm in 2002. Defendant sold most of the San Francisco office buildings by 2004. Defendant owned and operated 351 California Street for twelve years before transferring ownership to his lender in 2009 due to the recession. Defendant also purchased a large 200 acre parcel in Gilroy in 2001 which was a mini-nature preserve full of wildlife, flora & fauna. The property has a one-hundred and forty year-old stone dam built by US Senator Henry Miller that was the only remaining grandfathered dam remaining in the Bay Area/Northern California. Defendant purchased that property to preserve the natural beauty of it, keep it free from development, and to show and teach his children about the animals and flora on the property, including ancient sycamore and oak trees. Defendant unfortunately had to sell that property in 2009 to satisfy creditors during the reorganization bankruptcy. That property's dam was the focus of the Federal case currently pending.

### DEFENDANT'S RECENT BUSINESS VENTURES
#### *PRESENTENCE REPORT PARAGRAPHS 102-106*

Defendant maintains an excellent relationship with his lenders who have lent him in excess of $800,000,000.00 since 1992. Defendant is able to arrange purchase of properties in excess of $100,000,000.00 with his current support of lenders and financial friends. This puts Defendant in a select group of such commercial real estate investors on the West Coast.

//

//

## THREATS CLAIM
### *PRESENTENCE REPORT PARAGRAPHS 61, 62, & 80*

Defendant was arrested outside Judge Chesney's courtroom following a hearing over an alleged "threat" against a witness. Defendant had been on O.R. awaiting the trial for nearly two years. It was soon learned that the witness who had made this claim was Defendant's brother-in-law who had a ten year grudge against Defendant because Defendant kicked him off the Gilroy property. Defendant caught his brother-in-law cutting down ancient Oak trees for firewood on the property and stealing items from the house. Defendant took back the keys and banned him from the property.

## CRIMINAL HISTORY
### *PRESENTENCE REPORT PARAGRAPHS 51-55*

In 1982, someone placed batteries in Defendant's book bag at an on-campus store at San Diego State University. The bag was left at the entrance to the store. Defendant was stopped after he made a purchase in the store and told to open his book bag where the batteries were found. Defendant cooperated with the officers which led to the individual who put the batteries in the back pack and Defendant was cited for trespass. To this date, Defendant asserts he never knew of the batteries in his backpack. Defendant received unsupervised probation.

In 1989, 21 years ago, Defendant was learning to accurately pistol shoot because several members of the accuracy fly casting team at the Gold Gate Casting Club were taking up competitive accuracy shooting. Defendant was transporting the registered gun improperly in the glove box, instead of the trunk of his car. Defendant was pulled over for accelerating through a yellow light and when he provided insurance and registration the officer asked about the gun and explained that it had to be transported in the trunk and arrested Defendant. Defendant received unsupervised probation.

In 2000-2001, ten years ago, Defendant was arrested for violation of a restraining order resulting from an extortion/shakedown attempt against Defendant by a woman claiming Defendant was the father of her child. Ms. Riggs was a drifter from Texas who has three children by three different men and targeted Defendant after reading about him in SF Magazine and the newspapers. Ms. Riggs demanded $1,000,000.00 from Defendant prior to the birth of the child. Defendant's Attorneys Jill Hersch and Robert Kane told Defendant to pay temporary alimony until the child was born so he could sue for a blood test to prove the child was not his. After the child was born, Defendant sued Ms. Riggs and the hospital for two blood tests and Ms. Riggs refused, instead choosing to drop her claims against Defendant. During this period Ms. Riggs did obtain a restraining order against Defendant. When Defendant went to his mother's house one day Ms. Riggs was outside

trying to see Defendant's mother. Defendant's brother Eric, who has always lived with his mother, was tricked by Ms. Riggs into believing that the child was Defendant's. Defendant was arrested for violating the restraining order. Defendant received unsupervised probation.

## INTERESTS
### *PRESENTENCE REPORT PARAGRAPH 98*

Defendant enjoys writing and photography due to his family's life long dedication and interest with the arts. Defendant co-helped design the twenty-four story hotel/casino Tycoon in 2003 in Las Vegas with renown architect Lee Pinton. The design was approved by Clark County Commission in 2003 and is in the pre-development stage. Defendant is an accomplished piano player and enjoys writing music. Defendant is an art collector with a particular interest in Old Masters. Defendant is well schooled in all of the fine arts from contemporary, impressionist, American photography, old masters, modern and 19th Century. Defendant enjoys reading non-fiction, historical, art books and nature books.

Defendant is a long time member of the Olympic Club and Golden Gate Casting Club. Defendant is a long time supporter of Catholic Charities which serves all faiths in the Bay Area. Defendant was the main sponsor of two of their fund raisers providing $100,000.00 sponsorship. Defendant has provided substantial rent abatements and discounts to numerous non-profit agencies at his properties for the past 15 years, including Catholic Charities Cartoon Art Museum Center for Biological Diversity, Tuberculosis Treatment Center, and other non-profits totaling over $1,000,000.000.

## CRIMINAL HISTORY COMPUTATION
### *PRESENTENCE REPORT PARAGRAPHS 56-58*

Guidelines Section 4A 1.3 provides that there may be cases where the court concludes that a defendant's criminal history category over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. The Guidelines give the example of a defendant with two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

Here, the Court may conclude that Defendant's criminal history Category II over-represents the seriousness of his criminal history. His misdemeanor convictions are stale and the two added points for commission of the instant offense while under a criminal justice sentence are connected by the thinnest of threads (Probation commenced 7/31/02, current offense conduct 2/17/04).

