Pages 1 - 107

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| United States of America, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 08-0222 WHA |
| | ) | |
| Luke Brugnara, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Monday |
| | ) | May 24, 2010 |
| _____ | ) | 10:06 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**            U. S. Attorney's Office
                            450 Golden Gate Avenue, 9th Floor
                            San Francisco, CA  94102
                            (415) 436-6888
                            (415) 436-6748
                    BY:  **THOMAS NEWMAN**


**For Defendant**            Brian H. Getz
                            44 Montgomery Street, Suite 3850
                            San Francisco, California  94104
                            (415) 912-5886
                    BY:  **BRIAN H. GETZ**


Reported by:        Lydia Zinn, CSR #9223, RPR, CRR
                    Official Reporter - U.S.D.C.

```
 1            THE COURT:  All right.  Welcome, everyone.  Please
 2   have a seat.
 3            THE CLERK:  Criminal Number C.R. 08-222,
 4   United States versus Luke Brugnara.
 5            Counsel, please state your appearances.
 6            MR. NEWMAN:  Good morning, your Honor.  Tom Newman,
 7   on behalf the United States.
 8            MR. GETZ:  Brian Getz, for Luke Brugnara, in custody.
 9            MS. SEARLES:  Good morning, your Honor.  Ann Searles,
10   on behalf of the U.S. Probation Office.
11            THE COURT:  All right.  Welcome to everyone.
12            MR. GETZ:  Your Honor, Mr. Brugnara is present before
13   the Court.
14            THE COURT:  All right.  Mr. Brugnara, welcome back.
15            We're here for sentencing after a plea of guilty.
16            Mr. Brugnara, did you read the presentence report?
17            THE DEFENDANT:  Yes, your Honor.  And I have a letter
18   here that -- you know, I've been in solitary confinement over
19   at the Oakland Jail; been unable to have access to a phone or,
20   for that matter, even a shower, though maybe twice a week.  I
21   don't know if you were aware of that, but I've been unable to
22   communicate with anybody.
23            I wrote a letter to you last Thursday that I'd like
24   to hand to you.  And it pretty much explains about last week.
25   There was a series of filings that were filed in your court.
```

1   Do you see that?

2               THE COURT:  I did.

3               THE DEFENDANT:  Would you like me to read this

4   letter, or would you like me to hand it to you?

5               THE COURT:  I don't think that's necessary.  That has

6   to do with -- release out of custody on O.R. is what you were

7   requesting, correct?

8               THE DEFENDANT:  No.  This letter basically explains

9   what led up to the filing of those motions in your -- in your

10  court.  I'd like to read it, if I may, or I can hand it to you;

11  whatever you prefer.

12              THE COURT:  Just hand it to me, please.

13              (Whereupon a document was tendered to the Court)

14              THE DEFENDANT:  And these exhibits, please.

15              (Whereupon a document was tendered to the Court)

16              THE COURT:  All right.  Mr. Getz, have you seen

17  these?

18              MR. GETZ:  No, I haven't, but I'm aware that

19  Mr. Brugnara feels the record is woefully inadequate with

20  regard to the request for the evidentiary hearing pertaining to

21  the tax loss.

22              THE COURT:  All right.  The letter begins,

23                  "Dear Judge Alsup, This letter shall

24              affirm that Brian Getz was released as my

25              attorney a week and a half ago because he

```
 1              has had no communication with me for weeks,

 2              and did not file the required declarations

 3              and motions."

 4         It goes on in that vein.  And then later on, he asks

 5    for relief -- O.R. relief.

 6              THE DEFENDANT:  Your Honor.

 7         THE CLERK:  That was this prior he sent in

 8    (indicating).

 9         THE COURT:  All right.  Just to be -- there's a prior

10    letter here.

11              There was a separate letter that was asking for O.R.

12    relief.  So there are two separate letters.  The one dated

13    May 17 is the O.R. one.  May 21 is the one about the tax point.

14         THE DEFENDANT:  Your Honor, I had the opportunity to

15    speak to Mr. Getz for the first time in a considerable period

16    of time, before court began.  And I believe we've made some

17    headway on his concurrence with my opinion on tax loss, which

18    is -- as you know, has remained constant for two years; that

19    there is no tax loss, irrespective of the plea.  As you know,

20    the plea is completely separate from the tax-loss issue.

21              And, in fact, when the plea was taken into your

22    court, you had indicated to me you would allow me to speak

23    freely about whatever I wanted to, especially a tax loss,

24    because I was concerned at that time that the U.S. Attorneys

25    might, in fact, try to increase that number, even though I said
```

1  that they had been straight shooters for two years, and I

2  didn't expect it; but well, to no great surprise, they

3  increased the number 800 percent.  And, your Honor, I know

4  you're a mathematician.  An 800 percent increase from what was

5  the number for one year from May of 2009 through January 26,

6  2010, they took it up from $300,000 up to 2-million-4.

7           And you know what?  If that was in the civil world,

8  in business, that person would be shown the door for bait and

9  switch.  They'd be sued.  They might even have a criminal

10  action brought against them, because that's just not done.

11           I've done business at the highest level for 17 years.

12  And if there's a contingency issue, it might be 5 percent.  It

13  might be 10 percent.  Heck, it might be 20 percent.  It's not

14  800 percent.

15           So it's not a great surprise that they modified that

16  number after I was taken into custody, your Honor.

17           Your Honor, I was on O.R. release for two years, as

18  you know, in this court and in Judge Chesney's court.

19           And I was taken into custody based on a false claim

20  of threat that wasn't even able to produce an indictment.  That

21  was refuted in Judge Chesney's court by, apparently, one of the

22  parties that had -- it came from.  And it was, in fact, deemed

23  a false threat.  It wasn't even worthy of getting an

24  indictment.

25           And from that, unfortunately, came out this plea.

1          As you know, I have maintained my position of

2   innocence for two years in both the cases.

3          And, because of the circumstances, how sick I got in

4   the custody not of myself or of family members, but in the care

5   and custody of that jail -- I got deathly ill.  And that is

6   fact.  And nobody's refuted that fact.  I told the Pretrial

7   Services Officer, Rich Sarlatte, first time I spoke to him.  I

8   phoned my medical doctor the second I got out of that jail.  I

9   lost ten pounds in four days.  Your Honor, I put that in a

10  revised declaration.

11         And I also put it in a revised declaration to you on

12  the motion for reconsideration of plea withdrawal, which you

13  have not ruled on yet, which would make this hearing today

14  moot.

15         Details about Harris Taback's ineffectiveness as

16  counsel, which -- in your ruling, you were very specific that

17  you couldn't rule upon those issues, because it wasn't

18  presented in the form of a declaration or sworn testimony by me

19  at the request for motion for withdrawal of the plea.

20         So the filing for reconsideration of the motion for

21  withdrawal of the plea included a very detailed explanation of

22  what occurred between November 3rd, when I stood here with

23  Mr. Taback and told you that he was great, and that I loved

24  him -- as you probably remember that conversation, too.

25  Harris Taback is an amenable fellow.  And up to that point, I

1  had no reason to believe that he wouldn't do a good job.  He

2  had been paid up to that point $67,000.

3         Well, Harris Taback went on to tell you,

4  your Honor -- and he also said the same thing in

5  Judge Chesney's court the next day -- he needed more money.  He

6  needed more money for private investigators, and he needed more

7  money for expert witnesses:  The two critical things he needed

8  for the trial.

9         And you said to me, "Hey, Mr. Brugnara, I don't know

10  about you, but if I were you, I would get him that money,

11  because I don't want you coming here saying that, hey, after

12  the fact, 'We weren't prepared at trial because'" -- and you

13  can read this in your own -- your own transcripts; that -- that

14  Harris Taback didn't have the money to pay for these private

15  investigators and expert witnesses.

16         More interestingly, in Judge Chesney's court the very

17  next day, he made the same plea to Judge Chesney, and actually

18  was much more specific; said, "I need $7,000."  Gave her an

19  actual numerical amount -- $7,000 -- for expert witnesses and

20  for private investigators to review the defense witnesses that

21  they had proposed.  So we had a specific number in front of

22  Judge Chesney.  I believe he said it was around $10,000.

23         Well, your Honor, I didn't speak to Harris Taback for

24  two months, from November 3rd to January 3rd.  I tried to reach

25  him.  I tried phone him.  I tried to contact him.  He wanted

1    nothing to do with me.

2           So, from this love fest that was prior to

3    November 3rd, when he told you he was no longer going to work

4    on the case anymore -- he said, "I'm not working in this case

5    anymore," in so many words, to you.

6           And you said, "Well, listen.  Has he done a good job

7    up to that date?"

8           I said, "Absolutely."  I was shocked.  I thought it

9    was grandstanding on his part.  I thought it was a way that he

10   was going to try to, you know, strong-arm the Court into, you

11   know, letting him be released.  I have known Taback for nine

12   years.  I never expected that Harris Taback would not take my

13   calls --

14          Can I have a sip of water?

15          -- but he didn't.  And it went on for two months.  So

16   I finally contacted -- and this is in my declaration,

17   your Honor, or you can take my sworn testimony, if you want,

18   right now.  It's in my declaration.  When I told him I had the

19   money for -- I -- I got a call back in five minutes.  Five

20   minutes.

21          And he said, "Okay.  I'll see you tomorrow."

22          Went down to his office.  I said, "Here's the money

23   for the expert witnesses.  Here's the money for the private

24   investigator."  Now it's up to $29,000.  Because he was 67, I

25   gave him $25,000.  And I said, "This is what you said you

1    needed for Judge Chesney and Judge Alsup.  Here it is."  And

2    you've got to remember that the court date's in two weeks.

3    That's a big chunk of money to give to him for these private

4    investigators.  It covered the full amount due for the

5    investigation and the expert witnesses.

6           Well, guess what.  Harris Taback didn't spend a penny

7    of that $25,000 on expert witnesses or private investigators.

8    And that's huge, because he lied to the Court.  He represented

9    to you and to Judge Chesney in court on the transcript, "I need

10   $7,000, your Honor, to represent my client, Luke Brugnara, and

11   to do the best job that I'm required to do under, you know, the

12   federal court system.  I need $7,000."

13          Now, that's a lie, because he never intended on

14   taking that money and using it for my benefit, because I paid

15   it to him -- or maybe it wasn't -- I don't know, but the fact

16   is he didn't have any expert witnesses and he didn't have any

17   investigation done.

18          I gave Harris Taback, your Honor -- and this is in my

19   declaration; the supplemental declaration -- a list of 20

20   witnesses to contact:  Ten for your case, a ten for the fish

21   case.

22          I said, "Harris, here's the money."

23          And, your Honor, you know me after two years.  I'm a

24   frugal businessman.  You know, I have to run things; pay my

25   lenders.  So I'm very thorough.  I said, "Here's the money."

```
 1              I gave him a typed-out list, printed out from a
 2   computer.  Here's ten witnesses in each case.  These are my
 3   witnesses that will defend my position in the tax case.  It was
 4   my brokers.  It was my lenders.  It was my witnesses that --
 5   that would promote my position.
 6              And in the fish case, it was conservationists.  You
 7   have to understand that I've been a fly caster -- an accuracy
 8   fly caster -- my entire life, since I was ten years old.  I
 9   actually was involved in fish-conservation efforts from the
10   time I've been a child, actually, helping streams.  And I
11   had --
12              THE COURT:  But this is -- you're not helping
13   matters, getting off into any of the --
14              THE DEFENDANT:  Okay.  I won't get off, but the
15   specifics is:  Taback didn't spend any money on it.
16              So we came to trial.
17              And the other thing is very important.  The
18   psychiatrist's report that was basically going to be used to
19   impeach that I was out of my mind.  And I never held a position
20   that I was mentally ill.  I'm not, and I never have been; but I
21   was so physically sick and ill on that day, this -- I certainly
22   wasn't of sound mind.  I had a fever.  I had chills.  I had
23   diarrhea.  And, your Honor, you know, if you're sick, you don't
24   come to work.  If you're sick, you don't go to school.  I have
25   four school-aged children.  They're kept home for a reason; not
```

1  just because they'll get other people sick; because they can't

2  function at the level they need to.  I was sick.

3        Notwithstanding that fact, I said, on this

4  eavesdropped telephone conversation that was put into your

5  record, because you made the Kessler psychiatrist's report part

6  of your record, that -- I said to my mother, "I have no

7  confidence in Taback.  He's not prepared at all.  And I'm

8  innocent of the charges."

9        And God bless Dr. Kessler for putting that in his

10  report, because I think he put it in his report for a reason,

11  to let the Court know:  Here's Luke Brugnara, telling his

12  mother, literally hours before your plea, "I am innocent.  I

13  have no confidence in Harris Taback, and he's unprepared."

14        I made the same phone call to my wife.  And I

15  reiterated the same things:  I have no confidence in

16  Harris Taback; he's unprepared; I'm going to represent myself;

17  and I'm innocent.

18        And this was an eavesdropped, recorded telephone

19  conversation; the most honest source of information you could

20  probably get.  It's an eavesdropped call that was recorded,

21  unbeknownst to me.  And here it is now, of the record.

22        Now, the threshold in the Ninth Circuit, as you had

23  indicated, is a liberal threshold.  Again, I'm not an attorney.

24        **THE COURT:**  I let you take back your guilty plea

25  once.

```
1              THE DEFENDANT:  I understand that, your Honor.

2              THE COURT:  Now you want to do it twice.

3              THE DEFENDANT:  You know what, your Honor.  You know

4    what, your Honor.  I'm going to tell you something, with all

5    respect for you.

6              MR. GETZ:  Don't.

7              THE DEFENDANT:  No, no.

8              I apologize for that, your Honor.

9              I've been locked down.

10             I respect you.  In fact, if I listen to some of the

11   other eavesdropped conversations, because they've saved all of

12   them, I talk about my respect for you, and how fair you are;

13   about your appointment; who appointed you; where you're from,

14   and who you are.

15             I believe there are judges that do what the

16   U. S. Attorneys tell them.  I do not believe you're that

17   person.

18             I think you rule fairly and justly.  And I'll tell

19   you it's somewhat of an embarrassment, in a way, for me to ask

20   you, in your position, to withdraw this plea, your Honor,

21   because how could a man who has done a billion dollars' of

22   deals, who's making decisions like this without partners for 17

23   years, a father of four children, go plead guilty?

24             THE COURT:  Twice.

25             THE DEFENDANT:  Twice.
```

```
1          And that -- but you know what, your Honor.  The first

2   time that it happened, I think we all know, that was basically

3   on very serious negotiations between the U. S. Attorneys and

4   Hallinan & Wine.  And that was carefully drafted as a protected

5   plea.  And it was a pretty darn good deal.  Like you said, it

6   was in relation to whatever the charges were; but the problem

7   was that as soon as it was done, I said to my attorney, "You

8   know, I'm innocent."

9          And one other thing.  Pat Hallinan had a stroke that

10  week.  He actually had an operation.  He had a blood clot.

11         I told him.  I said, "You know, I'm innocent, though.

12  I just can't accept this, because -- because even though there

13  may be this 2-, $300,000, oh, it was done unintentionally.  It

14  was calculated from an Alternative Minimum Tax."  That's what I

15  put on my spreadsheet, even though my spreadsheet shows zero,

16  your Honor.  When you calculate in ATM [sic], the number comes

17  into that same number.  My spreadsheet shows zero, which ends

18  up being around 300 grand.  It's the same number that Hallinan

19  & Wine had.  It's the same number that they had up for the last

20  year.  So probably 300 grand is owed.

21         But in the Harris Taback situation, I'm going to tell

22  you something, your Honor.  I am not used to be being in jail.

23  You know, I'm in my mid forties.  I've never been to jail.  And

24  it was -- you know, I mean -- I mean, it's like taking a lamb

25  and putting it into a lion's den.  I'm just going to tell you
```

1  something.  You know, I mean, I know you deal with people all

2  the time.  That's not an excuse, you know; but from a practical

3  standpoint, you know, getting -- plus when I get sick, anyone

4  will tell you when I -- the world is blah when I'm sick.  It

5  could be the flu.  You know, my children have more strength

6  than me when I have the flu.  I'm, like, oh, my God, I'm sick.

7  Me being sick coupled with me being in that environment was a

8  horrific circumstance for me to come in and, you know, begin

9  this trial in Judge Chesney's court.

10           And then Harris Taback was the final nail in my

11 coffin.  And that was the main basis for our application to

12 withdraw the plea, because you know, subjectively, you could

13 say, "Well, how do I know how sick you were?  Did you get a

14 temperature taken?"