The Presentence Report Addendum under Paragraph 5 raises the issue of under-representation

of criminal history, but that possibility is tied to civil rather than criminal conduct. Under California's combination of Civil Code and Penal Code, restraining orders can issue under either civilly or criminally. The paragraph 55 restraining order issued in a criminal case. However, the paragraph 5 reference to under-representation rests on paragraphs 60, 62, and 64 through 77. Paragraph 62 was addressed in the Threats Claim portion of the filing, a dormant investigation that was resolved by guilty pleas to the two pending cases. Paragraphs 64 through 77 address civil restraining orders except for the overlap with the paragraph 55 subject matter.

Simply stated, the issuance of a civil restraining order should not form the basis of a finding of under-representation of criminal history category, even under the circumstances here. Where threats or the issuance of a civil restraining order could have been treated criminally but were not, it is improper to incorporate the civil event into the criminal case sentence fashioned by this Court.

## THE TAX LOSS

### *PRESENTENCE REPORT PARAGRAPHS 25-26*

Since the return of the indictment in this matter, Defendant has had the opportunity to employ forensic accountants for the purpose of establishing whether a tax loss occurred, and if so, how much. At the formal meet and confer with the Federal Probation Officer, the findings of the defense expert were discussed but not in the form of a final presentation. As a result, Paragraph 2 of the addendum correctly notes that an evidentiary hearing was to be the subject of our request.

Our expert has continued to study the loss calculation of the government and has conferred with government accountants and tax experts. As a consequence, we are in agreement with page eleven line 9 of the Sentencing Memorandum filed by the United States identifying the tax loss as being $1,904,625.35.

## FINANCIAL CONDITION-ABILITY TO PAY

### *PRESENTENCE REPORT PARAGRAPH 102-106*

While it is true that Defendant declined to provide financial information as noted in paragraph 102, the bankruptcy proceedings involving Brugnara business entities make accurate financial disclosure difficult, and likely to raise more problems than would be solved. Charges of bankruptcy fraud have consistently been part of the discussions leading to sentencing and are referred to in paragraph 13 of the Change of Plea Application submitted to Judge Chesney. Accordingly, declining to submit financial information should be viewed as a practical choice rather than a tactical decision.

Insolvency exists where outstanding loans and obligations exceed the value of presently-held equity. At the formal meet-and confer, defense counsel submitted that Brugnara is insolvent, a

comment noted in paragraph 106. Given the exchange of information that has occurred recently between government and defense experts, it may be that the United States agrees with our position. We invite the Court to inquire.

In any event, should this Court order restitution as anticipated, the amount would further reflect the fact that Defendant owes more money than he has. As such, he is insolvent and unable to pay a fine.

## ACCEPTANCE OF RESPONSIBILITY
### *PRESENTENCE REPORT PARAGRAPHS 29-35, 45*

Paragraphs 29 through 35 correctly recite the history of this case. We disagree with paragraph 45. Even conviction by trial does not automatically preclude a defendant from consideration of a two-level reduction. Comment 2 3E1.1. Significant evidence of acceptance of responsibility may be found where Brugnara entered a guilty plea and truthfully admitted the conduct comprising the offense of conviction (as described in paragraphs 29 and 31). The Court is poised to sentence Defendant based on the paragraph 31 proceedings, the Change of Plea on January 27, 2010. While a defendant who enters a guilty plea is not entitled to this adjustment as a matter of right, we are requesting it on the basis of fairness since the sentencing hearing is a product of the paragraph 31 allocution. As shall be shown below, there should not be an enhancement for obstruction of justice, and therefore no basis for denying an acceptance adjustment.

## OBSTRUCTION OF JUSTICE
### *PRESENTENCE REPORT PARAGRAPH 27, 28, 43*

Defendant submitted late tax returns each year (See, Presentence Report paragraphs 13, 14, 22). Brugnara did not perfect his tax filings which were the subject of the testimony under oath referred to in paragraph 27. That, however, is inadequate to comprise obstruction of justice within the meaning of 3C1.1. At the time of his testimony, Defendant believed that his filings were within the range of an acceptable schedule, even though they were late. Brugnara was wrong, but absent willful intent to deceive, obstruction points should not be added. Failure to comply with the Tax Code is not obstruction, and inaccurate testimony based on faulty understanding is not perjury.

There is the additional consideration of determining the precise statement supporting the finding of obstruction. Neither the Presentence Report nor the Sentencing Memorandum filed by the United States offer it. The May 31, 2000 testimony before the gaming commission is 143 pages of sworn statements. In order to properly address this issue, the page and line number should be identified for discussion.

## VOLUNTARY SURRENDER

### *PRESENTENCE REORT SENTENCING RECOMMENDATION*

Page three of the Sentencing Recommendation appended to the Presentence Report states that Defendant is not considered to be a good candidate for voluntary surrender.

Review of the two plea agreements in the two pending matters before this Court and Judge Chesney reveal that the government agreed to recommend voluntary surrender as part of the plea agreement. Brugnara expects the government to honor this agreement.

## BAIL PENDING APPEAL

As of this filing, the Court has not yet ruled on Defendant's Motion to Withdraw Guilty Plea. Bail pending appeal will be under consideration by Defendant in the event that the motion is denied.

DATED: April 30, 2010

Respectfully submitted,

LAW OFFICES OF BRIAN H GETZ

BRIAN H GETZ
Attorney for Defendant
Luke Brugnara