15           But what's not subjective was Harris Taback's

16 representations to you in open court in November, asking you

17 for a specific dollar amount, asking Judge Chesney for a

18 specific dollar amount for expert witnesses, for private

19 investigators to benefit his client; and then deceiving you and

20 deceiving Judge Chesney, and getting that money; not working on

21 my case, to the point where I'm basically telling my mother and

22 my wife, hours before the plea, "Listen.  Listen.  You know, I

23 can't have this guy represent me anymore.  I'm just going to

24 represent myself."  I'm -- everyone knows only a crazy person

25 represents themselves.

```
 1           He's not prepared.  He didn't know the name of the
 2   witnesses, for goodness' sake, for the prosecution.  So I'm
 3   just --
 4           And then, of course, Harris Taback, as soon as he
 5   sees the opportunity, he guides me into this plea.  I mean,
 6   he's so excited, your Honor.  And I know it's not grounds for
 7   withdrawing the plea, but he doesn't see the big, bold print on
 8   the application, "Must be in defendant's handwriting."  He's
 9   doing cartwheels to get this thing off his plate.
10           A.  He's not a trial attorney.
11           B.  He doesn't want to go to trial.
12           He told you, himself, "I don't want to go to trial."
13   He wasn't even prepared.  He wasn't prepared for the trial, so
14   he uses that to get out of the trial, to my detriment.
15           And you could just look at the plea.  I mean, there
16   is no benefit to me.  If it was like a Hallinan & Wine plea --
17   say, "Well, listen.  Look.  You know, this is pretty close to a
18   Hallinan & Wine plea.  It's a pretty good deal."
19           It's not a good deal.  It's a horrible deal.
20           THE COURT:  You're repeating yourself, and I cannot
21   give you this length of time.
22           THE DEFENDANT:  I'll cut it short, your Honor.
23           So the short of it is that he didn't even attempt to
24   get me released from the Oakland Jail by even finding out who
25   made this purported claim against me which resulted in the
```

```
 1   arrest.

 2              In fact, I had to hire Edwin Prather.  And

 3   Edwin Prather was hired.  And he went out, in a matter of a

 4   day, and found out the threat came from a felon, a drunk, a

 5   person who had a vendetta against me, who was kicked off my

 6   property for cutting down ancient oak trees ten years earlier.

 7   Never spoke to me again.  He was an in-law.  And he begrudged

 8   me -- this person.  And he made up this false claim,

 9   third-person removed, that he heard from somebody who heard

10   from somebody else who heard from somebody else that I

11   threatened him, which was a complete fabrication.  Of course,

12   it was defused, and proven to be a lie.  This is one thing that

13   isn't important.

14           THE COURT:  This presentence report is full of

15   instances where you have threatened people with physical

16   violence.

17           THE DEFENDANT:  Well, your Honor, let me tell you.

18           THE COURT:  So if that other story was made up, then

19   it's in good company, because this --

20           THE DEFENDANT:  Well --

21           THE COURT:  You have made a career of bullying

22   people, and physically threatening them.

23              Now, that's not what you pled guilty to; but for you

24   to say that this was a totally made-up story that you --

25           THE DEFENDANT:  Well, your Honor, let me tell you.
```

1          First, if you look at this -- people that make these

2     allegations -- let's start off by saying how many people I've

3     dealt with in the last 17 years, and the amount of value of

4     business in a corner grocery store.  I've dealt with probably

5     10,000 tenants, professionals, contractors.  You're talking

6     about 2 million square feet, 17 high-rise office buildings and

7     shopping centers.  I've dealt with tens of thousands -- not

8     tens -- probably 10,000 people.

9          There's a handful of people ten years ago.  And it

10    was all in a concentrated period of time, your Honor, because

11    there was an article that came out on me in the *San Francisco*

12    *Weekly* that alleged I had threatened somebody.  And all of the

13    people that wanted to try to shake me down and try to get some

14    sort of leverage on me in any position said, "Oh, well, he did

15    that to me, too."

16         There haven't been any allegations of threats in ten

17    years, your Honor.  There haven't been any allegations of

18    threats in ten years:  A decade.  And I -- and I'm very careful

19    about and I've learned my lesson about even dealing with

20    people, unless there are other people around.

21         My attorneys advised me there's a reason why you need

22    to have company with you at all times in business:  So people

23    don't make up false claims about you.

24         And these were false claims.  The bulk of the claims

25    came from a woman who shook me down for a million-dollar claim.

1          And my attorney and I had actually sued for a blood

2   test.  We actually had to sue her for a blood test, to prove

3   that the child was not mine.  And, of course, she disappeared

4   and crawled back under the rock that she came out of when it

5   came time to take the blood test.

6          So, you know, I mean, you have to look at each one on

7   its own merit.  And the fact that there haven't been any claims

8   of any threats in ten years, you know, your Honor, I ask that

9   you set aside this plea and let me go to trial, your Honor.

10  You -- this tax case deserves a trial.  And it will prove, in

11  my opinion, at the end of the trial, that I probably owe

12  between 250- and $300,000 on Alternative Minimum Tax.

13         And I think it will also prove that that number was

14  because I didn't know what I was doing, because I still don't

15  know today how to calculate Alternative Minimum Tax, or I would

16  have put it on the graph.  I would have been found innocent.

17  That's how your trial, in my opinion, will end.

18         If you allow this to go to trial, I will be found

19  innocent, and I will be fined, oh, $300,000 now, in the

20  interests of justice.

21         **THE COURT:**  One more sentence, and then --

22         You've been going on now for 30 minutes.

23         **THE DEFENDANT:**  Well, your Honor, 30 minutes.

24         **THE COURT:**  You can make -- I'm going to let you

25  speak more later, but I need to hear from the other side.

1          This long statement that you're making --

2          **THE DEFENDANT:**  Well, your Honor, I believe there are

3    sufficient grounds under the Ninth Circuit standard, the

4    liberal standard, of setting aside a plea prior to -- prior to

5    sentencing.  There's not a limit on the number of times a plea

6    can be withdrawn, or it would be in the -- in the Federal Code.

7    It would say, "You can only do it once."  There is no limit.

8    You can do it ten times, if there's ten fair and just reasons;

9    but I'm asking you to do it for a fair and just reason of

10   ineffective counsel, who did not spend the money that he was

11   given that he represented to the Court that he would use for my

12   benefit, for investigative services for the trial and for the

13   expert witnesses.  And he represented not only to you but in

14   Judge Chesney's that he would do that, and lied to both of you,

15   to my detriment.  That, alone, is grounds for his being

16   ineffective.

17          The eavesdrop conversations confirm this:  Even hours

18   before the trial, he wasn't prepared.  The fact of how he

19   guided me into a plea that provided no benefits was the final

20   proof; but I request that you set aside the plea.  I'm not

21   asking you to dismiss the case.

22          There's judges in the Ninth Circuit.  Judge Jones in

23   Las Vegas actually dismissed a federal tax case because he said

24   it didn't involve illegal source of funds, and he felt in the

25   Ninth Circuit that only illegal sources of funds should be a

1  criminal tax case, and that the balance should be in U.S. tax

2  court.

3           I'm not asking you to dismiss the case.  I'm simply

4  asking:  Please let me go to trial.  I'm not asking for any

5  extension of time.  You could set it for next week.  I'll go.

6  This isn't any stall or delay.  Let me go to trial.  Set your

7  first calendar date, the first speedy-trial date you have.  And

8  if the Government believes they have a case against me, let

9  them prove it.  Do it the old-fashioned way, the American way,

10  the way of the Constitution.  Let them prove that I'm guilty.

11  Let them prove it, because you know what.

12           **THE COURT:**  All right.  You're making a speech.

13           **THE DEFENDANT:**  Your Honor, I'm not asking for any

14  extensions.  Set my trial next week.  Let them prove their

15  case.

16           **THE COURT:**  But you know in the meantime, the Court's

17  calendar has been taken up.

18           It sounds fine for you to say that, but we have

19  relied upon your plea of guilty, and made other arrangements,

20  and so the calendar is filled up.  The Government has released

21  its witnesses.  It would take a long time to get the case

22  reset.  So that's not as easy as just saying, "Let's go to

23  trial next week."

24           What does the Government say on the motion for

25  withdrawal of plea?

1            **MR. NEWMAN:**  That it should be denied, your Honor.

2            The defendant is bringing up the same reason as he

3    did before.  A motion for reconsideration is not brought to

4    relitigate already decided matters.  He's not bringing up new

5    facts; no new legal grounds.

6            Whatever illness he had, it's not mind altering.

7    There's already a conclusion by his psychiatrist that he knew

8    exactly what he was doing on January 26th when he pled guilty.

9            There's no indication that Harris Taback's advice

10   gave any kind of consideration into this.  The defendant

11   testified to your Honor and to Judge Chesney that this was all

12   his idea.  So there isn't any reason to assume at all that

13   Harris Taback, even if he gave bad advice -- and that's not

14   what the testimony is -- that it made him make a bad decision.

15           And as to the defendant's now pleas of innocence, I

16   would say that he testified twice now under oath as to the

17   factual elements to a very basic crime of signing a false

18   income tax return willfully, just meaning that he knew that he

19   had to include, in essence, the inclusion of the sales of these

20   buildings on each of the tax returns; one for each year.  And

21   for the first one, two buildings were sold.

22           The Government made a proffer.  Consistent with the

23   proffer, the Government introduced two declarations from the

24   defendant's accountants.  The accountants confirm everything

25   that the Government proffered, including --

1          THE COURT:  This is on which, please?

2          MR. NEWMAN:  Sorry.  For the second one, your Honor.

3   For the second plea, the Government made a proffer.

4          THE COURT:  This was before the plea was taken.

5          MR. NEWMAN:  It was before the plea was taken.

6          The defendant hired two accountants in Las Vegas, or

7   two accountants at the same firm.  They asked him repeatedly,

8   "How much did you sell the buildings for" as to Count One,

9   Count Two, and Count Three; specifically, the sale of the

10  Post Street property, the sale of the Market Street property,

11  and the Mission Street property.

12         The defendant repeatedly replied to them in writing

13  how much he bought the buildings for, how much he sold them

14  for, and how much tax he thought was due.

15         And I filed these declarations twice; the second

16  time, with the Government's sentencing memo.

17         The defendant gave them written confirmation that he

18  believed he owed $2.5 million of tax on the sale of the

19  490 Post Street.  That was contemporaneous when that income tax

20  return would be due -- or not that one; that would be for when

21  the 2001 -- 2000 return would be prepared in 2001.  At that

22  time, he was telling them he sold that property.  They were

23  asking him for the specific purpose of putting it on his tax

24  returns.  That's what their question was:  What is the sale to

25  include on your tax returns?

1          He replied the same is true of the 814 Mission Street

2    property.  He asked them.  The accountants asked, "What did you

3    sell it for?  And how much do you expect to owe?"

4          And he replied, "$1.96 million of tax."

5          In March of 2001, when the tax return in Count One

6    would have been prepared -- it was due a month later.  He

7    didn't include the sale at all.  These questions and answers --

8          **THE COURT:**  Did he prepare -- did he sign that

9    return?

10         **MR. NEWMAN:**  Yes, he did.  And he testified that he

11   signed all of these returns, and omitted all of these sales.

12         **THE DEFENDANT:**  Your Honor.

13         **THE COURT:**  Wait, wait, wait.

14         So, in the Government's view, not that you don't have

15   other strong points, but what would be the most irrefutable, in

16   your view, tax-fraud point that the defendant is guilty of, and

17   that you could show if this case had ever gone to trial?

18         **MR. NEWMAN:**  I have the declarations, your Honor.

19   And I have them here.  It's just that --

20         **THE COURT:**  Just summarize it, for the record.

21         **MR. NEWMAN:**  Well, that he specifically told his

22   accountants,

23         "**QUESTION:**  What buildings did you sell this

24         year, and for what amount?"

25   And paragraph three of Bill Nelson's declaration is that

1    he asked exactly,

2              "Give me the estimated net income and

3         loss for 2000 that will be reported on your

4         tax returns."

5    And in the same fax, he wanted the estimate; the net

6    income or loss that would be reported on your 2001 tax return,

7    including the sale of 490 Post.

8    The defendant replied to that fax that was dated

9    February 28th, 2001, by a fax on March 1st.  The defendant

10   responded by stating his estimated net income and loss for

11   2001 -- that will be including the sale of 490 Post -- is an

12   estimated $12.5 million of gain; and then estimated

13   $2.5 million of tax on that sale.

14            **THE DEFENDANT:**  Yeah.

15            **MR. NEWMAN:**  He also included the sale of

16   814 Mission Street, and $2.4 million of gain on that sale, and

17   the sale of 939 Market Street.

18            The defendant went on to say that the gain was

19   $9.6 million; an estimated $1.96 million of tax.

20            They asked these questions over again.  And, in

21   paragraph six of the Nelson declaration, the defendant again

22   provided the basis for the properties, the amount he bought

23   them for, and the amount of realized gain, and included the

24   amount of tax that he thought he would owe that year.  And, in

25   fact, he didn't report the sales at all.

```
 1              The accountants went on to tell him that he is
 2     required to report either the sale or the exchange of any
 3     property that he owns, whether or not he realized any gains on
 4     any of these properties.
 5              And Mr. Crowther's declaration --
 6         THE COURT:  Let me ask this, Mr. Newman, just for the
 7     sake of argument.  If the amount of the tax loss was $300,000,
 8     what would be the sentencing range?  And how would that affect
 9     the -- how would that affect our numbers?
10         MR. NEWMAN:  If it was 300-, I think it would be 46
11     to 57 months.
12         THE COURT:  I'm sorry.  Show me.  Where do we have
13     the loss number in the computation?  That would be in paragraph
14     39?
15         MR. NEWMAN:  Talking about 39 of what, your Honor?
16         THE COURT:  Of the Presentence Report.
17         MR. NEWMAN:  Oh.  The loss amount.  Your Honor, since
18     that time, if I could explain that -- are you -- it is 2.4.
19         THE COURT:  I'm looking at the PSR, paragraph 39.
20         MR. GETZ:  The answer to the Court's question is
21     "Yes."  It's paragraph 39.  There's a different loss number,
22     but it would not affect the number 22 in paragraph 39, because
23     the range is big enough to include both numbers; but I think
24     what the Court's asking is whether the number -- were the
25     number to be 300,000, where does it go down from 22?
```

```
 1              THE COURT:  That's what I'm asking.

 2              MR. NEWMAN:  Mm-hm.

 3              THE DEFENDANT:  Your Honor, could I have some water?

 4   They won't give me any water.

 5              THE COURT:  Marshals, give the defendant some water.

 6              MR. NEWMAN:  Yeah.  That -- it would be 37 to 47

 7   months.

 8              THE COURT:  Thirty-seven to forty-six.  Is that

 9   agreed, Mr. Getz?

10              MR. NEWMAN:  Yes.  Yeah.

11              MR. GETZ:  It would be less than 37, if --

12              THE DEFENDANT:  Eighteen months.

13              MR. GETZ:  It would be less than 37, if the Court

14   decided two levels for obstruction were unwarranted.

15              THE COURT:  Well, all right.  Let's just find --

16              THE DEFENDANT:  Your Honor, could I respond to --

17              THE COURT:  If we were to go down even two more

18   levels, what would it be?  If you knocked out the obstruction

19   of justice, what would it be?

20              MR. NEWMAN:  Thirty to thirty-seven.

21              THE DEFENDANT:  That's not true.  It's 18 months.

22   Hallinan -- that's what it was.  It was 18.  Eighteen months.

23              MS. SEARLES:  Eighteen.

24              MR. NEWMAN:  What?

25              THE COURT:  All right.  With respect to the motion to
```

1  withdraw the plea, I'll give you --

2        First of all, is Mr. Getz your lawyer, or not?

3        **THE DEFENDANT:**  Your Honor, I would just like to

4  address this, because he's not prepared to address these

5  points.

6        **THE COURT:**  No, no.  Is he your lawyer?  Have you

7  fired him?  Because you sent me a letter saying that he had

8  been released as your attorney.  Now, is that -- are you back

9  on track with that?

10       **THE DEFENDANT:**  I'm back on track right now, but I'm

11  presenting this information, your Honor, at his approval.

12        What Mr. Newman just said, your Honor -- he started

13  off completely off base.  He said that I omitted

14  490 Post Street in February 2001.

15        Let's start off by explaining.  Piercy Bowler Taylor

16  & Kern is an accounting firm in Las Vegas.  They were hired

17  solely to prepare what's called a "preopening cash statement"

18  for the Silver City Casino, which is required by the Nevada

19  Gaming Commission.

20        They weren't hired to do my tax returns.

21       **THE COURT:**  Well, but here was the problem.  The

22  Gaming Commission didn't just fall off the turnip truck.  They

23  know that applicants always try to overstate their assets.  So

24  they want to see the tax returns, to see if the applicant is

25  being honest.  So the accountants have to look at the tax

1  returns --

2           **THE DEFENDANT:**  No.  I understand.

3           **THE COURT:**  -- to see if they're consistent.

4           So -- and they caught you red handed, trying to show

5  that you were wealthy guy to the tax -- to the Gaming

6  Commission, when you were telling the United States Government

7  you were broke.

8           **THE DEFENDANT:**  Well, that's not true, your Honor.

9           **THE COURT:**  That's the way I read this PSR.

10          **THE DEFENDANT:**  Okay.  Well, let me explain.

11          Piercy Bowler Taylor & Kern were in a dispute with

12 me, and are biased against me.  And that's a fact.  They didn't

13 put that in their declaration; but notwithstanding that fact,

14 you can say, "Well, would they say this?"  I don't know what

15 they would say.  They were fired.  We just -- we had a dispute

16 over funds.  I haven't heard from them in years, the fact is,

17 for starter income and net worth are completely unrelated.

18          I'll give you an example.  A property next door to

19 mine was purchased, you know, in Las Vegas for, you know,

20 $10 million.  And they sold it for $300 million ten years

21 later.  The fact is the appreciation of that property went up

22 over ten years from $10 million to $300 million.  So on paper

23 they can go to the Gaming Commission or Judge Alsup and say,

24 Listen, your Honor.  I want $200 million," but the fact of the

25 matter is they have zero income, because it's not generating

1   income.

2          You could have a piece of land that's worth, you

3   know, $100 million that generates no income.  You could be

4   worth $100 million.  So income and net worth are completely

5   unrelated.  And the IRS doesn't ask what you're worth.  They

6   only ask what your income is.  I reported what -- those sales

7   on all of my tax returns, contrary to what Tom Newman says.

8   They listed and itemized every single property that was sold in

9   2000, 2001, and 2002.  They're all on there.  Every single

10  property sold in the three years under indictment are on the

11  tax returns.

12         And the information that I told the Piercy Bowler

13  Taylor & Kern was estimated information.  490 Post Street

14  didn't even sell until May of 2001.

15         And he says the conversation occurred in

16  February 2001.  So you have to give them an estimate, because

17  that was four months before the property even sold.  Okay?  So

18  you know what they're trying to essentially -- you know,

19  they're on a witch hunt, you know.  What you do is you find the

20  person, put his feet under a fire, which was the Oakland Jail.

21  Give him some food poisoning.  Have him say he's a witch, and

22  then kill him.  Isn't that the way the trials worked back in

23  those days?  Then you go hang him.

24         The bottom line is, your Honor, I have borrowed

25  $800 million.  I've paid back every lender every penny.  I am

```
 1    proud of that.  It's incredible.  Even under this indictment,

 2    I'm in the middle of $100 million purchase:  The repurchase of

 3    the Las Vegas shopping plaza.  That's how much confidence my

 4    lenders have in me.

 5            The true measure of someone's integrity in business

 6    is:  Will they lend you money?  Because, man, nobody's going to

 7    lend you a penny if they think you're a snake or if they think

 8    you're a fraud.  And I have borrowed $800 million without

 9    pedigree, without a father who has handed over, you know, his

10    business contacts.  I am extremely proud.  I have

11    Tony Crossley, Colliers International, sitting in the fourth

12    row, who can testify to that.  He's the executive vice

13    president of Colliers.  And I've honored all of my obligations.

14            The U.S. Attorney, your Honor, Tom Newman, was a tax

15    attorney when they were suing me for $11 million.  Tom Newman

16    there was U.S. tax attorney before he was a U.S. attorney, and

17    wasn't on my case specifically, but they all communicate

18    together.  And they said I owed $11 million for the preceding

19    ten years.  You know what.  In -- your Honor, in this building

20    in front of Judge Haynes, Judge Haynes ruled I owed nothing.  I

21    owed nothing for the preceding eight years.  And they said I

22    owed $11 million.

23            So here we are now.  The next three years they

24    started off, your Honor, saying I owed $1.5 million.

25            Man, it wasn't enough just to indict me and serve me
```

```
 1  with papers.  They went to the Chronicle.  They went to the
 2  Examiner.  They sent out press releases to anybody who would
 3  write it in their newspaper:  Luke Brugnara is a cheat.  He
 4  owes one and a half million dollars in taxes off, you know,
 5  $60 million property.
 6          You know, your Honor, here we are.  Look at this two
 7  years later.
 8          THE COURT:  All right, Mr. Brugnara.
 9          THE DEFENDANT:  No, because they've come down
10  90 percent, and I still dispute their million.  They've come
11  down 90 percent.  Ninety percent.  And, you know, the irony is,
12  your Honor, for the entire spreadsheet, if you calculate all of
13  the income, it's $100 million.
14          It's a 1 percent deviation.  That's considered a
15  contingency in any business.  I know you are familiar with
16  that.  3 to 5 percent of gross is considered contingency
17  factor.  1 percent -- that's pretty darn close.  And I dispute
18  that.  I believe, like I said, I think it's between 2 and 3.  I
19  think it's actually 1/10 of 1 percent.  1/10 of 1 percent,
20  your Honor.  And that's why I asked you to let them go to trial
21  just from the numeric, because numbers don't lie, your Honor.
22          I think that's also an important factor to consider
23  if you decide this is worthy of going to trial, because,
24  your Honor, you know, I know we have the Harris Taback issue of
25  ineffective counsel.
```

```
 1          And the fact that I was sick -- we have my mother's

 2   declaration on file, affirming the diarrhea, the fevers, the

 3   chills; my declaration, and my doctor's.  So there's no dispute

 4   that I was sick.

 5          There's no dispute that Harris Taback didn't do what

 6   he was supposed to do.  And -- and now, on top of it, which I

 7   think is another issue to consider for the withdrawal of the

 8   plea, your Honor, to go to trial -- not to dismiss this case,

 9   but just to simply go to trial -- is the fact that this number

10   we're talking about now is likely to be 1/10 of 1 percent.

11   1/10 of 1 percent, man.  I have sat in jail for three months in

12   a pod of 1,000 square feet with nine murderers.  Luke Brugnara,

13   the family man with four children, given away over a million to

14   charity, haven't had as much as a traffic ticket in ten years.

15          The Wilson Baker murder.  Gang-bang mass murderers.

16   All they do is bang on their chairs 24/7 and scream, because

17   they're going to prison last time in their life.

18          That's how much the U.S. Attorneys hate my guts.

19   Solitary confinement, where I'm getting out two times a week.

20          Let me go to trial, because you know what.  The

21   number is 1/10 of 1 percent.  That, itself, is worthy of going

22   to trial.  Fair, just reason having it go to trial, your Honor.

23          THE COURT:  All right.  I'm going to have to direct

24   you.  From now on, until it's time for me to let you have

25   further say, you have an attorney.  Everything else that you
```

```
1   need to say will be said through your attorney, Mr. Getz.  He
2   is supposed to represent you.  He's one of the finest lawyers
3   who practice in this court.  And so you should not say anything
4   more unless Mr. Getz wants to say it himself.
5            The motion to withdraw the plea is denied.  The Court
6   sent out a very long order explaining why, once before.
7            Nothing that you have said persuades me that there
8   would be a fair and just reason to allow you to withdraw the
9   plea.  And I want to remind you and the people present that you
10  pled guilty once before, a year -- not quite a year ago, but
11  last year.  And you admitted to everything under oath.
12           Then you fired that attorney, Mr. Wine, also one of
13  the respected members of this court, and said that you had made
14  a mistake, and it wasn't true, and you wanted to have your day
15  in court.  And I let you.  I said, "Okay."  I let you withdraw
16  that plea.
17           Then you got a new lawyer:  Mr. Taback.  And we go
18  down that path, after you were out on bail.  It necessitated a
19  six-month-longer delay -- maybe seven months, eight months --
20  coming up to the next trial.  And on the eve of that trial, you
21  decided to plead guilty yet again.
22           Then time goes on.  And you get a new attorney; fire
23  that attorney.
24           And you now have Mr. Getz as your attorney.  And you
25  wanted to withdraw that plea.  A second time you had pled
```

1    guilty to the same thing.

2            And then I get letters from you like this recent one,

3    where you want to fire -- of course, now you're saying you're

4    back okay with Mr. Getz, but at least when you wrote this

5    letter on May 21, you were saying that he was being released as

6    your attorney because he wouldn't do *X, Y, Z.*

7            Well, you are under oath.  And you told me you were

8    feeling fine; you were thinking clearly.  You admitted to all

9    of the crimes.  The Government had a detailed recitation of the

10   facts in the record to support the factual basis for the plea.

11           Yes, at one point in time you clearly had a right to

12   go to trial if you wanted to, but two times you have now pled

13   guilty.  And it's not as easy as just saying, "Oh, next week

14   we'll have a trial."  No.  That's not the way it works.  It

15   takes a -- it's a major effort to get geared up for a trial.

16           So the Court is convinced that you are trying to game

17   the system; that we get right up to the edge of a trial, and --

18   wham-o! -- you decide to plead guilty.  And after the pressure

19   is off, you decide to withdraw your plea, fire that attorney,

20   get another attorney.  This could go on forever.

21           The Court is convinced to a moral certainty you are

22   indeed guilty of what you pled guilty to.  There's enough of a

23   record for that.  If I thought you were innocent, I would let

24   you go to trial, but it's clear that you're not.  And you are

25   guilty.  So -- at least, based on this record.

```
 1              So the motion is denied.  And we're now going to

 2    proceed to sentencing.  And from this point on, you don't get

 3    to say anything until I let you.  Your lawyer's going to do all

 4    of the talking.

 5              Mr. Getz, are there any other paragraphs that are --

 6    to which -- in the PSR -- let me ask you this, Mr. Getz.  Did

 7    Mr. Brugnara get a copy of this presentence report?

 8              MR. GETZ:  Yes, he did.  And he would like to augment

 9    his earlier filings with the documents that were handed up to

10    your Honor this morning.  And, pursuant to Rule 47, I make the

11    motion permitting those to become part of the record.

12              THE COURT:  Just a moment, Mr. Brugnara.  I need to

13    ask you to just say "Yes" or "No."  Did you receive and read

14    the presentence investigation report?

15              THE DEFENDANT:  I have to see it.  I received a

16    report.

17              THE COURT:  Show it, please, to --

18              THE DEFENDANT:  Yes.

19              THE COURT:  All right.  Thank you.  All right.  These

20    additional materials -- has the Government seen them?

21              MR. NEWMAN:  Yes, your Honor.

22              THE COURT:  Including the one with the long tax

23    spreadsheet?

24              MR. NEWMAN:  No.

25              THE COURT:  I'm going to hand this down to you, so
```

1  you take a look at it and see -- tell me if you've seen that

2  before.

3          MR. NEWMAN:  I haven't, your Honor.  I can look at it

4  now, if that's what you're asking.

5          THE COURT:  Well, take a short moment to look at it.

6  And tell me what the Government's view is on what should be

7  done with those pages.

8          MR. NEWMAN:  Your Honor, I don't believe it's

9  appropriate to file them, since they have been received so

10  late.  I think that any submission to the probation officer or

11  to the Court should have been made weeks in advance of this

12  hearing.

13          THE COURT:  What do you say to that, Mr. Getz?

14          MR. GETZ:  I think, while the papers are submitted

15  late, the Court has the discretion to permit the entry into the

16  record, so that Mr. Brugnara can complete the record.  He has

17  offered things late in a *pro se* filing.  I think that he feels

18  the record's inadequate without those documents, and I think

19  the Court should admit it.

20          MR. NEWMAN:  I would add, your Honor, I think that

21  these are completely duplicative of the declarations that were

22  already filed last week.  They essentially -- all of them --

23  say the same thing.  They're not sworn testimony of anything.

24  They're just letters.

25          THE COURT:  All right.  The Court will allow this to

1  be made part of the Clerk's record.  And I'm referring to a

2  May 21, 2010, grouping of about seven pages, handwritten, with

3  one typewritten spreadsheet called, "IRS Tax Spreadsheet."

4            And I'm not saying that this is something that the

5  Court should properly take into account as timely, but it ought

6  to at least be there for the benefit of the Ninth Circuit.

7            **MR. GETZ:**  Thank you.

8            **THE COURT:**  All right.  Now, are there any unresolved

9  objections to the presentence report, Mr. Getz?

10           **MR. GETZ:**  Much as Mr. Brugnara articulated in his

11 motion for reconsideration on the motion to withdraw the plea,

12 of course, based on what the Court's admitted into evidence and

13 what's been enunciated here in court, he renews his motion for

14 an evidentiary hearing on the tax loss.

15           **THE COURT:**  Well, he said earlier that his tax loss

16 was $300,000.

17           **MR. GETZ:**  His position is the tax loss does not

18 exceed $300,000.  And if the Court is going to select a

19 guideline range to articulate a sentence, then the numbers

20 should correspond with the $300,000 figure, which coincides

21 with the initial plea of guilty in this case, which was later

22 rejected by the Court.

23           **THE COURT:**  No.  Once you -- that was an 11(C)(1)(c).

24 And it doesn't work that way.  Once you strike a deal with the

25 Government, the Government is bound by that deal; but you get

1   to get out of it.  It's a new ball game for both sides.  The

2   Government is not bound by the negotiations that went on in

3   that 11(C)(1)(c) negotiation.

4         **MR. GETZ:**  Of course, the Courts correct's in that,

5   but I think there's an equitable consideration here, which I

6   think the Court might consider, and the equitable consideration

7   is:  There was a time not so long ago when the Government's

8   estimate at the time of the change of plea of the loss

9   calculation was 300,000.  Later, the Government took the

10  position that the loss calculation should be 2.5.

11         I think that's something that should concern the

12  Court.  And I think that, alone, would have a basis for

13  requesting an evidentiary hearing.  And that was the motive and

14  the reason why Mr. Brugnara filed the *pro se* filings.

15         **THE COURT:**  What does the Government say about an

16  evidentiary hearing?

17         **MR. NEWMAN:**  Your Honor, may I hand this up to you?

18  And I'll respond after I --

19         (Whereupon a document was tendered to the Court)

20         **MR. NEWMAN:**  There isn't any reason for an

21  evidentiary hearing.  As a factual matter, even if the facts

22  were supported, I would ask you to turn to just page 1041.  I

23  think it's tabbed.  And, for clarification, that's a decision.

24  It's *U.S. v. Yip.*  And the reason I gave it to you is that the

25  tax loss is determined based on all possible deductions that

1    are claimed on an individual's tax return.

2          The declaration and the method used to compute the

3    defendant's tax loss in this case gave him the benefit of every

4    deduction he claimed on his tax return.

5          And what I'm referring to in this decision is the

6    paragraph that begins Section 2T1.1 on page 1041 of the

7    decision.  And it ends with that section.  It does not require

8    a Court to speculate about tax deductions that a taxpayer chose

9    not to claim.

10         The tax loss that was computed in this case gave the

11   defendant the benefit of a loss carryforward of roughly about

12   $5 million from 1998.  That's not a charged year.  That was

13   route -- forward to 2000, which is a charged year.  The

14   defendant claimed that $9 million tax loss, or he claimed a

15   $9 million loss for 1999.  That's not a charged year.  He also

16   left off the sale of a property that year.  The sale of that

17   property was added back to 1999, and the remainder of the loss

18   was carried forward to 2000.

19         So he's given the benefits of every single deduction,

20   whether it's included on his charged returns 2000 and 2002, and

21   loss carryforwards that were not carried forward.  He didn't

22   carry forward the loss from 1998.  The Government gave it to

23   him.  The same is true for '99.  And this $1.9 million number

24   that's mentioned at the end of the declaration that was filed

25   in support of the tax loss carries back a $3 million loss from

```
 1   2003 that is claimed on his 2003 tax return.  The defendant is
 2   given every other deduction that's claimed on the charged
 3   returns.
 4            THE COURT:  Is it true that you said you agreed with
 5   the defendant months ago that it was 300,000, and now you're up
 6   to 2.4?
 7            MR. NEWMAN:  Up to 1.9.  I would agree with the 1.9
 8   number.
 9            THE COURT:  Was it 300,000 back then?
10            MR. NEWMAN:  I will explain that, your Honor.  Part
11   of the difference -- or I've got to say the major difference
12   was the way the loss was computed the last time.  And I agreed
13   with that as part of a plea.  It was a negotiated plea.  And we
14   can settle based on whatever terms, but one of the things that
15   changed about the numbers was the original loss figures carried
16   forward a loss from 1999 that I said before of $9 million.
17            What it didn't do was add back a building that
18   Mr. Brugnara sold that year.  And I was not aware of that, but
19   this revenue agent -- we changed revenue agents.  He looked
20   everything over, and he added back that sale.  I can't give
21   figures to the Court.
22            If you want me to say were those numbers too low -- I
23   mean, they -- turns out that they were.  These aren't numbers
24   that I created.  These weren't numbers that the IRS calculated.
25            Based on the defendant's own tax returns, they gave
```

1  him the benefit of every loss carried forward.  And the

2  original loss figures that I had -- it was actually much more

3  than that.  It's just they didn't give him the benefit of an

4  Alternative Minimum Tax.

5          **THE COURT:**  How long would it take to do an

6  evidentiary hearing?

7          **MR. NEWMAN:**  I don't think it would take that long,

8  your Honor.

9          **THE COURT:**  Well, let me ask Mr. Getz this question.

10         Would it be acceptable to you that the Court take

11  $300,000 as the tax loss amount, and use that?  Not up to, but

12  right at 300,000.  That would be alternative one.

13         Alternative two would be to hold an evidentiary

14  hearing, where it may turn out that the number's lower.  Could

15  turn out that the number's a lot higher.

16         So --

17         **MR. GETZ:**  May I have just a moment?

18         **THE COURT:**  I mean, in other words, holding an

19  evidentiary hearing could help; but it could also hurt your

20  client.  So what do you want to do there?

21         (Discussion off the record)

22         **MR. NEWMAN:**  If I could address that, your Honor, I

23  don't think it could help, which is the point of turning that

24  up there, is that you can't claim any previously unclaimed

25  deductions.  If the defendant came back with $50 million of

1   deductions, even if they were legitimate, the Court can't

2   accept them.

3            **THE COURT:**  Why is that?  Because they were

4   unclaimed?

5            **MR. NEWMAN:**  Because they were previously unclaimed,

6   he's given the benefit of everything on his return.

7            I mean, if the defendant wants to address the choices

8   the Court gave him -- but that's what that ruling says.

9            **THE COURT:**  Well, it does say that.  So is -- if the

10  idea, Mr. Getz, is that he could come in with deductions he

11  could have taken, but somehow forgot to take, I think this

12  decision does say you cannot do that.

13           **MR. GETZ:**  It's on appeal in *U.S. versus Yip.*  And

14  *U.S. versus Yip* doesn't address the evidentiary value of

15  something that's offered at trial.

16           So, of course, initially what the Court heard and

17  ruled upon was a motion to withdraw the plea.  *Arguendo*, if the

18  plea has been withdrawn and we're going to trial, we're not

19  limited to what is in his tax return, where he's putting forth

20  a defense based on a good-faith effort that his numbers were

21  right.  He can be acquitted even if the numbers are wrong; but,

22  to answer the Court's question, we would agree with the

23  $300,000 figure as a basis for the Court's sentencing

24  calculation.

25           **THE COURT:**  That's what I want to do.  All right.  So

1  that issue is off the table.

2          What else -- I will take 300,000 as the basis for the

3  sentence that the Court plans to give; not that I plan right

4  now, but whatever it is is going to use 300,000 as the tax

5  loss.

6          All right.  Are there any other paragraphs that you

7  want to object to?

8          **MR. GETZ:**  Of course, we have raised certain issues

9  in our sentencing memorandum regarding the calculations, such

10  as obstruction-of-justice points, acceptance of responsibility,

11  and overrepresentation of the criminal-history category.

12          **THE COURT:**  All right.  Well, let's take -- let's go

13  to acceptance of responsibility first.  What's your argument

14  there?

15          **MR. GETZ:**  The argument there is Mr. Brugnara has

16  pled guilty twice.  When has the Court ever seen that before?

17  If the Court's going to sentence him on the second of the

18  guilty pleas, I think, as a matter of fact, there was some

19  acceptance of responsibility at the time the guilty plea was

20  entered.

21          Now what's happened since then is a matter of record,

22  but even the guidelines say a defendant who goes to trial can

23  still get acceptance-of-responsibility points, a category I

24  pointed out in the brief.  And I'd ask the Court to find that

25  he should get some acceptance points.  If not the full three

1    points, then give him two.

2            **THE COURT:**  What does the Government say to that?

3            **MR. NEWMAN:**  It's the defendant's burden to prove

4    that he's entitled to the reduction; either the two points or

5    three points in this case.  And he hasn't shown that.  He pled

6    guilty twice, but since then, he's vacillated back and forth

7    between professing innocence, whether under or not under oath,

8    and essentially balking at forcing the Government to prove its

9    case.

10           He's here today.  He's not saying that he's guilty,

11   and that he's willing to accept responsibility here, which is

12   exactly what the two points are for.

13           Months ago when he pled guilty, he's done anything

14   but reduce the burden on the Court or on the Government, and

15   maintain a position that he's guilty.  He has said anything but

16   that he's guilty.  He's made the Government do this and that in

17   the case, and asked to have him detained.  He has shown nothing

18   to express the fact that he feels that he is guilty in this

19   case.  And I don't think it's warranted.

20           **THE COURT:**  All right.  Let's hear about the

21   obstruction of justice.

22           **MR. GETZ:**  We address that on page 8 of our brief.

23   And it's something of a moving target, really, that the

24   Government offers, because the obstruction basis has been

25   offered on a variety of grounds, both in the Government filing

```
 1  the sentencing memorandum, and it's also reflected in the
 2  federal probation officer's report regarding testimony before
 3  the Nevada Gaming Commission; but overlooked, for the most
 4  part, is the notion that if a person says something that they
 5  believe to be true, even if it's false, there cannot be
 6  obstruction levels awarded.
 7          And so I guess the question becomes:  Even if we
 8  agree upon the conduct, what was the state of mind of
 9  Mr. Brugnara at the time he made the assertions, both before
10  the Nevada Gaming Commission and elsewhere?
11          And I submit to the Court that what he said, he
12  believed to be true at the time it was said, along the lines
13  of, "I filed my income taxes."  He had sent documents in which
14  were inadequate.  Ultimately, they had to be resubmitted, but
15  whether that rises to the level of obstruction can only be
16  based on his state of mind at the time of his words.  And I
17  submit to the Court that he believed it to be true when he said
18  it.
19          And I think there's ample record made in this case of
20  how his mind works.  He has a facile mind, a flexible mind.  He
21  thinks broadly.  He is grandiose in his vision.  He has the
22  ability to look at things in a broad spectrum of colors.  He
23  expresses himself well before the Court.  And his mind is
24  moving.  There's pressured speech.  There are racing thoughts.
25  He expresses himself in a unique way.  And if what he did
```

1  before the Nevada Gaming Commission is anything like what this

2  Court has seen, then I think that this Court can find a basis

3  in finding that he believed it when he said it.  And if he

4  believed it when he said it, even if he's wrong, then he did

5  not obstruct.

6       **THE COURT:**  Mr. Newman.

7       **MR. NEWMAN:**  Well, for clarification, I've never

8  asserted that defendant is liable for the obstruction

9  enhancement, or provided any information based on what happened

10  before the Nevada Gaming Commission.

11       It was actually based on a note to 3(C)1.1 about

12  providing false testimony under oath under a related civil

13  investigation, which would be the IRS audit.  And the defendant

14  did provide testimony under oath.

15       And, your Honor --

16       **THE COURT:**  I'm sorry.  The paragraph 43 is referring

17  to giving an oath in a civil proceeding that he had filed his

18  tax returns when he had not.  Now, that's what --

19       **MR. NEWMAN:**  Yes, your Honor.

20       **THE COURT:**  So address that one, not the tax returns;

21  but what was the testimony?  Was that before the Nevada Gaming

22  Commission?

23       **MR. NEWMAN:**  No, it wasn't.  It was before the IRS.

24  And it was a summons proceeding done under oath.  It was

25  essentially a deposition.  And that was the only thing that the

1   probation officer listed.

2          And I think it was only because it -- true, I had a

3   number of reasons that I had given, but we had the

4   meet-and-confer.  So I left the meet-and-confer believing that

5   this was a resolved issue, because everyone agreed on the

6   facts.  And I provided all of the statements.  Now, the

7   defendant provided --

8          **THE COURT:**  You mean, you're saying that Mr. Getz

9   agreed to the two points?

10         **MR. NEWMAN:**  I had believed that.  And I'm not

11  putting Mr. Getz or attempting to put him on the spot, but we

12  left the meet-and-confer.  That was the only reason left on the

13  report, because I believed it was resolved after the

14  meet-and-confer.  The objections actually don't have this

15  listed as unresolved, for, I think, that very reason, but I

16  will address it now.

17         **THE COURT:**  Well, just -- well, before you address

18  any -- whether it was resolved or not on the one item that's

19  listed in paragraph 43, which I think is the only one I should

20  be taking into account, did he file his returns?

21         **MR. NEWMAN:**  He filed returns.  And he had -- he

22  testified under oath that he filed them on a timely basis; that

23  he gave the tax returns -- they were filed with the IRS, so

24  they would have been received.

25         Whether there's an extension or not timely -- that's

1  actually not true.  And that is false testimony among --

2         **THE COURT:**  This doesn't go to timely.  Doesn't say

3  anything about timely.  Ms. Searles' report -- she doesn't say

4  timely or not timely.

5         **MR. NEWMAN:**  He testified under oath that he filed

6  all of his tax returns on time.  And that's what the objection

7  should say, or what the enhancement should be liable for.

8         **THE COURT:**  Ms. Searles, what's going on here?  I

9  don't see the word "timely."

10         **MS. SEARLES:**  Well, your Honor, if you look at

11  page 8, paragraph 27 and paragraph 28, that's the narrative

12  that supports the obstruction-of-justice enhancement that was

13  given to me by Mr. Newman.

14         **THE COURT:**  Paragraph 8?

15         **MS. SEARLES:**  Your Honor, page 8, paragraph 27 and

16  paragraph 28.

17         **THE COURT:**  So are the true facts that he had never

18  filed returns, but had only asked for extensions?

19         **MR. NEWMAN:**  No.  He'd never asked for extensions.

20  The facts would be that he provided testimony under oath that

21  all of his tax returns were filed on time when, in fact, they

22  weren't.

23         **THE COURT:**  And the reason they weren't?  It

24  wasn't -- what were the true facts?

25         **MR. NEWMAN:**  That they were all filed late.  And some

1  of them hadn't even been received, but the defendant insisted

2  that they were already filed.

3           **MR. GETZ:**  That's exactly it.  They were filed late.

4  And that was the basis of the claim that they were filed.  They

5  were filed improperly.  They were filed inadequately, but they

6  were filed late.  And so to call that "obstruction" is to just

7  run roughshod over the state-of-mind exception to the

8  obstruction finding, and that's what I'm asking the Court to

9  focus on.  And the paragraph --

10          **THE COURT:**  Did he say that he had time -- did he

11  testify he had timely filed?

12          **MR. NEWMAN:**  Yes.

13          **THE DEFENDANT:**  Could I make a comment, your Honor?

14          **THE COURT:**  No, no.  Mr. Getz is your lawyer.

15          Just a second.

16          Mr. Newman, read to me the testimony where the word

17  "timely" was used.

18          **MR. NEWMAN:**  Your Honor, may I pass this up to you,

19  so that you can have it?  I will read it to you.  This is the

20  same information.  It's filed materials that I had already

21  given to the probation officer.  And the defense have this as

22  well.

23          **THE COURT:**  What page do you want me to look at?

24          **MR. NEWMAN:**  I had marked the page.  I think I made a

25  line underneath it.  It's page number 70, on the left-hand

1  corner.  And the testimony is,

2          "My position is that I did file the

3          returns in the timely fashion for these

4          years, and that you have copies of all of

5          these tax returns."

6          And that is page 70, lines 15 through 20.

7          **MR. GETZ:**  That's exactly right.  And when he said,

8  "My position is," he is stating a state-of-mind exception to

9  the rule that that's obstruction.

10         And I can't see how the Court can look at that, when

11  he uses the phrase, "My position," as the same as if he were a

12  forensic accountant, which he is not; a tax lawyer, which he is

13  not; a C.P.A., which he is not.  And the most important thing

14  is:  He did his taxes himself.  And when he states that that's

15  his position, that was his position.  So how can that be

16  obstruction?

17         **MR. NEWMAN:**  Okay.  And so that's the testimony.  And

18  he states his position.

19         On the very next page, he said -- October 15th, 1999,

20  letter from the defendant's broker stating that the defendant,

21  in fact, had not filed his tax return for 1998 yet, and that he

22  was expecting to be liable for penalties.  That would be the

23  basis for the reason why the false information is material, is

24  a late return would require the defendant to be subject to

25  penalties under Internal Revenue Code 6651.

1           THE COURT:  Wait.  What?  You say something on the

2    next page?

3           MR. NEWMAN:  On the very next page, if you turn to

4    the next page, the physical next page.

5           THE COURT:  Oh, oh.  I see.

6           MR. NEWMAN:  It's a letter from the defendant's

7    broker saying he hasn't filed his 1998 tax return yet.  That

8    letter's dated October 15th.

9           THE COURT:  When was this testimony?

10          MR. NEWMAN:  That letter -- when the letter was at a

11   time, you mean?  Oh.  The testimony was from 2004.

12          THE COURT:  Well, between '99 and 2004.  Did he file

13   for that year?

14          MR. NEWMAN:  He eventually filed.  The return is on

15   the next page, your Honor.

16          THE COURT:  Well, what year did he file that return?

17          MR. NEWMAN:  He filed it in 2000.

18          THE COURT:  So by the time of the deposition, he

19   would have -- he said, "My position is that I did file the

20   returns in a timely fashion."

21          All right.  I'm going to hand that back to the

22   Government.

23          All right.  Anything more on that

24   obstruction-of-justice point?

25          MR. GETZ:  Only to add that a qualified assertion of

 1   timeliness cannot possibly be the basis of obstruction of

 2   justice.

 3          **THE COURT:**  All right.  What else is there to argue

 4   over?

 5          **MR. NEWMAN:**  There was, well, obstruction.  There

 6   were other additional points that the Government had.

 7          Your Honor, when the defendant was released from his

 8   plea on June 9th -- or not released from his plea, but we had a

 9   hearing about it on June 9th of 2009.  He told your Honor that

10   he didn't have enough money to hire an attorney, and that he

11   wanted a C.J.A. appointment.  And we had five or six hearings

12   to get such an appointment.

13          As part of Docket Number 67 in this case, the

14   Government filed something to have his release conditions

15   modified because, in fact, around the same time or several

16   months later, in December of 2009, the defendant filed a

17   complaint in bankruptcy court, indicating that he had paintings

18   worth roughly $1 million that he purchased in 2003 that were

19   being held by Sotheby's.

20          That is false information provided to a judge or

21   magistrate, as provided for in Note F to 3(C)1.1, in that he

22   told your Honor that he had no money to pay for an attorney,

23   and no assets, when, in fact, he was holding a million dollars'

24   worth of artwork that he gave to Sotheby's to sell.

25          **THE DEFENDANT:**  Can I respond, your Honor, to that?

1  Because Mr. Getz doesn't know the particulars.

2          **MR. GETZ:**  If it's okay with the Court, it's all

3  right with me if he responds to that.

4          **THE DEFENDANT:**  Your Honor, if the paintings -- there

5  was no misrepresentation to you or bankruptcy court.  Those

6  paintings were, in fact, liened, and not in my possession.

7  They were in the possession of Sotheby's, and had a secured

8  lien against them.  And the secured creditors in

9  Judge Montali's bankruptcy signed off that, in fact, there was

10  no equities in those paintings over and above the secured

11  paintings of Sotheby's Financial Services.

12          And what was the other one?

13          **MR. GETZ:**  Let me finish this.  It shouldn't surprise

14  the Court that somebody in a commercial-real-estate posture

15  would have a cash-flow problem.  At the time Mr. Brugnara said

16  he did not have funds to hire a lawyer, that was absolutely,

17  100 percent true.  He had no money to hire a lawyer.

18          Now, it may be that he had an expectancy of some

19  money later.  It may be that he had something he could look

20  forward to, if something sold.  It may be that somebody was

21  going to step forward later; but the Court has to look at the

22  context.  At the time he said it, it was factually true.  He

23  didn't have any money.

24          He had business interests, and bankruptcy.  There

25  were no funds to hire a lawyer for a case of this magnitude.

1  So it's true at the time he said it.

2          Later, when he was able to obtain funds, he obtained

3  counsel; but I fail to see how the Government can argue

4  obstruction based on a true statement that was said in a

5  situation that was financially fluid, and changed later.

6          **THE COURT:**  Are there any other grounds for

7  obstruction of justice that the Government wants to argue?

8          **MR. NEWMAN:**  No, no.  The most recent filings the

9  defendant gave to your Honor from last week.  And the one that

10  was Docket Entry 119, the defendant responds to the

11  Government's sentencing memo, and indicates that he never filed

12  a tax return with the IRS that was inconsistent with anything

13  that he ever gave to a lender.  Again, I would say that that is

14  false information provided to a judge or magistrate as part of

15  Note F to 3(C)1.1.

16          I have already filed in this case two 1994 tax

17  returns, both signed by the defendant under oath; one of them

18  provided to a lender, indicating that his income was $489,000

19  for 1994, and he had a tax liability for $156,000 and change.

20  His filed 1994 tax return with the IRS indicates net income of

21  negative $142,721.

22          We're here at sentencing.  The defendant is telling

23  the Court he's never done this.  There are other examples of

24  this.  This is false information attempting to assuage the

25  Court or persuade it that none of these things are true, but

1    that is not the case.

2              There are many examples of exactly what's in the PSR

3    can be proven to be true.  And I don't know why we're getting

4    to objections to these things and counter-arguments that are

5    both irrelevant and inconsistent with the PSR, but the

6    defendant's not giving the Court correct information.

7              **MR. GETZ:**  If I may, your Honor, at the

8    meet-and-confer we conceded certain conduct.  And therein may

9    lie the confusion between what was resolved and what wasn't.

10             We conceded there was certain conduct on the part of

11   Mr. Brugnara in what he said and what he filed that was

12   factually wrong; but we never conceded that he was

13   intentionally trying to put one over on this Court, or any

14   other Court, or that he was trying to mislead any fact finder.

15             The basis for the discussion at the meet-and-confer,

16   from our perspective, is that when he says certain things, he

17   believes it at the time that it is said.  And that -- that

18   flamboyant method of presenting himself has been consistent

19   through this whole case.  And it's just not -- it's not

20   obstruction.  It may be puffery.  It may be exaggeration.  It

21   may be fantasy, but it's not obstruction of justice.

22             Obstruction of justice requires a knowing and

23   intelligent fraud perpetrated upon someone who is engaged in

24   the decision-making process.  And that's not what he's ever

25   done.  And every episode that is being recounted here is an

1 example of his racing thought process, where he says something

2 that comes into his head, believing it to be so at that moment.

3       **THE DEFENDANT:**  Your Honor, also -- no.  Regarding

4 the tax, that's serious, in my opinion.  Hey, listen.  You give

5 this to -- it's 17 years ago.  Still, I don't care.  This is my

6 reputation.  The proof is in Judge Haynes' ruling.  For those

7 tax years, there was a zero tax loss.  In fact, there was loss

8 carried forward.  The tax return that was provided first was a

9 draft return in preparation of these returns.  This is 17 years

10 ago.

11       The correct return was provided prior to the loan

12 funding.  And the loan, in fact, funded and was paid off in

13 full.  And, in fact, the corrected return -- not the draft --

14 was the basis for the loan.  And, in fact, it was ruled in

15 Judge Haynes' court that that was correct.  That's, in fact,

16 proper, of -- what to do if, in fact, you have an incorrect

17 return, a draft return, and people are pressing you.

18       I don't know that.  You didn't ask, "What do you

19 have?  Do you have a draft in front of you?  Do you have an

20 informational return?"

21       **THE COURT:**  You're not supposed to be talking.  It's

22 supposed to be Mr. Getz.  I've listened to what you've had to

23 say, but it's gone on too long.

24       All right.  Any other issues on the -- on the

25 guideline calculation?

1          **MR. GETZ:**  Over-representation of the

2    criminal-history category.  I address this in the brief on

3    page --

4          **THE COURT:**  Do you think it should be one?

5          **MR. GETZ:**  I do.

6          There are lot of people that get sentenced as a

7    Category 1 with less than what he's got.  If what he's got is

8    referring to his criminal convictions -- a misdemeanant.  He

9    has been boisterous and rude.  He has been loud and volatile.

10         There's not one thing in there about him hitting

11   anybody.  There is a little bit of roughhousing regarding the

12   Christie Rigs (phonetic) episode.

13         **THE DEFENDANT:**  That's not true.

14         **MR. GETZ:**  But no one has said that he's ever struck

15   anyone; not anyone saying they've been struck, nor anyone

16   saying he ever has been seen to strike.  It's all verbal.  It's

17   all happening in his head.  There isn't anything factual that's

18   felonious about anything that he's done.

19         And, as I've pointed out in the memorandum, he missed

20   by about 12 months not getting that extra point for having

21   something happen while he's on probation, because that would

22   have been three-year probation, and it happened in the second

23   month of his misdemeanor probation.

24         **THE COURT:**  Did you get this addendum?  Did you --

25   Ms. Searles, did you provide the addendum --

 1            **MS. SEARLES:**  Yes, I did, your Honor.

 2            **THE COURT:**  -- to counsel?

 3       There's an October 2008 incident?

 4            **MR. GETZ:**  Well --

 5            **THE COURT:**  A request for orders to stop harassment

 6  filed by the Pastor and Principal of St. Vincent de Paul

 7  School, where Mr. Brugnara threw a bottle of water at the

 8  coach; walked on the field; obscenities; traumatized the

 9  students.

10            **THE DEFENDANT:**  That's not true.

11            **THE COURT:**  It goes on and on about how he has

12  terrified people at the soccer.

13       And then later on, another school official:

14            "When he is upset, he screams and

15            yells, as well as making threats.  He

16            forced a parent off the road, onto the

17            sidewalk, with his car because her son had

18            called his son 'fat.' Mr. Brugnara has a

19            volatile nature.  He can be abusive.  He

20            screams at school personnel and parents."

21       Now, this is all recent.  You were saying a while ago

22  it was nothing in the last ten years, but this is -- these are

23  things in the last ten years.

24            **MR. GETZ:**  We filed a brief in response to that.  Has

25  the Court received it?

1          **THE COURT:**  I don't think so.

2          **THE DEFENDANT:**  Well, I want to respond.

3          **THE COURT:**  No, no.  I want to hear Mr. Getz' --

4          **THE DEFENDANT:**  Well, I haven't discussed it with

5    Mr. Getz, so I'll tell you.  For starters, I coach the baseball

6    team at St. Vincent de Paul.  And I -- I didn't harm or do

7    anything.  I politely went over to a soccer coach, who was

8    another coach, and I told him they need to follow the rules.  I

9    never used what he said; never threw a bottle at him or anyone

10   else.

11         Catholic Charities received a million dollars from

12   me, your Honor, between 1999 and 2003, through

13   Archbishop Levada.  I'm sure he won't approve of that letter

14   being sent to you.  So, you know, we can go on a diatribe about

15   the Catholic Church for probably for the rest of the day, but

16   the fact is I did not threaten that coach ever.

17         **MR. GETZ:**  I would like to augment the intemperate

18   outburst once again from Mr. Brugnara, by saying that -- and

19   this was in the brief which we dropped off Friday, but I take

20   responsibility for not filing it earlier.  If you have a civil

21   action along the lines of a restraining order that never

22   becomes a criminal case, never becomes a criminal arrest, never

23   becomes a restraining order in a criminal case, which we have,

24   it's under the Penal Code.  It happens down at 850

25   Bryant Street every day.  How can this elevate to the level of

```
 1  criminal conduct that can be factored into whether someone's
 2  criminal-history category is over- or under-represented?  I
 3  just don't see it.
 4          If he had been -- if he had been charged with a Penal
 5  Code 415 for disturbing somebody's peace, if he had been
 6  charged with a Penal Code 4153, for fighting words, swear
 7  words, loud words, anything -- if he had been arrested or if he
 8  had been contacted by the police, I would make the argument.
 9          But you have a situation where a civil restraining
10  order is sought, which people have a right to do.  And there's
11  a reason why they call it "civil"; but no criminal restraining
12  order is sought.  No criminal case ever arises.  And he's never
13  arrested.
14          How can this be something in criminal-history
15  category?  It seems to be a distortion of what it is.
16          We have separate categories:  Civil, and criminal.
17  And all of these things that the Court has reviewed in
18  connection with the soccer game were all in a civil context.
19  And that's why I say that these other things that were criminal
20  are stale.  And I think they're -- the Court can consider the
21  age in trying to decide whether he's Category 1 or 2.
22          And also, he missed with that bottle, your Honor.  So
23  in terms of my earlier statement --
24          THE COURT:  He just told me he didn't throw it.
25          THE DEFENDANT:  He's joking.  I didn't throw any
```

1  bottle.  I'm the baseball coach.

2          THE COURT:  I didn't rob the bank; but if I did, I

3  didn't get much money.

4          THE DEFENDANT:  Your Honor, I'm the baseball coach.

5  They wouldn't have me as the baseball coach if I was

6  inappropriate.  I have four children.  Perfect conduct.

7  Straight A's.  I am very proud of them.

8          THE COURT:  Ms. Searles, why is it Category 2 if it's

9  only one point?

10          MS. SEARLES:  Your Honor, he was on probation while

11  he committed part of the instant offense, so he received

12  additional two points for that.  And that's noted in paragraph

13  57.

14          THE COURT:  All right.  Let me see that.  So three

15  points.  That gets us up to Roman Numeral II?

16          MS. SEARLES:  Yes.

17          THE COURT:  Without regard to the water bottle and --

18          MS. SEARLES:  Those matters did not factor into his

19  criminal-history category, your Honor.  This is just based on

20  the convictions.

21          THE COURT:  All right.  Okay.  All right.  What else

22  do you want to raise on trying to get the right sentencing

23  category into the guidelines?

24          MR. NEWMAN:  Well, your Honor, since we're on

25  criminal history, the Government did note and the PSR does

1   note -- and I'm saying this because I don't agree with the

2   reduction of the criminal-history category to a 1 -- that there

3   are numerous other incidents that would fall into what is

4   described in 4(a)1.32(E) of other similar conduct not resulting

5   in a criminal conviction.

6            The 1994 tax returns -- I had already talked about

7   two of them:  One different that was filed with the IRS

8   claiming negative $142,000 of income, and one that was given to

9   a bank.  That is -- that did not result in the conviction, but

10  it is undoubtedly mail fraud.

11           **MR. GETZ:**  No.

12           **MR. NEWMAN:**  The defendant also gave testimony under

13  oath to the IRS that his accountants -- the same accountants

14  that provided declarations in this case -- told him that

15  whether he had positive income, no income, or negative income,

16  he was required to file corporate tax returns for every

17  corporation he owned or controlled.

18           The failure to do so is a violation of

19  26 U.S.C. 7203.

20           And in giving that number of an estimated 30

21  violations, that only counts, from the advice given to -- given

22  by the accountants in 2001 or 2000 until about 2004, seven

23  entities that failed to file returns.  And Mr. Brugnara

24  testified under oath at these 2004 hearings he was required to

25  file corporate tax returns including 1120s.

1              Here they are (indicating).  He gave them to banks,

2    but he never filed them with the IRS, from at least 2000, when

3    he received that advice, to at least 2005, when he could have

4    legitimately claimed, on advice of counsel, that he was no

5    longer filing returns because there was a criminal

6    investigation.

7              Up until that time, he had consistently testified to

8    the IRS that those accountants told him he had to file

9    corporate tax returns.  And, in fact, he had been giving them

10   to banks up until his recently as 2007.

11             All of the corporate tax returns that he gave to the

12   banks, including the ones for the charged years that were never

13   filed, report positive incomes for his own tax returns.

14   Don't --

15             **THE DEFENDANT:**  They're trying to --

16             **MR. NEWMAN:**  That's a violation.  It would be wire

17   fraud, and failure to file corporate tax returns.

18             He's the one that testified under oath.  And he was

19   required to do it.  At the very least, I don't think there

20   would be a basis for a downward departure.

21             **THE COURT:**  Anything you want to respond to on that,

22   Mr. Getz?

23             **MR. GETZ:**  Again, what the Court just heard was a

24   technical attack on the way that Mr. Brugnara handled his tax

25   filings.  And that is what has brought him before the Court

1   today.

2          He listed all of his corporate entities on his

3   Schedule K, and he did everything wrong.  It was all done

4   wrong.  And it was done with pen and ink, but that is not a

5   basis to find that his criminal-history category should be

6   higher.

7          **THE COURT:**  All right.  Anything more by way of

8   guideline calculation that the lawyers want to bring up?

9          **MR. NEWMAN:**  No, your Honor, not of the guidelines.

10          **MR. GETZ:**  No, your Honor.

11          **THE COURT:**  All right.  Mr. Getz, I need your help on

12   something.  If you just to go back to the $300,000 point for a

13   moment, if the -- given that I'm accepting that as the base

14   offense level, what is the base offense level if you take

15   300,000?

16          **MR. NEWMAN:**  It's 18.  And let me show it to you, so

17   you could --

18          **MS. SEARLES:**  That's correct, your Honor.

19          **MR. NEWMAN:**  (Indicating)

20          **MR. GETZ:**  Yeah.

21          **THE COURT:**  All right.  So the Court's going to be

22   thinking about the -- if you want, I will take a break and go

23   read your memorandum, but I am prepared to tell you that I will

24   not take into account the bottle-throwing and so forth in that

25   supplemental, if that's all your other brief dealt with.

```
 1            If you want me to take a break and go find and read
 2   your late memorandum, I will do that.
 3            MR. GETZ:  No.  The Court's not going to take it into
 4   consideration.  I think that we're prepared to proceed.
 5            THE COURT:  All right.  How is my court reporter?
 6   Are you doing all right?
 7            THE REPORTER:  Yes, sir.  Thank you.
 8            THE COURT:  So I will -- at this time I will invite
 9   counsel to make your arguments as to what should be the
10   sentence and just, basically, the statutory sentencing factors.
11   And then I'll give Mr. Brugnara an opportunity to have the last
12   word.  And then I'll make a decision.
13            Mr. Getz, go ahead.
14            THE DEFENDANT:  Can I get some water, your Honor?
15            Could you (indicating) fill this up, please?
16            THE COURT:  Please, one of the marshals --
17   Mr. Brugnara needs some water.
18            Mr. Getz.
19            MR. GETZ:  Yes.  Well, as is often done in debates as
20   well as closing arguments, I'd like to give a few of my minutes
21   to Mr. Brugnara.  So the Court, I hope, will appreciate that my
22   remarks are somewhat abbreviated, because I'm relying on
23   Mr. Brugnara to, you know, fill in the gaps regarding the
24   equitable argument that I'm going to make.  And it's simply
25   this.
```

1          Twenty-five months is adequate for what Mr. Brugnara

2   has done.  A sentence exceeding 25 months would not fit the

3   crime.  The punishment should fit the crime, and I think the

4   Court can consider this.

5          The punishment is analyzed from the viewpoint of the

6   one receiving it.  And in that regard, the higher someone goes,

7   the harder the fall.  I think for some people, to get two days

8   in prison would be a heavy penalty; and Mr. Brugnara is one of

9   those.  Two days is a lot to him.  And he's already spent more

10  than two months in custody.

11         Twenty-five months will address a concerns that the

12  Court has about punishment standing as an example to those who

13  run afoul of the tax laws.

14         Twenty-five months is adequate time for Mr. Brugnara

15  to think about what happened, and come to grips with the

16  reality of this case.

17         Twenty-five months is enough time for Mr. Brugnara to

18  make a comeback.  He's been successful before.  He's got a

19  great future.  He's got people around him; not just his family.

20  He's got people in the business community, many of whom are

21  here, who'll support him when he comes back to us.

22         If the Court gives him 25 months in prison under

23  those circumstances, Mr. Brugnara will be in prison for at

24  least a year and a half.  He will be away from his family.  He

25  will be away from his business interests.  And he will have

1   time to think about and ponder how he can do better when he

2   comes back.

3           He's got a great future.  He's got a limitless

4   future.  He's got plenty of time ahead of him to achieve his

5   goals.  And I'd ask the Court to limit the penalty to 25

6   months.

7           **THE COURT:**  All right.  Let's hear from the

8   Government.

9           **MR. NEWMAN:**  Your Honor, I think the most serious

10  point to consider in this case is that 3553(a) factor; is the

11  defendant's respect for the law.  And I would say that he's

12  shown during the course of his case that he doesn't have any.

13  He's given the Court misleading if not outright false

14  information.  And this has been going on since at least the

15  early '90s; that he was part of an incident in the early '90s

16  where his real-estate license was revoked.  And at least the

17  allegation was that he helped prepare false tax returns.  And

18  the person that was trying to get a loan with him, as the

19  broker, wasn't allowed to.

20          And there is a detailed decision about -- it was

21  essentially absolving -- I don't know if I would go that far --

22  Mr. Brugnara as being the one responsible for preparing the

23  return; but most certainly you should be aware of the incident

24  where a tax return that goes to a lender should be the same as

25  the one that goes to the IRS.  And that was in 1990; 1993 when

1   that decision came out.

2          Since that time, this investigation has uncovered

3   four or five corporate tax returns that I have in my hand that

4   the defendant has never filed with the IRS.  He's never filed

5   them.  And he's given them to lenders, reporting positive

6   income.  And he never filed a tax return with the IRS ever

7   reporting positive income.  He testified, "I had to file

8   corporate returns," but he never asked -- we're getting

9   arguments that it's a technicality that the way that he files

10  is he doesn't file corporate returns; he makes an attachment to

11  his 1040.

12         Well, I have his corporate returns in my hand that he

13  gave to lenders.  In 1996 he gave 1040s to

14  Fremont Investment and Loan.  The one he gave to them, he made

15  a half a million dollars.  The one he filed with the IRS, he

16  made negative 142.  And there's other instances of the same

17  conduct.

18         We have forged documents that were given to lenders;

19  misleading documents.  And this went all the way up until the

20  bankruptcy case that was pending during the course of this

21  trial, of testifying under oath that your Honor gave him

22  permission not to file tax returns, explicitly using the Court

23  name, when, in fact, that wasn't at all true.  That -- no one

24  here -- and there was no order by this Court allowing the

25  defendant not to file tax returns, so that its entities can

1  proceed in bankruptcy.

2          For that reason -- and I understand the Court's

3  reason/rationale for using a $300,000 tax-loss amount, but I

4  would urge the Court to still use a higher guideline range and

5  enter a sentence of 46 months, which is the high end of

6  Level 20.  It would correspond to the adjustment that the Court

7  has already made, because I think there is ongoing, continuous

8  conduct that is both typical white-collar fraud the defendant

9  will never admit to.  He has no respect for the Court, no

10 respect for any federal law, and no respect for state law.

11         I thought that it was shocking to see that sealed

12 transcript, where the defendant was told an indictment that may

13 not be filed in that case that was pending before

14 Judge Chesney, if he just took the dam down, and he didn't.

15 And charges followed.

16         It doesn't matter what the law says, what the Court

17 orders say.  It's clear that the defendant is calling himself

18 for a severe punishment, because he has no respect for the

19 judicial system at all, or federal laws.

20         And I would ask your Honor, if the Court is going to

21 adjust the guideline level, that we also adjust the penalty

22 level, too; the fine.

23         **THE COURT:**  Tell me this.  The 300,000 offense level

24 -- did you say that was 18, or 16?

25         **MR. NEWMAN:**  Eighteen.

```
 1              THE COURT:  All right.
 2              MR. NEWMAN:  And that it would be adjusted up to 20
 3   for the obstruction -- I would ask for that.  Whether the Court
 4   accepts the obstruction or not, I think that's adequate basis
 5   for a departure.  That PSR has put the defendant on notice that
 6   a departure is maybe warranted.  And I think that one is
 7   warranted, whether or not the Court gets them adjustment for
 8   acceptance or not for -- or for instruction, I think that 46
 9   months is an appropriate sentence.
10              THE COURT:  All right.
11              THE DEFENDANT:  Thank you.
12              For starters, your Honor --
13              THE COURT:  Your turn.  Go ahead, Mr. Brugnara.
14              THE DEFENDANT:  -- in the spirit of the
15   bottle-throwing joke --
16              Can I get more than a sip this time (indicating), so
17   that I don't -- could I have a full glass of water?
18              THE COURT:  How about a third of a glass of water?
19              THE DEFENDANT:  I want a third of a glass this time.
20              You know, your Honor, I want to start off, because to
21   me, my name is everything.  To me, my family's the most
22   important, and my reputation.
23              And, you know, it's kind of funny, because all of
24   these accusations dating back all of these years -- file the
25   charges.  They don't file charges, because it's all hearsay.
```

1  People have investigated me, your Honor, for 20 years.  They

2  don't like a guy who's up and coming, successful.

3           Let's go back.  For starters, I definitely want you

4  to read the supplemental memorandums that were filed this last

5  week.  There were two of them, in addition to Brian Getz'

6  response.  I definitely want you to read those, because it

7  details detailed explanations about these supposed incidents.

8           Let's start with the '91 incident.  I was never

9  involved in anyone's fraud.  I was out of school a couple of

10  months.  And it was some woman and her son-in-law who did some

11  deal on seven properties.  I was barely out of San Diego State

12  a few months.  And I was only -- had my license suspended for

13  30 days because I asked for the broker's fee.  That's in the

14  supplemental memorandum.  This is the sort of ugly lies.

15           They can't talk about my current business.  I've done

16  $800 million of deals, which is nearly a billion dollars.  And

17  they want to talk about something from 20 years ago.

18           Hey, let's talk about it.  I don't back down from it.

19  Let's talk about '94.  I just told you I have Fremont

20  Investment.  Thank God the correct return that Judge Haynes

21  ruled was, in fact, accurate -- I didn't owe anything.  They

22  got a draft return before that.

23           What happens when you prepare your returns,

24  your Honor -- a very simple explanation.  Lenders need returns

25  for their files.  If you don't have them done yet they say,

1  "Well, give me your draft return."  That's what they tell me.

2          I do it.  I give it to them.  There's a Form 4506 --

3  I think it is -- where they can send in to the IRS, and get a

4  copy of your form.

5          There's no shenanigans.  They want to paint

6  Luke Brugnara.  They feel so inadequate about themselves.  And

7  they say, "This guy's so successful, he must have done

8  something illegal."  So that's how people feel about me:  I

9  must have done something illegal, because he can't do that on

10 his own.  I have done it on my own.  The proof is the lenders

11 that support me and the volume of deals that I have done.

12         So they pull up this '91 -- this '94 incident.  This

13 guy must threaten people.  I haven't threatened anything.  The

14 rigs person was a drifter.  Three different men try to shake me

15 down on a false paternity claim.  Refused to take a blood test,

16 your Honor.  I had to spend $40,000 to get her to take a blood

17 test with this kid to prove that the kid wasn't mine.  It was a

18 shakedown.  I was a victim.

19         Regarding these tax returns, early 2000, that were

20 given to the lenders that they don't have yet -- the lenders

21 required them.  I can't file these, because I'm in this --

22 these actions.  You know, it was a civil, then a criminal

23 action.

24         They said, "Fine.  Send us what you have; what you're

25 going to file."

1          All of these lenders funded the loans.  All of them

2    were paid back in full.  There was a broker of record on every

3    loan.  Every lender was paid back every penny, and is fully

4    aware of my circumstances.  And if they want to go to trial,

5    like I begged you four, we're going to have a three-week trial.

6    And I will have every single lender come up here and on that

7    stand and say, "Yeah, that's what happened."

8          They like to do it that way:  Torture me into a

9    guilty plea.  And let's throw a bunch of dirt on him from 15,

10   20 years ago.  Looks like an idiot in his clown suit.

11         One sip of water.  I asked for four glass of water.

12   They gave me a half a sip each time.

13         Same thing.  Took my pen away, so I couldn't take

14   notes while they were talking.

15         It's the system.  Here I am, caught up in it.  I

16   can't beat one thing.

17         I did say that was true at the time sentencing at the

18   guilty plea.  I can't beat these guys.  I can beat anyone in

19   business, because I play fair, but I can't beat somebody who's

20   going to stick me in a cement box with nine murderers.  Can't

21   do it.

22         So what I want to ask you for, your Honor, is mercy

23   today, because you're going to -- you made a ruling that I'm

24   guilty.  You're moving ahead to sentencing.  I respect your

25   decision today.  Even though I don't agree with it, I respect

1   it, because this is your court.

2           **THE COURT:**  Thank you.

3           All right.  Mr. Getz, would you hand me --

4           **THE DEFENDANT:**  No.  I want to say, your Honor --

5           **THE COURT:**  You're not done?

6           **THE DEFENDANT:**  -- about -- about -- I'd like to get

7   something from my mother, if I can.

8           **MR. GETZ:**  No, no, no.

9           **THE DEFENDANT:**  A picture.  Please, your Honor.

10          **THE COURT:**  The marshals won't let you do that.

11          **THE DEFENDANT:**  It's a -- this is my allocution.

12  Please, Mr. Getz.  Please.  I'm a family man, your Honor.  Four

13  children:  Luke, Vincent, Loren, and Brianna.  They're in first

14  grade through eighth grade.  I wanted to show you their

15  pictures.  I would never bring them in court, your Honor, out

16  of respect for them, first, and out of respect for you.  It's

17  inappropriate.

18          I have four children, and I dedicate my life to them.

19  I spend a considerable amount of time with them.  I always put

20  them before my business.  That's why I think, in a way, that

21  I've been successful in business:  Because I've never really

22  valued money as much as my family.

23          So I take in, you know, risks, and leveraging

24  properties, and buying other properties because, you know,

25  irrespective of whether those properties made money or lost, at

1    the end of day I have my family.  And that's the only thing

2    that supports me.

3            They try to paint a picture that I live flamboyantly.

4    My wife drives the same car since 2001.  It's a Chevy Suburban,

5    for the last nine years.  If we were living flamboyantly, we

6    we'd get a new car every year.  We go to the park.  I coach

7    their baseball team, you know.

8            You know, my dad -- he worked at Juvenile Hall for 35

9    years.  My uncle was chief of police.  You know, my brother

10   works as a -- I'm a law-abiding, good guy who's a family man

11   who happened into business.

12           I never even really expected to get to where I'm at

13   in business.  It was two benefactors -- Harry Blumenthal and

14   David Pick took a liking to me right after I graduated from

15   college, and lent me a lot of money to buy properties.  They

16   were getting large returns.  That's, in fact, why there are no

17   taxes to deal with:  Because, in fact, you know, there were

18   such high interest rates paid to these lenders; but I had

19   enough to live comfortably with my wife and children.  That's

20   really the only thing important to me.  The only thing that's

21   been important to me.

22           I can't tell you how many deals were actually cut

23   sitting on the grass at a playground, but -- so I probably --

24   you know, half a dozen or more, because my children are the

25   most important thing to me; but you know, your Honor, in this

1  case I was thinking about -- I've sat in your room several

2  times.  And -- about what's fair, and what's a fair sentence

3  for me, you know, considering what you're doing today.

4        You know, you know, I don't think it's fair to use my

5  success in the past as a businessman.  And again, I don't think

6  that makes me any better or any worse than a plumber or someone

7  working at a fast food.  We're all the same; but for somebody

8  to treat me differently because I work so hard, and I was

9  fortunate to get to the level of business where I'm at, as a

10 way to deter the public or to use, you know, my name and my

11 notoriety as way to try to advance their own personal careers

12 and personal agendas -- all of these attorneys, you know, want

13 to work for MoFo or a major firm, you know, after they put in

14 their time for the Government.  So they want to take down the

15 elephant; the big gorilla.  They want to use that.

16       You know, I was in this court.  There was, you know,

17 an Asian fellow in here.  And John Runfola was representing

18 him.  And this guy stole $175,000 from Wells Fargo and, with

19 his cousin as a teller, from a little old lady.  And the guy

20 got four months.  And I said, "Wow."  I mean, four months for a

21 guy who stole $175,000 from Wells Fargo Bank, using fake I.D.s,

22 from a little old lady's bank account?

23       If you use that as a measure of what's fair, in my

24 case, I should get zero.  They want to use me as an example,

25 which violates my civil liberties and my constitutional rights

1  to be treated fairly.  Why didn't they go to the press with

2  him -- to the *Chronicle* -- and use Luke Brugnara's fame to

3  advance myself, you know.  And that's just not fair.  You know,

4  that's not fair.

5           I mean, listen, your Honor.  If you put this in

6  perspective, this is a -- less than 1 percent.  It's actually

7  1/10 of 1 percent IRS spreadsheet.  I'm not going to talk about

8  my spreadsheet, because it's out the window.  IRS spreadsheet.

9  It's a 1/10 of 1 percent tax-loss case.  Okay?

10          And if you put that in perspective to any other

11  citizen in this country, it's like essentially asking for a

12  principal term of a teacher who makes 40,000 a year who erred,

13  you know, a $100 on her tax return ten years ago, or the

14  plumber with four children, like my dad.  My dad worked hard.

15  He may have 50,000 -- whatever -- $60,000 a year.  It would be

16  like going after my dad for a tax return ten years earlier that

17  he was off by $200:  1 percent of income from ten years ago.

18          In my opinion -- and I know you're a mathematics --

19  mathematician -- intent to violation is relative to percentage,

20  not the numerical amount due.  I believe that the severity of

21  violation correlates to the percentage of error, which shows

22  either intent or a reasonable contingency.

23          For example, a $1 million or less error on a hundred

24  million is certainly less severe than someone who only makes a

25  million and owes a half a million, even though the half a

1   million is a much lower figure, because it shows intentionality

2   versus contingency.

3           And in my case, you know, he talked about how I

4   didn't carry the loss carryforward.  Your Honor, he has to talk

5   about, you know, my malicious intent.

6           The fact that I didn't carry the loss carryforward

7   shows, in fact, that I didn't have malicious intent.  I didn't

8   even carry forward the $5 million that I was able to carry

9   forward.  I didn't even carry back the $3 million that he was

10  able to carry back.  If I was looking to drive a number down, I

11  would certainly take advantage of any opportunity to lower that

12  number.

13          Your Honor, regarding the guideline ranges, you know,

14  those guidelines ranges, you know, your Honor, are just

15  advisory -- what I've been told by my three attorneys -- and

16  that you have the full authority to give me whatever you think

17  is fair and appropriate.

18          You even said, "I can give you zero if I want, or

19  more."  You know, whatever.  I'm standing in front of you

20  today, your Honor.  I wanted to, you know -- to fire Brian

21  right here, because I don't want -- I don't think -- I don't

22  want to go to jail anymore.  I don't want to go to prison.  My

23  children suffer; have suffered every single day for the last

24  three months.  I've suffered immeasurably.  I mean, I didn't

25  think I could make it in there two days, let alone three

1    months.

2          You know, the previous U.S. Attorney, Kevin Ryan, who

3    was very well respected, refused to prosecute this case as a

4    criminal case.

5          Tom Newman talks about how I thumb my nose at the law

6    because I didn't take down a dam.  Your Honor, the dam on the

7    Gilroy property was built by a U.S. Senator, Henry Miller, in

8    the 1870s.  And it was the last grandfathered dam in northern

9    California.  Out of respect for the fact that it was a legal

10   dam, I didn't -- I did not take it down.

11         Harris Taback, prior counsel, told the U.S. Attorney,

12   "If you could prove that that dam is illegal, we'll certainly

13   take it down," because I do follow the law.  I said, "Show me

14   that it's an illegal dam, and we will take it down."  It's not

15   an illegal dam.  It's registered with the State of California,

16   and has been for 140 years.

17         So the guidelines are in your discretion.  Whereas

18   you can give John Runfola's client four months for robbing a

19   bank and forging a little old lady's I.D. and stealing $170,000

20   from her bank account and getting caught, I can't believe my

21   crime that you've ruled upon today is more serious than that;

22   but then again, he's unknown.  And Tom Newman can't advance.

23   Tom Newman can't get a job at MoFo, bringing this immigrant

24   from the Orient to MoFo, and say, "Hey, look.  I got this guy,

25   you know.  Four years.  Look what he did to this little old

1   lady."

2           So what they're doing is they have their own personal

3   agenda to use my name.  They should be ashamed.  If this was in

4   the business world, your Honor, and someone said -- you've got

5   to remember the amount of the tax-court case was for

6   $11 million.  And this case was for $17.5 million.  Let's look

7   at it.

8           For the last 15 years, 1991 all the way through the

9   end of '04, 15 years, I have been sued by the U.S. Attorneys

10  and the U.S. tax attorneys collectively for $28.5 million in

11  taxes due.

12          The ruling in the U.S. tax court in front of

13  Judge Haynes was minus $87,000.

14          The ruling in this case -- it was a couple hundred

15  thousand dollars, or whatever it is.  The number ended up being

16  collectively in the hundreds of thousands of dollars off their

17  claim of $28.5 million.

18          What would happen at MoFo if someone were to sue

19  someone for $28.5 million, and they said, "Oh, well.  It's only

20  a couple thousand dollars."  They would be shown the door, man.

21  They would have a serious problem.

22          What they want you to do is clean up their mess.

23  What they want you to do is to say, Hey, we were right.  No.

24  Kevin Ryan was right.  Kevin Ryan was right.  He said, "No,

25  this is not a criminal case"; but no, no, no.  They have the

1  personal agenda.  And they went ahead with it.  They went to

2  all of the newspapers said, "This guy.  17 and a half million."

3  They want you to stick it to me, so you can save them in this

4  case, so you can prove they were right.

5          You know what you said.  I was wrong.

6          Okay.  I accepted your decision, because your Honor,

7  I respect your court, and I respect you.  I really do.  I think

8  you have a lot of integrity.  I've always liked you, you know.

9          Your Honor, they're wrong, too.  They come in with

10 unclean hands here, because they made all sort of accusations

11 that were so wildly off base; more than 90 percent off base.

12 That's a disgrace to your court and to their profession, A, and

13 to their job.  That's a disgrace on their backs.

14         So they want to somehow sweep away, because that's

15 what people do.  I've noticed this, your Honor.  I'm at a point

16 where I don't even like this.  People who make mistakes, they

17 hide their mistakes, so they look to get out of their mistakes.

18 That's what they're trying to do here to me.  They're trying to

19 use my name, you know.

20         Your Honor, the only thing that matters to me are my

21 children.  I wish you could see their pictures.  They're

22 beautiful children.  I was looking forward to one call a day to

23 them, and then they moved me into solitary confinement.  I

24 didn't have so much as the one write-up.  For the last three

25 months I've been sitting in this jail.  They stuck me in some

```
 1  solitary confinement for no reason, your Honor.  I can't even

 2  talk to my children anymore.  I'm a good father.  We go to the

 3  museum.  I try to teach them about art.  I try to teach them

 4  about -- you know, we always walk through Golden Gate Park

 5  every Sunday.  These children are just being destroyed.  They

 6  don't even know why.  They don't even know why this is -- this

 7  happening.  This is six years old to 14 years old.

 8          I'm using an accountant now on every tax return.  I

 9  promise you, you'll never hear the name Luke Brugnara as it

10  relates to taxes ever, because an accountant who was also an

11  attorney is doing all of my taxes.

12          So what benefit comes from punishment of me at this

13  point?  I don't think anything, your Honor.

14          I mean, trust me.  I've gone through self-analysis,

15  sitting with myself for the last three months.  I believe that

16  I'm a better person at the end of this, and have put in

17  perspective, even more importantly, how important my family is

18  to me.  And, quite frankly, that's all that matters to me.

19          And, you know, your Honor, giving me more time would

20  just destroy my children.  It will destroy my family unit.  And

21  I think that's what makes this great country of ours so

22  special, is how strong the family units are; how strong and

23  important it is to have a family stay together.  You know, my

24  son's 14 years.  Ordinarily, one of them -- he needs me with

25  him.  He -- I helped them with their homework, your Honor,
```

1    every night, with their algebra, prealgebra.

2          This isn't like when you were younger, I was younger.

3    They get two, three hours of homework a night.  I took a great

4    deal of effort helping my children.  They all get straight A's.

5    They need me.  They're just hurting so bad, your Honor.  I miss

6    them.  And whatever you give me, you know, I am changed from

7    this case.  And I promise you that.

8          And I promised Tom Newman I am changed from this

9    case, to the point where, you know -- you know, there can't be

10   any contingency factors, not even 1/10 of 1 percent, if you're

11   going to deal with the U.S. Government.  You can't give even

12   the needle of an eye [sic], especially if, you know -- if

13   you're at a higher level, you just can't do it.  And that's

14   what I have learned.

15         And if I pass on any message to my sons, that's what

16   I'll tell them.  Man, don't even have a hair's breadth of error

17   when it comes to the government, because they will go after

18   you.  Your Honor, I didn't have that, because, like I said, my

19   father worked for the Juvenile Hall for 35 years; never missed

20   a day of work.

21         And I was kind of like on-the-job training, your

22   Honor.  As I went through buying these buildings, the market

23   was improving.  And, you know, I was being lent these funds.

24   And, you know, the mistakes that were made on those returns

25   will never happen again.

1          And I have that knowledge to pass on to my children;

2    but you know at this point, your Honor, I mean, I am beaten

3    down.  I mean, you can see I've lost 50 pounds, man, in the

4    last three months.  I don't think I've slept once, you know,

5    more than an hour at a time sitting in this jail.

6          So I just pray to you that you look at my case, and

7    look at it not in the context of anything other than just a

8    regular American, just like these Oriental guys or anyone else

9    or the teacher or the plumber who basically are in front of

10   you.  And don't treat me any differently.  You know, treat me

11   as the guy who was off by 1/10 of 1 percent ten years ago.  Ten

12   years ago.

13         There's no indictment, your Honor.  Two years ago,

14   three years ago, four years ago -- ten years ago, I was off by

15   1/10 of 1 percent.  Please, you know, show mercy and let my

16   family be together.  That's what I pray to you.

17         **THE COURT:**  Thank you.

18         Mr. Getz.  I'd like if you can hand up to me the

19   memorandum that your client wants me to read.  And we'll take a

20   recess.  I'll go read it now -- or if you will help me identify

21   them to make sure that I have them, which I think I have, I

22   would be happy to go take a look at them.

23         I will hand down to you the ones I already have,

24   which are three.

25         **MR. GETZ:**  I can.

 1             THE DEFENDANT:  No, no, no.

 2             THE COURT:  You tell me if I already have the ones

 3   that you've been talking about.  Let me -- can I hand these

 4   down to you?

 5             MR. GETZ:  Thank you.

 6             THE COURT:  And those are the three that I already

 7   have, but you got me nervous that there's something that I

 8   haven't read.

 9             MR. GETZ:  All right.  I can hand up what the Court

10   has not shown us.

11             THE DEFENDANT:  Excuse me.  Let me make sure.

12             MR. GETZ:  The Court has considered the sentencing

13   memorandum and the amended status of sentencing.  And then last

14   Friday was this response which the Court said it had not

15   received, but the issue is moot because the Court said it would

16   not consider the soccer episode.

17             THE COURT:  All right.  Well, then, can you hand me

18   those three back?  But is there anything else I have not read?

19             (Whereupon a document was tendered to the Court)

20             MR. GETZ:  Yes.  I'll hand that up.

21             THE DEFENDANT:  These, too.

22             (Whereupon a document was tendered to the Court)

23             THE COURT:  All right.  For the record, you have

24   handed up something called, "Supplemental Sentencing Memorandum

25   of Defendant Luke Brugnara" --

```
 1            MR. GETZ:  Yes.

 2            THE COURT:  -- "Defendant Luke Brugnara's Response to

 3   U.S. Sentencing Memo," and "Declaration of Luke Brugnara."

 4            All right.  I'll go read these three.  And we'll

 5   resume in about 20 minutes.

 6            MR. GETZ:  Thank you.

 7            (Recess taken from 12:07 p.m. until 12:25 p.m.)

 8            THE COURT:  All right.  Let go back to work.  Please

 9   be seated.

10            MR. GETZ:  Mr. Brugnara is present again.

11            THE COURT:  All right.  The defendant is present.  I

12   want to resume now.

13            I'm going to hand back down to you these three

14   memoranda.  These were all filed by Mr. Brugnara himself, as

15   opposed to through counsel; but after reading them, I relies

16   that two of the three I had seen before.  And I can't account

17   for why I didn't have it out here.  Nonetheless, I now know

18   what's in all three, so I'm handing those back down.

19            MR. GETZ:  Thank you.

20            THE COURT:  And at this point, I'm going to proceed

21   to pronounce sentence.

22            All right.  First, I want to say the Court needs to

23   calculate the guideline range.  This is disputed in this case.

24            The Court will take 300,000 as the agreed-upon loss,

25   which gets us to Number 18, as opposed to 22.
```

1          And I should start off by saying that the probation

2     officer calculated the correct range to be 57 to 71 months, and

3     recommended 64 months in prison.  And that was based on Total

4     Offense Level 24, Criminal History Category 2.

5          Now I'm going to recalculate this, with a few

6     adjustments based on today's argument.

7          So the Base Offense Level is 18.

8          Though there is -- the Government says in a short

9     evidentiary hearing it could prove the original 22 based on a

10    much higher loss level, the Court will go with the agreed-upon

11    300,000.

12         With respect to adjustment for obstruction of

13    justice, this is a close call, but I'm not going to include 2

14    points for obstruction of justice; but I want to tell you I do

15    not accept Mr. Getz' argument that somebody of Mr. Brugnara's

16    personality can be excused on the ground that he must think

17    that things he's saying are true at the moment he says them,

18    even though they're demonstrably false.  I don't accept that.

19         I just think the way that -- I just think the way

20    that testimony was worded is slightly ambiguous.  And

21    therefore, I'm not going to impose the 2 points for obstruction

22    of justice.

23         With respect to acceptance of responsibility, this is

24    an unusual case.  Ordinarily, when somebody pleads guilty, they

25    get at least -- they get the 2 points for acceptance of

1  responsibility.  In this case --

2           Well, let me give the counterexample first.  There

3  are instances where, if somebody goes to trial, nonetheless,

4  you could -- you could give them some acceptance of

5  responsibility, on account of there may be some unique issue

6  that would -- while they were willing to admit the basic facts,

7  there's a legal issue, for example, over whether or not the

8  conduct even constitutes a crime.  And therefore, the I, even

9  myself, have, in the past, been lenient, and given acceptance

10  of responsibility for that circumstance.

11          This is a the exact opposite.  Here we have a

12  situation where Mr. Brugnara has twice pled guilty, but

13  immediately tried to wiggle out of it, and claim that he does

14  not accept responsibility, and that, in fact, he is innocent,

15  and wants a trial.  And I have no doubt he's going to appeal,

16  and go all the way.

17          So this entire record is the exact opposite of

18  accepting responsibility.  It's a long-winded process of

19  blaming everyone in sight -- everyone:  The accountants, the

20  lawyers, the Government, Mr. Newman -- blaming everyone except

21  himself for failing to file returns and pay his taxes.  So I'm

22  not going to give the 2 points for acceptance of

23  responsibility.

24          With respect to the criminal-history category, the

25  question is whether it should be Number 1 or Number 2.  There's

1   no doubt it should be Number 2.  It certainly does not

2   overstate his criminal history.  It is a right-on, correct

3   computation by the probation officer, Ms. Searles.

4          And I want to say that, without getting into the

5   soccer thing, and ignoring that totally, as I said that I

6   would, the rest of this record is replete with examples that

7   would show, if anything, it ought to be higher; that

8   Mr. Brugnara is a hostile individual who loses his temper

9   easily and threatens people.  So I'm not increasing it to

10  Number 3, but certainly Number 2 is fair.

11         So the Court finds that 18 roman numeral II is the

12  right -- is the right -- where this ought to come down.  And,

13  by my math, in looking at the -- that's 30 to 37 months as the

14  correct range.

15         Now if, hypothetically, the Court had gone down 2

16  points for acceptance of responsibility, the range would be 24

17  to 30.

18         Now the correct, in my judgment, sentence --

19         First I want to say I totally accept Mr. Brugnara's

20  statement that he is a good father; that he loves his family;

21  and they're going to miss him.  No doubt about it.  And it

22  hurts to have to be in this situation where a good father is in

23  this position.  It is not a comfortable situation for the Judge

24  to be in here; but I have a duty to do what is right under the

25  law, and that's what I'm going to do.

1        So I have taken that into account, but I also have to

2   take into account the sentencing factors.   There is a -- when

3   we come to our taxes, there is a huge, huge obligation on all

4   of our parts to pay our fair share to the United States

5   Government, and help this country move along, and not to cheat

6   on our taxes.

7        The Government can't possibly go after everyone who

8   cheats on their taxes, but it can go after a few, and hold them

9   up to public example, so that others will see:   Aha!   I'd

10  better pay my taxes.   I don't want to be caught and have to

11  serve time, like Mr. Brugnara did.

12       So deterrence is an important factor on this

13  sentencing decision.

14       Another important factor is to promote respect for

15  the law.   And the Court is convinced that Mr. Brugnara is --

16  has almost no respect for the law.   He violates it over and

17  again, and then he blames other people, instead of just trying

18  to make it right.   He blames other people.

19       There's an element of being a bully; of making

20  physical threats.   He definitely is a fast talker and a

21  manipulator.   He's someone who refuses to honor his

22  obligations.

23       So, to promote respect for the law, I think, is an

24  important factor in these circumstances.

25       So those are the two, I think, of the sentencing

1   factors -- the two that come to mind most readily.

2          Can take him at his word that he won't commit any

3   more crimes?

4          I've heard that too many times, and I don't quite

5   believe it in Mr. Brugnara's case.  It's -- I treat that factor

6   as a wash in these circumstances; meaning I discount it, but I

7   don't know -- I don't know how much weight to put on that.

8          I want to circle back to what the guideline range is.

9   The guideline range, which is advisory -- and Mr. Brugnara's

10  right about that.  The guideline range is 30 to 37 months.

11  That's the one that I think does apply; but if acceptance of

12  responsibility was given, it would be 24 to 30 months.

13         So they overlap at the 30 level.  And that's going to

14  be the sentence:  30 months in prison.  Two and a half years.

15  It's a little more than Mr. Getz argued for, but I think that

16  is the right sentence in this case.

17         And I want to make it very clear that if I am wrong

18  about the acceptance of responsibility, then it would still be

19  a 24 to 30 months.  And I would still find and do find that 30

20  months would be the appropriate sentence in that circumstance.

21  So either way, 30 months would be the appropriate sentence.

22         All right.  I want to say that Ms. Searles is one of

23  our absolute best probation officers ever.  And it is hard for

24  me to come out with a sentence that is less than half of what

25  she has recommended; but I've tried to explain the reasons why

1    I have come to that conclusion.

2              Now, I need the help of the Government for a moment.

3    You said that there should be a reduction in something.

4         **MR. NEWMAN:**  I think the fine -- a reduction of fine

5    amount to fit the level would be appropriate, too, your Honor.

6         **THE COURT:**  To what?

7         **MR. NEWMAN:**  I would ask for a fine of $50,000.  And

8    I would add that that's --

9         **THE COURT:**  What is the range?

10        **MR. NEWMAN:**  The range for an 18 to 19.  That would

11   be with acceptance, your Honor, is 6- to 60,000.

12        **THE COURT:**  Is what?

13        **MR. NEWMAN:**  6- to 60,000.  That's with acceptance.

14   Excuse me, your Honor.  It's 5,000 to 50,000 with acceptance.

15             Without acceptance, Level 18 is 6,000 to 60,000.  I

16   would ask for 50,000, which is the high end of a Level 16.  So

17   that would, again, as the Court has already imposed sentence,

18   overlap both an 18 and a 16 guideline range.

19        **THE COURT:**  I think the restitution level has got

20   to -- doesn't that have to be down to 300,000?  That's what I

21   would.

22        **MR. NEWMAN:**  It would not, your Honor, because the

23   restitution amount, the tax loss amount for criminal purposes,

24   and the guideline amount -- they're never synonymous.  So at

25   the very least, it should be 1.9 million.  Specifically, it

1   should be $1,904,625.35.

2          That may not be the criminal tax loss amount, but it

3   certainly is the low end of the civil amount due; but if the

4   Court wants to impose a restitution amount of 300,000, that

5   would really just be the tax loss amount.  I don't think that

6   that would be appropriate.  I think the restitution amount

7   should be the actual amount due, which is $1,904,625.  And that

8   would be the lowest, most conservative figure for the civil tax

9   due.

10         **THE COURT:**  Say that number again.

11         **MR. NEWMAN:**  $1,904,625.35.

12         **THE COURT:**  All right.  What do you say to that,

13  Mr. Getz?

14         **MR. GETZ:**  The numbers mathematically are correct,

15  but missing from the equation -- and what I think the Court

16  should consider -- is ability to pay.  And I'm not aware that

17  Mr. Brugnara has money.

18         So, based upon my --

19         **THE COURT:**  You said $800 million that he's borrowed

20  in the past, and paid back.  I believe that he will have money

21  in the future.  So I'm going to go with the 1.9 million that

22  the Government has offered up.

23         All right.  Please listen as the Court pronounces the

24  sentence.  And then at the end, I'll ask you whether or not the

25  form of the judgment should not be entered as stated.

 1              Pursuant to the Sentencing Reform Act of 1984, it is

 2    the judgment of the Court that Luke D. Brugnara is hereby

 3    committed to the custody of the Bureau of Prisons for a term of

 4    30 months.  This term consists of terms of 30 months on Counts

 5    1, 2, and 3, all to be served concurrently.

 6              Upon release from imprisonment, he shall be placed on

 7    supervised release for a term of one year.  This term consists

 8    of one year on each of Counts 1, 2, and 3, all to be

 9    concurrent.

10              Within 72 hours of release from the custody of the

11    Bureau of Prisons, he shall report in person to the probation

12    office in the district to which he is released.  While on

13    supervised release, he shall commit no more crimes; shall

14    comply with the standard conditions adopted by the Court; shall

15    refrain from any unlawful use of a controlled substance; and

16    submit to a drug test within 15 days of release on supervised

17    release, and to periodic drug tests thereafter, and comply with

18    the additional conditions.

19              One, pay all restitution, fines, special assessments

20    imposed by the judgment that remain unpaid at the commencement

21    of supervised release.

22              Two, provide probation with access to financial

23    information as requested; authorize Probation to do credit

24    checks and obtain copies of income tax returns.

25              Next, defendant shall comply and coöperate with IRS

1    in a good-faith effort to pay any outstanding tax liability, to

2    include penalty and interest.

3           Next, provide U.S. Probation with a copy of any

4    written and approved agreement with the IRS for the payment of

5    any outstanding tax liability, to include penalty and interest,

6    within ten days of execution of such agreement.

7           Next, defendant shall timely and accurately file all

8    future income tax returns required by law during the term of

9    supervision, unless an extension granted by IRS.

10          Next, no firearms, no ammunition, no destructive

11   devices, no other dangerous weapons, and never be present in a

12   vehicle where any such thing is present.

13          Next, coöperating in the collection of DNA, as

14   directed by Probation.

15          Next, unless directed in writing otherwise, check

16   voice mail and/or answering machine daily, and follow all

17   instructions left by Probation.

18          Next, defendant shall pay to U.S.A. a special

19   assessment of $300, due now.  This can be worked off through

20   the Inmate Responsibility Program.

21          Next, pay to the U.S. a total fine of $50,000.  The

22   fine consists of $50,000 on Counts 1 through 3, all due now;

23   all concurrent.  While incarcerated, this can be worked off

24   through the Inmate Responsibility Program.

25          It is further ordered that the defendant pay to the

1    IRS, 450 Golden Gate Avenue, the amount of $1,904,625, which is

2    due now.  While incarcerated, payment of restitution can be

3    worked off at the rate of $25 per quarter through Inmate

4    Responsibility Program.

5            Upon release from custody, restitution payments shall

6    be made to the Clerk of the Court, 450 Golden Gate Avenue, at

7    the rate of $10,000 per month.

8            Any reason why the form of judgment should not be

9    entered as stated?

10           **MR. NEWMAN:**  No, your Honor.

11           **MR. GETZ:**  No not as to the form.

12           **THE COURT:**  All right.  The judgment will be entered,

13   probably today or tomorrow.

14           And, Mr. Brugnara, you have ten days within which to

15   file a notice of appeal, in case you want to do that.  And so I

16   give you that advisement so that you won't let the time slip

17   by, and you'll make sure that you cover that base if you do

18   want to appeal.

19           Are we done for today?

20           **MR. GETZ:**  We are not.

21           There are two matters -- at least two matters that I

22   would like to address with the Court, if I may.

23           **THE COURT:**  Sure.  Go ahead.

24           **MR. GETZ:**  The first is the issue of self-surrender.

25           It was bargained for in the very written plea bargain

1  that the Court relied upon to sentence Mr. Brugnara moments

2  ago.  It's written in there that the Government would not

3  object to a self-surrender.

4          As I mentioned in my sentencing memorandum, I'm

5  holding the Government to their part of the bargain.  So the

6  question is, more poignantly, whether the Court would consider

7  Mr. Brugnara a fit candidate for self-surrender.  And I have,

8  essentially, three brief points to make in that regard.

9          The first is there isn't anyone that's ever come

10  before the Court that has more community ties that

11  Mr. Brugnara.  He is from San Francisco and has lived here his

12  entire life.  His wife is here today.  His mother lives here.

13  And his four children live here.  So that is the first point.

14          The second thing is:  He's not a flight risk,

15  because, were he to flee, he would never see his children

16  again.  So that's not even worth any consideration.

17          The third thing is:  He's been convicted of a

18  tax-fraud case.  And that is not the kind of case that should

19  result in incarceration rather than self-surrender.

20          I would also mention in connection with that, that it

21  is well known that those who self-surrender obtain significant

22  benefit in terms of their calculation, both as to placement in

23  the security system maintained by the federal penitentiary, but

24  also in the amount of time they serve, so that the defendant

25  who self-surrenders is given a lower security category, and can

```
 1   maintain placement in a camp, rather than a medium- or maximum
 2   security, and that inmate will serve less time.  Because of the
 3   way credits are calculated, the inmate receives less time.
 4   And, as a "first offender," if I can use that term -- and I
 5   do -- I think Mr. Brugnara deserves that.
 6            So I'm asking that the Court to permit
 7   self-surrender.  He will surrender when he's designated by the
 8   Bureau of Prisons.  And I'm asking that the Court make its
 9   advisory recommendation to the Bureau of Prisons.  And this is
10   the second thing -- that he be -- that the Court make the
11   advisory recommendation that he be housed at Lompoc Camp.
12            THE COURT:  Well, the second part I'm willing to do.
13            All right.  Let's hear argument on the first part.
14            MR. NEWMAN:  Well, this is a very difficult position
15   for me to be in, because, your Honor, that's true in the plea
16   application that the Government would make a recommendation
17   that that defendant could self-surrender; but at the same time,
18   this case has groan exponentially over the years.  And, while I
19   wouldn't have a problem making that recommendation, I have a
20   hard time doing it now, with the caveat that we're putting the
21   cart before the horse.  The defendant really needs to show that
22   he should be able to get out.
23            And there's clear evidence that he's a danger to the
24   community in several respects.  And it's problematic knowing
25   that he's supplied the Court with misleading information just
```

1   to get out of custody.  He did to Judge Spero.  And this had

2   been going on for nearly a year.

3       **THE COURT:**  What evidence is there he's a danger to

4   the community?

5       **MR. NEWMAN:**  An economic danger.

6       And the information that's in the presentence report

7   that other people were threatened is not so much as related to

8   this case, but in other cases.  And that -- I guess I have a

9   general concern as to what will happen with this case if

10  there's an attempt to contact or influence witnesses; but I

11  don't think that this decision could be made kind of on the fly

12  right now about whether or not he should be released today.  I

13  understand that was in the application, but at the same time, I

14  think that this should be something that's thought through a

15  little more than just this argument.

16      I mean, the presentence report itself takes these

17  threat allegations as they relate to physical threats very

18  seriously.  I would say that --

19      **THE COURT:**  Who could he threaten that's connected

20  with our case?

21      **MR. NEWMAN:**  He knows at the very least who the

22  people are that would be witnesses in the case, and would

23  attempt to contact them.

24      And there's evidence that I have -- I put this before

25  the Court two years ago, nearly -- is that he shouldn't be

1  allowed to contact anyone outside of the presence of counsel.

2  If there's an appeal or anything of that sort, I have that

3  concern.  And that's something that I'm raising now; not to say

4  that he should be in custody, but I have a concern that he just

5  gets let out today, without thinking this through in careful

6  terms of release pending his self-surrender, if that's even the

7  case; but I don't think that this is something that can be

8  decided today.

9         MR. GETZ:  If I may briefly respond to that.  And,

10 without repeating what I said before in this regard, I have two

11 new things to say.

12         One is I think the Government's barred from making

13 the argument under Rule 11 that the Court can't release him

14 today.  I think they're barred by the plea agreement.  And

15 your Honor sentenced him on that written plea agreement.  And

16 I'm standing right here, looking at it.

17         THE COURT:  Hand that up to me, please.

18         MR. NEWMAN:  I'm not sure I agree with that.  It's a

19 recommendation that he self-surrender.

20         THE COURT:  I don't see anything.  This is

21 handwritten.

22         MR. GETZ:  Yes.  That was the plea agreement in which

23 the Government agreed that it would not oppose voluntary

24 surrender.  And that plea agreement's the one that the Court

25 relied upon to sentence Mr. Brugnara.

 1          **THE COURT:**  That's true.  It does say that.

 2          I hand this back (indicating).

 3          **MR. GETZ:**  So I'm making a narrow procedural argument

 4   that the Government is barred from making the argument that the

 5   Court just heard, but in addition, I have a point having to do

 6   with the Government's admission of this psychiatric evaluation

 7   by Dr. Kessler, which doesn't saying anything about

 8   Mr. Brugnara being a danger or a risk.  So I think on that

 9   basis, the Government's barred from making any argument that he

10   should not be released for voluntary surrender.

11          Now, the Court may have its own idea about whether or

12   not Mr. Brugnara should voluntarily surrender.  Here's what I

13   have to say about that.  He wouldn't cross the street to avoid

14   his sentence, because he wants to come back.  He's got nothing

15   if he runs, and he's got no place to run to.  So, just looking

16   at it logically, looking at it equitably -- and all courts are

17   based on equity -- how can he not be a great candidate for

18   self-surrender?  There's never been anyone better.

19          I'm making that request.  In terms of the details how

20   it would be worked out or so forth, the -- I think the Court

21   ought to order him released today, with an order to

22   self-surrender; but if the Court wants some procedural

23   safeguards built into it, then give us a date before

24   Magistreate Spero on Wednesday morning to work out the details.

25   I'll meet and confer with the government today and tomorrow.

 1   We'll put something in place.  And we'll appear Wednesday in

 2   front of Judge Spero with the blessings from this Court that

 3   Magistreate Spero can release him for self-surrender as he

 4   bargained for.

 5          **THE COURT:**  Is Judge Spero familiar with this case?

 6          **MR. GETZ:**  He's very familiar with this case, because

 7   we had five -- we had a bail hearing followed by four motions

 8   for reconsideration.  And in the end, he wouldn't release

 9   Mr. Brugnara.

10          **MR. NEWMAN:**  I would add, your Honor, we've had six

11   detention hearings.  He's not just being held in one case.  So

12   I --

13          **MR. GETZ:**  That's true.  He's not being held in one

14   case, but the other case is also on calendar for proceedings on

15   Wednesday afternoon at 2:30.  So it makes perfect sense to give

16   us the calendar date Wednesday morning with Magistreate Spero.

17          And I would just like to add, because I forgot about

18   it until the Government just spoke, but at the last detention

19   hearing or motion to reconsider, as it were, before

20   Magistrate Spero, one of the grounds the Government advanced

21   for denying bail to Mr. Brugnara presentencing was that he

22   faced a significant prison time.

23          Now, it is true that he faces significant prison

24   time.  And he'll do his time, but the numbers that were being

25   discussed at the last hearing were 57 to 71.  So now we know

1  now we know what the sentence is.  The sentence is 30.  And

2  he's eligible for halfway house the last six months.  That

3  makes it 24.  He gets 55 days' good time off every year.  It's

4  moving in the right direction.  He's not even going to serve

5  two years on this case.  It's going to be somewhere between one

6  and two years.

7              How is he not a great candidate for self-surrender?

8              **THE COURT:**  All right.  Here's what we'll do.

9              Put it on Judge Spero's calendar for Wednesday, for

10  him to do the following:  To see if the statutory requirements

11  for release pending appeal are satisfied; or no -- for release

12  pending self-surrender -- that's what I mean -- are satisfied,

13  and on what conditions that can be done.

14              And I move to do this only because the Government

15  agreed in writing to do it.  I'm not, myself, saying that I

16  would grant such relief.  Be clear on that; but I do think that

17  when the Government makes a representation like this, as it

18  did, we ought to try to honor that, because I'm sure

19  Mr. Brugnara relied on it, even though the Government has no

20  authority to bind the Court.

21              But I have one last thing to say on this, and that

22  is:  Under no circumstances would I support bail pending

23  appeal.

24              So if that's where this is headed, please, no, no.  I

25  think Mr. Brugnara should start serving his time as soon as

1  he's designated.  And I would not want anything in this record

2  to suggest that I or the Government certainly even that writing

3  doesn't go that far.

4        And so if circumstances can be -- and conditions

5  could be worked out with Judge Spero that would satisfy him

6  that he would not be a danger to the community, would not flee,

7  will report when he's supposed to, then okay.

8        **MR. NEWMAN:**  Well, your Honor, then I guess that's

9  the point I was trying to make earlier, is that's what

10 Judge Spero already decided.

11       **THE COURT:**  Well, send it back to him now.  I think

12 we all know what the sentence is now, and I'll let him take a

13 fresh look at it.  And if he decides, no, still can't do it,

14 then that's okay.  That's -- so I guess you could appeal.

15       I'm not saying which way it out to come out, but I am

16 saying that when the Government makes that kind of a

17 recommendation, and we ought to -- we ought to try to honor

18 that.  And I want to give Mr. Brugnara another opportunity to

19 do it.

20       I will say one other thing.  Mr. Brugnara, if you

21 were not to report -- let's say that you got it in your mind

22 that you could decide to give yourself a one-week extension on

23 when you would report to whatever place they send you.  I

24 believe it would be the new offense called "Escape," if I'm not

25 mistaken.  I'm not sure of that.  There is -- it is a crime.

1    And the Judge in that case may not be as lenient as I have been

2    today.  And if it's me, I might not be that lenient as I have

3    been today.

4            So if you were to be designated to, you know, Fargo,

5    North Dakota, and they told you to get up there and report on

6    such-and-such a date, there would be no excuses if that were to

7    happen; and even if you thought you were going to get bail

8    pending appeal, no.  You have to do it until there's an order

9    of the Court telling you otherwise.

10           Now, we're not even there yet, because Judge Spero

11   hasn't looked at this, but -- but I know the way you think,

12   Mr. Brugnara.  And my fear is this; that once you get out, you

13   will be so inclined to want to stay out that you will invent

14   fictitious reasons for staying out, and get yourself in huge

15   trouble.

16           These federal marshals and the FBI will catch you.

17           I had a case -- I had a case where the guy thought no

18   one was watching.  They had five FBI agents tailing him into

19   the airport.  He's serving 71 years right now.  So you would

20   not want to do that, because you -- you would just be digging

21   the hole deeper.

22           All right.  So we'll set it -- but please do not

23   construe any of this as saying that I think he should be let

24   out.

25           I'm just saying he ought to be -- Judge Spero should

 1  take another look at it, now that we know what the sentence is.

 2          All right?

 3          **MR. GETZ:**  Yes.  The Court is saying that it's up to

 4  Magistrate Spero?

 5          **THE COURT:**  Well, both sides can take an appeal.  And

 6  say it's up to him in the first instance.  And I don't know

 7  what I would do if there was an appeal to me, but I think

 8  that's what you've asked for, so we're going to -- I'm going to

 9  say, "Fine."

10          **THE DEFENDANT:**  I want to make a statement.

11          **THE COURT:**  No, no.

12          **THE DEFENDANT:**  I respect you, your Honor, and what

13  you said.  I just wanted to let you know I needed the time.  I

14  have four small children.  I'm like you.  I just want to get

15  the time over with.  I told you I accepted -- we haven't talked

16  about an appeal.  I want to get this sentence over with and get

17  on with my life.  I need time to get my four children and my

18  wife situated, like any good father and husband, just to

19  prepare them mentally for what I have to go through; get them

20  prepared, and then go get this time over and done with; come

21  out better.

22          **THE COURT:**  Well, Mr. Brugnara, that's one of the

23  things that you've said that I understand, you know.  And if I

24  didn't have all of baggage from all of the other things that

25  have happened in this case, I would place a hundred percent

1   confidence in that; but you make me nervous, with so many other

2   things that you've said and done, that I don't know for sure

3   that I can trust you.

4          But let's see what Judge Spero says.  It's a good

5   reason that you want to -- that you give.  So Wednesday

6   morning, Judge Spero.  And, Dawn, can you do that?

7          **THE CLERK:**  I can send word to Judge Spero, yes.

8          **THE COURT:**  All right.

9          **MR. GETZ:**  Thank you.

10         **MR. NEWMAN:**  One more thing, your Honor.

11         **THE COURT:**  Good luck, Mr. Brugnara.

12         **MR. NEWMAN:**  One more thing.

13         **THE COURT:**  Wait, wait, wait.  There's one more

14  thing.

15         **MR. NEWMAN:**  The Government moves to dismiss Count 4

16  of the superseding indictment, and Counts 1 through 3 of the

17  original indictment.

18         **THE COURT:**  All right.  Mr. Getz, I'm going to grant

19  the motion to dismiss the other counts.

20         **MR. GETZ:**  Yes.  We have no objection to that motion.

21         **THE COURT:**  All right.  That part of your motion is

22  granted.

23         **MR. NEWMAN:**  Thank you, your Honor.

24         (At 1:00 p.m. the proceedings were adjourned)

25

**CERTIFICATE OF REPORTER**

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 08-0222 WHA, United States of America v. Luke Brugnara, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Friday, August  20, 2010