# EXHIBIT E

Form 1

FORM 1.  Notice of Appeal to the United States Court of Appeals for the Federal Circuit from a Judgment or
Order of a UNITED STATES DISTRICT COURT

FILED

2010 JUN -4 P 3: 15

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# U.S. District Court

## Name of United States District Court for the 9th Circuit

Case Number CR08-0222 WHA

United States of America          , Plaintiff,

v.                                **NOTICE OF APPEAL**

Luke D. Brugnara                  , Defendant.

Notice is hereby given that  Luke D. Brugnara          (name all parties* taking
the appeal) in the above named case hereby appeal to the United States Court of Appeals for the
Federal Circuit from the Order denying Defendant's Motion to Withdraw Plea (from the final judgment) ((from an
order) (describe the order)) entered in this action on  May 24   2010    (date).

_____
(Signature of appellant or attorney)

224 Sea Cliff Avenue
San Francisco, CA  94121

_____
(Address of appellant or attorney)

*See Fed. R. App. P. 3(c) for permissible ways of identifying appellants.

109

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page3 of 59

# EXHIBIT F

Form 1

**FORM 1.** Notice of Appeal to the United States Court of Appeals for the Federal Circuit from a Judgment or Order of a UNITED STATES DISTRICT COURT

FILED

2010 JUN -4 P 3:15

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# U. S. District Court

## Name of United States District Court for the 9th Circuit

Case Number CR08-0236 MMC

United States of America               , Plaintiff,

v.                    **NOTICE OF APPEAL**

Luke D. Brugnara               , Defendant.

Notice is hereby given that Luke D. Brugnara _____ (name all parties* taking the appeal) in the above named case hereby appeal to the United States Court of Appeals for the Federal Circuit from the _____ (from the final judgment) ((from an order) (describe the order)) entered in this action on May 26   2010 , _____ (date).

_____
(Signature of appellant or attorney)

224 Sea Cliff Avenue
San Francisco, CA 94121
_____
(Address of appellant or attorney)

*See Fed. R. App. P. 3(c) for permissible ways of identifying appellants.

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page5 of 59

# EXHIBIT G

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CRIMINAL PRETRIAL MINUTES

E-filing

Date: MAY 26 2010

Case No. CR-08-0236 MMC          JUDGE:   Maxine M. Chesney

LUKE BUGNARA          Present ( ✓) Not Present ( ) In Custody ( ✓)
DEFENDANT

MAUREEN BESSETTE, TOM NEWMAN          BRIAN GETZ
U.S. ATTORNEY          ATTORNEY FOR DEFENDANT

Deputy Clerk: TRACY LUCERO          Reporter: JAMES YEOMANS

**PROCEEDINGS**

REASON FOR HEARING   Defendant's motion for order permitting
withdrawal of guilty plea – Defense
made oral motion to withdraw motion
RESULT OF HEARING   to withdraw guilty plea – Granted.
Sentencing hearing advanced from 6/16/10:
Sentence ~19 months in custody. to run
concurrent with sentence imposed in
CR-08-0222 WHA, 1 year supervised release,
$300 special assessment. (See judgment for
additional conditions)

Case continued to _____ for Further Status.
Case continued to _____ for Motions.
                    (Motion due _____, Opposition due _____, Reply Due _____)
Case continued to _____ for Pretrial.
Case continued to _____ for Trial. (Court/Jury: _____day(s)
Case continued to _____ for _____

///////////////////////////////////////////////////////////////////////

EXCLUDABLE DELAY (Category) _____ Begins _____ Ends _____
///////////////////////////////////////////////////////////////////////

(1hr 14 min)

# EXHIBIT H

1  JOSEPH P. RUSSONIELLO (CABN 44332)
2  United States Attorney

3  BRIAN J. STRETCH (CABN 163973)
   Chief, Criminal Division
4
5  MAUREEN C. BESSETTE (CABN 2468254)
   THOMAS NEWMAN (NYSBN 4256178)
6  Assistant United States Attorneys
7      1301 Clay Street, Suite 340S
       Oakland, CA, 94612
8      Telephone: (510) 637-3691
       Facsimile: (510) 637-3724
9      E-mail: maureen.bessette@usdoj.gov

10 Attorneys for United States

11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14               SAN FRANCISCO DIVISION

15

16 UNITED STATES OF AMERICA,        )   No. CR08–00222 WHA
                                     )       CR08–00236 MMC
17            Plaintiff,             )   U.S.' OPPOSITION TO DEFENDANT'S MOTION
                                     )   FOR MODIFICATION OF CONDITIONS OF
18    v.                             )   RELEASE
                                     )
19                                   )
   LUKE D. BRUGNARA,                 )   Date: March 5, 2010
20                                   )   Time: 10:30
              Defendant.             )   The Honorable Joseph C. Spero
21                                   )   Courtroom A
   _____)

22

23        The defendant has pled guilty in two separate federal criminal cases -- *United States v.*

24 *Luke D. Brugnara*, CR08-00222WHA, a criminal tax case in which the defendant pled guilty to

25 three counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1), and *United States v.*

26 *Luke D. Brugnara*, CR08-00236MMC, a criminal Endangered Species Act case in which the

27 defendant pled guilty to two counts of making a false statement, in violation of 18 U.S.C. § 1001

28

*CR08-236-MMC; CR08-222-WHA*
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*

and four counts of violating the Endangered Species Act, in violation of 16 U.S.C. §§
1538(a)(1)(G) and 1540(b)(1).

On Friday, January 22, 2010, the defendant was arrested on a complaint for threatening to
kill witnesses in the wildlife case set to begin the following week. The defendant was detained
as a danger by the Honorable Elizabeth LaPorte. On Tuesday, January 26, 2010, right before jury
selection, the defendant pled guilty to all charges in the wildlife case, and later that afternoon he
pled guilty to three of the four charges against him in the tax case. On Thursday, January 28,
2010, this Court released the defendant to conditions agreed to by the defense and prosecution in
both cases, including that (1) his mother Vicki Brugnara act as his custodian; (2) he reside 24
hours a day, 7 days a week at his mother's residence in San Francisco; (3) he have electronic
monitoring; (4) that he not leave the residence except to go to the following locations with the
approval of Pretrial Services – court, his defense attorney; medical reasons; and Pretrial Services;
and (5) that he not have any contact with witnesses, directly or indirectly.

The defendant now moves the Court to broaden the terms of his release by allowing him
to travel to Las Vegas to visit his family, and to remove the electronic bracelet because he has
"substantially complied" with all terms and conditions of pretrial release. The government
opposes defendant's motion and asks that the Court either remand the defendant into custody or
add two additional terms of release proposed by Pretrial Services -- that the defendant's mother
accompany him on all pre-approved outings for the limited reasons delineated by the Court and
that the defendant not travel to Gilroy, California -- because the defendant cannot show by clear
and convincing evidence that he is not likely to flee or pose a danger to the safety of any other
person or the community if released.

///

CR08-236-MMC; CR08-222-WHA
U.S.' Opposition to Defendant's Motion for
Modification of Conditions of Release                    2

# I. FACTUAL BACKGROUND

On January 22, 2010, the eve of trial in the wildlife case, the defendant was arrested and placed into custody for threatening to kill witnesses who were set to testify at the trial set to begin on Tuesday, January 26, 2010, in violation of 18 U.S.C. § 1512. The threats were made while the defendant was on pretrial release in the two federal criminal cases. Magistrate Judge Laporte ordered that the defendant be detained.

On January 26, 2010, as the trial was set to begin, the defendant pled guilty to both federal criminal cases against him. On January 28, 2010, Magistrate Judge Spero released the defendant from custody on a $250,000 unsecured bond, with restrictive conditions, including that:

(1)     Defendant remain in the third-party custody of his mother, Vicki Brugnara, at her home at 1266 30th Avenue, San Francisco, California, 24 hours a day, 7 days a week, on electronic monitoring.

(2)     Defendant could only leave Mrs. Brugnara's residence when specifically authorized and pre-approved by Pretrial Services for 4 reasons only –
 •     to visit his attorney;
 •     for medical reasons;
 •     to meet with Pretrial Services; and
 •     for court appearances.

(3)     Defendant could not contact any witnesses – directly or indirectly.

*See* Exhibit 1, Pretrial Services Memorandum at p.2 and Conditions of Release and Appearance.

On February 8, 2010, the first date the defendant was authorized by Pretrial Services to leave his mother's home to meet with two prospective attorneys[1], federal agents observed and

---

[1] The defendant has since hired a third attorney, Brian Getz, and plans to file a motion to withdraw his guilty plea. The defendant has previously entered into a guilty plea in the tax case and thereafter moved to withdraw from the guilty plea before Judge Alsup. At the second guilty plea, on January 26, 2010, Judge Alsup told the defendant that he would not let him withdraw a second time.

*CR08-236-MMC; CR08-222-WHA*
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                3

1   photographed the defendant and his mother at an unauthorized location – a residence he owns in

2   San Francisco – without the approval of the Court or Pretrial Services. *Id.* at p. 2-3 and Exhibit

3   2, Declaration of Special Agent Steve Martins, IRS CI, at ¶3 and attached photograph of the

4

5   defendant and his mother at 224 Sea Cliff Avenue, San Francisco, CA.

6       The criminal complaint charging the defendant with threatening witnesses was based on a

7   declaration by the wildlife case agent, Special Agent Roy Torres, NMFS, who had received

8   information from Joe McAvoy, a witness in the wildlife case and the defendant's brother in law,

9

10  that the defendant had threatened to have him killed. *See* Exhibit 3, Declaration of SA Roy

11  Torres, NMFS, at ¶3. Mr. McAvoy learned that the defendant had threatened to kill both Joe

12  McAvoy and another witness, Dave Chantler. *Id.* and Exhibit 4, Declaration of Joe McAvoy at

13

14  ¶3. This threat was deemed by both Mr. McAvoy and Mr. Chantler as a real and serious threat

15  based on their long term knowledge of the defendant and their interactions with him. *See* Exhibit

16  4 at ¶4 and Exhibit 5 (Declaration of Dave Chantler) at ¶¶2, 3.

17      The defendant has a long history of threatening individuals, including witnesses with

18  information against him. *See* Exhibit 2, Declaration of Special Agent Steve Martins, IRS CI at

19

20  ¶4 (Defendant has threatened: (1) a San Francisco Deputy City Attorney and his principal witness

21  in the case; (2) a *Court-appointed* Receiver who was designated to handle the incoming rents on

22  defendant's property; (3) his former mistress and her husband; and (4) his brother). Further, the

23  defendant has violated court imposed restraining orders prohibiting him from contacting

24  threatened individuals and other court orders. *See id.* Further, the defendant has been convicted

25  of carrying a concealed weapon and threatening an individual with intent to terrorize. *See*

26

27  Exhibit 6, Defendant's Criminal History at p.1 and 2.

28      Aside from the physical danger to others, defendant has also repeatedly and consistently

*CR08-236-MMC; CR08-222-WHA*
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                 4

1    engaged in conduct that has economically harmed others and submitted false documents to

2    banks. Some of this occurred during his pretrial release in these two federal criminal cases.

3
4         As early as 1993, defendant's real estate broker's license was revoked amidst accusations

5    that he had prepared false tax returns for customers. Second Declaration of SA Martins ¶ 7,

6    Exhibit 4. As stated in the court's decision, the customers testified that Brugnara prepared tax

7    returns inflating their income. Thereafter, he attempted to extort money from them. *Id.* Three

8    years later in 1996, the defendant submitted a loan application to Fremont Loan & Investment

9    along with a 1994 Federal Income Tax Return reporting taxable income in the amount of

10   $489,778. Second Declaration of SA Martins ¶ 3, Exhibit 1. The defendant "re-attested" to the

11
12   truth of the 1994 tax return in 1996 as the application explicitly stated Fremont was relying on

13   this information. *Id.* Defendant's 1994 tax return filed with the IRS – purportedly signed

14   contemporaneously with the one submitted with the loan – reports income in the amount of

15
16   -($142,721). Second Declaration of SA Martins ¶ 4, Exhibit 1A.

17        In 2000, seven years after the defendant's real estate license was revoked, he submitted a

18   documents with forged signatures to Merrill Lynch. Second Declaration of SA Martins ¶¶ 5-6,

19
20   Exhibits 2-3.[2] The individuals whose signatures appear on the documents deny signing it. *Id.*

21   Defendant also prepared "Brugnara Corporation" by-laws authorizing the company to, *inter alia,*

22   obtain the Merrill Lynch loan and file for bankruptcy. The witness who purportedly signed this

23   document denied that the signature was his. Second Declaration of SA Martins ¶ 9, Exhibit 6.[3]

24
25        [2]Under the management agreement Collier's would collect rent from the defendant's
26   building to ensure the loan was paid first. Notably, the receiver that the defendant threatened was
     appointed for the same purpose of collecting Merrill Lynch's loan payments from the rent.
27
28        [3]Defendant also possessed an extension to file a tax return for 1996, which he signed.
     The extension was never receive by the IRS but has the forged signature of the IRS District
     Director that granted the extension. Second Declaration of SA Martins ¶ 8, Exhibit 5. In 1999

CR08-236-MMC; CR08-222-WHA
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                    5

In 2007, the defendant submitted forged and false letters and tax returns in support of a loan application to Gramercy Capital, a private lender. Second Declaration of SA Martins ¶¶ 11-14, Exhibits 8-10. This included letters from a non-existent tax service with the forged signature of the security guard in the defendant's building. Second Declaration of SA Martins Exhibit 8. The defendant also supplied the lender with unfiled partnership tax returns and a statement that he owned $468,425,000 of artwork. Second Declaration of SA Martins Exhibit 9.

During these proceeding, the defendant represented to this court he lacked fund to pay his attorney and requested court-appointed counsel.

## II. LAW

The express language of 18 U.S.C. § 3143 states that a defendant who has already been found guilty of an offense shall "be detained" unless the defendant proves by clear and convincing evidence that he is neither a danger nor a flight risk. 18 U.S.C. § 3143(a). Detention is appropriate where defendant is a danger. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). The Court should consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense charged; the weight of the evidence against the defendant; the history and characteristics of the defendant, including his past conduct; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

Moreover, danger to the community includes economic danger to the community. The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of the community" language in Section 3142 was expected to be given a broad

---

he submitted two financial declarations, one to prove assets to obtain financing and the to calculate a fine based on net worth. Defendant reported a net worth of both $508,000 and $130,900,000 in December 1999. Second Declaration of SA Martins Exhibit 7.

CR08-236-MMC; CR08-222-WHA
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                6

1   construction. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in 1984*

2   *U.S.C.C.A.N.* 3182, 3195 ("The reference to safety of any other person is intended to cover the

3   situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is

4   of concern, while the language referring to the safety of the community refers to the danger that

5   the defendant might engage in criminal activity to the detriment of the community. *The*

6   *Committee intends that the concern about safety be given a broader construction than merely*

7

8   *danger of harm involving physical violence.")* (emphasis added). Courts have, therefore,

9   appropriately construed the statute to find that protection of the community from economic harm

10  is a valid objective of bail conditions. *See United States* v. *Schenberger,* 498 F. Supp. 2d 738,

11

12  742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical

13  harm or violent behavior" and citing the Senate Committee Report language reproduced above);

14

15  *United States* v. *Persaud,* 2007 WL 1074906, at *1 (N.D.N.Y. Apr. 5,2007) (concurring with the

16  Magistrate Judge that "economic harm qualifies as a danger within the contemplation of the Bail

17  Reform Act"); *United States* v. *LeClercq,* 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13,2007)

18  (finding that a large bond was necessary to, among other things, "protect the community from

19  additional economic harm"); *United States* v. *Gentry,* 455 F. Supp. 2d 1018, 1032 (D. Ariz.

20

21  2006) (in a fraud and money laundering case, in determining whether pretrial detention was

22  appropriate, the court held that danger to the community under Section 3142(g) "may be assessed

23  in terms other than the use of force or violence ... [including] economic danger to the

24  community"); *see also United States* v. *Reynolds,* 956 F.2d 192, 193 (9th Cir. 1992) (post-

25

26  conviction for mail fraud and witness tampering, the Court held that "danger may, at least in

27  some cases, encompass pecuniary or economic harm."); *United States* v. *Provenzano,* 605 F.2d

28  85, 95 (3d Cir. 1979) (in a pre-1984 Bail Reform Act case, post-conviction, the Court rejected an

*CR08-236-MMC; CR08-222-WHA*
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                    7

application for bail finding that "danger to the community" is not limited to harms involving violence).

Finally, the Court must declare the bail forfeited if a condition of the bond is breached. Fed. R. Crim. Proc. 46(f)(1); *United States v. Donald Ray Abernathy, et al.*, 757 F.2d 1012, 1015 (9th Cir. 1985). Forfeiture of the bond is appropriate where the defendant has violated the conditions of his release. *Id.* at 1016 (affirming district court's granting of the government's motion for forfeiture of bond upon defendants' supervised release violations).

### III. ARGUMENT

In the instant case, the defendant willfully violated the conditions of his release on the very first day he was allowed to go out of his mother's residence. Further, as discussed below, the statutory factors weigh in favor of detaining the defendant pending sentencing.

**1. Nature and circumstances of the offense charged (18 U.S.C. § 3142(g)(1)).**

First, as discussed above, the defendant has threatened to kill witnesses in the federal criminal case against him. *See* Exhibits 4, 5, and 6. Based on his lengthy history of threatening individuals, the government and its witnesses believe that these threats are real and serious.

**2. Weight of the evidence against Defendant (18 U.S.C. § 3142(g)(2)).**

Defendant has pleaded guilty and admitted to the conduct at issue in both cases. This factor, therefore, weighs in favor of detention.

**3. Defendant's history and characteristics (18 U.S.C. § 3142(g)(3)).**

Defendant's history and characteristics demonstrate a propensity to violently threaten and intimidate witnesses and others with whom the defendant is angry. *See* Exhibit 2 at ¶4 (defendant's threats against witnesses and others); Exhibit 3 at ¶3 and Exhibit 4 (defendant threatened to kill witnesses in the wildlife case). Further, the defendant has previously pled

*CR08-236-MMC; CR08-222-WHA*
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                    8

guilty to threatening an individual. *See* Exhibit 6 at p.4, defendant's criminal history, conviction for Threaten Crime With Intent to Terrorize. In addition, the defendant has been convicted of carrying a concealed weapon. *See* Exhibit 5 at p.1-2.

In addition, these incidents are far from isolated. To the contrary, the defendant has threatened numerous individuals over a period of years. Demonstrating a clear disregard of judicial orders, defendant harassed and threatened a court-appointed receiver. In another instance, he physically threatened an attorney for the City of San Francisco. Defendant's problems with these individuals related only to money – the imposition of fines.

The situation was somewhat different when the defendant's ability to obtain a gaming license was jeopardized. In that instance, the paternity suit filed against him stalled his application. When that happened, and when she tried to end their relationship, he threatened to kill her. In fact, many of these threats were recorded and documents by the responding police officers. He also asked someone else to kill her.

In that regard, it is difficult to conclude these were "casual" threats not to be taken seriously. Each individual filed for a restraining order or filed a police report. Nor are the threats vague. The police reports and declarations provide contemporaneous details of each threat, and corroborate one another. And in many instances, the defendant failed to abide by the restraining orders or any court ordered mandate.

In the brief time the defendant has been on release with strict conditions, from the evening of January 28 through today, he has violated this Court's order by traveling to an unauthorized location, demonstrating that he disregards the orders of this Court and will not abide by the conditions of his release.

### 4. Defendant poses a danger.

*CR08-236-MMC; CR08-222-WHA*
*U.S.' Opposition to Defendant's Motion for*
*Modification of Conditions of Release*                    9

As discussed above, it is defendant's burden to prove by clear and convincing evidence that he is not a danger. Given defendant's conduct and his history, the defendant cannot sustain his burden.[4]

### 5. Economic danger.

From at least 1993, the defendant has submitted false, fictitious, and forged documents. The defendant was party to an action accusing him of preparing false returns that inflated income to support loans. When taken for the limited purpose of showing knowledge, this conduct was willfully repeated over a course of years. Each act constitutes wire or bank fraud. He submitted federal tax returns inflating income in 1996 and 2007. The defendant also submitted forged management agreements, by-laws for his corporation, and fictitious letters from a tax preparation service.

The defendant also stated he has over $468 million in artwork as early as 2007. In these proceeding, he stated to this court he lacked funds to hire an attorney. He failed to disclose that these assets. In December 2009, the defendant initiated a lawsuit seeking the return of millions of dollars of artwork according to his complaint in bankruptcy court.

Along those lines, there is no question these lenders were harmed. The defendant filed for bankruptcy and hid assets from creditors and this court. He also tried to circumvent the same creditors he defrauded by interfering with a receiver and supplying false management agreements for the same purpose. In that regard, the defendant's past actions demonstrate a propensity to defraud through willful and deceptive means. His clear defiance of previous warnings, as shown by the revocation of his real estate license, establish that he cannot show that he will refrain from

---

[4]*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2nd Cir. 1972) (past misconduct "gives rise to an inference of a reasonable expectation of continued violations.")

CR08-236-MMC; CR08-222-WHA
U.S.' Opposition to Defendant's Motion for
Modification of Conditions of Release                    10

1    similar conduct in the future.

2        6. Forfeiture of defendant's bond.

3        In releasing the defendant, Magistrate Judge Spero imposed a $250,000 unsecured bond

4    and directed the defendant to stay in his mother's home unless he obtained Pretrial Services

5    approval to go to one of four locations. Defendant violated this condition by going to 224 Sea

6    Cliff, SF. Because defendant's violation was willful, the Court should forfeit the bond to the

7    government.

8                            **IV. CONCLUSION**

9        For the reasons stated above, the United States urges the Court to remand the defendant

10   into custody as it is clear that he will not abide by conditions set by the Court and to forfeit the

11   $250,000 bond set by Magistrate Judge Spero.

16                                    Respectfully submitted,

18                                    JOSEPH P. RUSSONIELLO
                                      United States Attorney

20                                    _____/s/_____
21                                    MAUREEN C. BESSETTE
22                                    THOMAS NEWMAN
                                      Assistant United States Attorneys

CR08-236-MMC; CR08-222-WHA
U.S.' Opposition to Defendant's Motion for
Modification of Conditions of Release                11

PROPOSED ORDER/COVER SHEET

TO:   Honorable Joseph C. Spero          RE:   Luke Brugnara
      U.S. Magistrate Judge

FROM: Richard W. Wieking, Acting Chief   DOCKET NO.:   CR 08-00222WHA
      U.S. Pretrial Services Officer

DATE: February 12, 2010

THE ATTACHED MEMORANDUM WAS PREPARED BY PRETRIAL SERVICES OFFICER:

Rich Sarlatte, Specialist                      415-436-7508
U.S. PRETRIAL SERVICES OFFICER                 TELEPHONE NUMBER

We are requesting direction from the Court. Please initial the appropriate box(es), and return this form to us so that we may comply with your instructions.

☐   I have reviewed the information that you have supplied. I do not believe that this matter requires any action by this Court at this time.

☐   Inform all parties concerned that I will conduct a Bail Review Hearing in Courtroom No. _____ on _____ at _____.

☐   Inform all parties concerned that a Bail Review Hearing will be conducted by: Magistrate Judge_____ Presiding District Court Judge_____

☐   I agree with the recommendation of the Pretrial Services Officer and hereby modify the defendant's Pretrial Release conditions as indicated below:

☐   Modification(s)

    A. The defendant can only leave his home if accompanied by his mother, Vicki Brungara.

    B.

☐   Bail Revoked/Bench Warrant Issued.

☐   I am returning the signed order and direct that a copy be provided to the Court file and all interested parties(AUSA and Defense Counsel).

☐   Other Instructions:

_____

_____

_____

JUDICIAL OFFICER                              DATE

Cover Sheet (03/26/08)

1

Case3:08-cr-00223-WHA Document158 Filed02/22/11 Page20 of 59
Case: 10-10286 06/22/2011 Page: 14 of 20 ID: 7800115 DktEntry: 27-9
Case3:08-cr-00236-MMC Document64 Filed03/04/10 Page3 of 12

| UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA | ORDER SETTING CONDITIONS OF RELEASE AND APPEARANCE BOND | DATE | CASE NUMBER |
|---|---|---|---|

| NAME OF DEFENDANT | ADDRESS OF DEFENDANT | TELEPHONE NUMBER |
|---|---|---|

| NAME OF SURETY | RELATIONSHIP TO DEFENDANT | ADDRESS OF SURETY | TELEPHONE NUMBER |
|---|---|---|---|

| NAME OF CUSTODIAN | RELATIONSHIP TO DEFENDANT | ADDRESS OF CUSTODIAN | TELEPHONE NUMBER |
|---|---|---|---|

| AMOUNT OF BOND | ☒ UNSECURED | ☐ SECURED BY | ☐ DEPOSIT RECEIVED RECEIVED FROM | OTHER SECURITY POSTED | TIME/DATE OF NEXT APPEARANCE | COURTROOM/JUDGE |
|---|---|---|---|---|---|---|
| $ | | $ | | TO BE POSTED BY: | | |

## CONDITIONS OF RELEASE AND APPEARANCE

Defendant is subject to each condition checked:

☒ Defendant shall appear at all proceedings as ordered by the Court and shall surrender for service of any sentence imposed.

☒ Defendant shall not commit any federal, state, or local crime.

☒ Defendant shall not harass, threaten, intimidate, injure, tamper with, or retaliate against any witness, victim, informant, juror, or officer of the Court, or obstruct any criminal investigation. See 18 U.S.C. 1503, 1510, 1512, and 1513, on reverse side.

☒ Defendant shall not travel outside the Northern District of California, that is, these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, San Francisco, San Mateo, Santa Clara, Santa Cruz, and Sonoma. See map on reverse side.

☒ Defendant shall report in person immediately upon release and thereafter as directed to Pretrial Services in _____. See addresses and telephone numbers on reverse side.

☒ Defendant shall surrender all passports and visas to the Court by _____ and shall not apply for any passports or other travel documents.

☒ Defendant shall not possess any firearm, destructive device, or other dangerous weapon.

☒ Defendant shall remain in the custody of custodian _____ at _____ who agrees to supervise him/her and to report any violation of a release condition to Pretrial Services. A custodian who fails to do so may be prosecuted for contempt.

☐ Defendant shall participate in (drug) (alcohol) (mental health) counseling, and submit to (drug) (alcohol) testing, as directed by Pretrial Services.

☐ Defendant shall not use alcohol to excess and shall not use or possess any narcotic or other controlled substance without a legal prescription.

☐ Defendant shall maintain current employment, or if unemployed shall seek and maintain verifiable employment.

☒ Defendant shall submit to a warrantless search of his/her person, place of residence and vehicle at the direction of Pretrial Services.

☒ Defendant shall have no contact with any co-defendant out of the presence of counsel.

☐ Defendant shall not change residence without prior approval of Pretrial Services.

☐ Defendant shall comply with the following curfew: _____ to _____.

☒ Defendant shall be subject to electronic or voice track monitoring. Defendant may leave home for the purpose of _____.

☐ Defendant must ☐ reside in Halfway House _____ ☐ participate in Residential Treatment _____.

☐ The following conditions also apply:

Defendant shall contribute to the cost of services provided by Pretrial Services as directed by Pretrial Services.

## CONSEQUENCES OF DEFENDANT'S FAILURE TO OBEY CONDITIONS OF RELEASE

Payment of the full amount of this bond shall be due forthwith, and all cash or property posted to secure it shall be forfeited. Judgment may be entered and executed against defendant and all sureties jointly and severally.

An arrest warrant for defendant shall issue immediately, and defendant may be detained without bail for the rest of the proceedings.

Defendant shall be subject to consecutive sentences and fines for failure to appear and/or for committing an offense while on release. See 18 U.S.C. 3146 and 3147, on reverse side.

We, the undersigned, have read and understand the terms of this bond and acknowledge that we are bound by it until duly exonerated.

| SIGNATURE OF DEFENDANT | SIGNATURE(S) OF SURETY(ies) |
|---|---|

| SIGNATURE OF CUSTODIAN | |
|---|---|

| THIS ORDER AUTHORIZES THE MARSHAL TO RELEASE DEFENDANT FROM CUSTODY. | SIGNATURE OF MAGISTRATE JUDGE JOSEPH C. SPERO UNITED STATES MAGISTRATE JUDGE | DATE |
|---|---|---|

5. U.S. ATTORNEY - GREEN COPY

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page21 of 59
Case: 10-10286   03/22/2011   Page: 15 of 20   ID: 7656715   DktEntry: 27-9
Case3:08-cr-00236-MMC   Document64   Filed03/04/10   Page6 of 12

<table>
<tr><td>1</td><td>JOSEPH P. RUSSONIELLO (CABN 44332)<br>United States Attorney</td></tr>
</table>

1   JOSEPH P. RUSSONIELLO (CABN 44332)
    United States Attorney
2
    BRIAN J. STRETCH (CABN 163973)
3   Chief, Criminal Division

4   MAUREEN C. BESSETTE (CABN 2468254)
    THOMAS NEWMAN (NYSBN 4256178)
5   Assistant United States Attorneys
       1301 Clay Street, Suite 340S
6      Oakland, CA, 94612
       Telephone: (510) 637-3691
7      Facsimile: (510) 637-3724
       E-mail: maureen.bessette@usdoj.gov
8
9   Attorneys for United States

Exhibit 2

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,          )   No. CR08-00222 WHA
                                        )       CR08-00236 MMC
15        Plaintiff,                    )
                                        )   DECLARATION SA MARTINS IN SUPPORT OF
16        v.                            )   UNITED STATES' MOTION TO REMAND
                                        )   DEFENDANT AND FORFEIT BOND
17  LUKE D. BRUGNARA,                   )
                                        )
18        Defendant.                    )
                                        )

19        I, Steve Martins, being duly sworn, hereby depose and state as follows:

20        1. I am a Special Agent ("SA") with the Internal Revenue Service, Criminal Investigations,

21  and have been so employed for 7 years. I submit this affidavit in support of the United States'

22  Motion to Remand defendant Luke Brugnara into custody.

23        2. On January 26, 2010, Mr. Brugnara pled guilty to three counts of filing false tax returns,

24  in violation of 26 U.S.C. § 7206(1), in *United States v. Luke Brugnara*, CR-08-222-WHA.

25        3. On February 8, 2010, I followed the defendant as his mother drove him from her

26  residence to meet with several different defense attorneys in San Francisco. During this time, the

27  defendant went to an unauthorized location – 224 Sea Cliff Avenue, San Francisco, CA – his

28

Case: 10-10286  07/22/2011  Page: 16 of 20  ID: 7656  5  DktEntry: 27-9
Case3:08-cr-00222-WHA  Document158  Filed03/22/11  Page22 of 59

Case3:08-cr-00236-MMC  Document64  Filed03/04/10  Page7 of 12

1  residence. I photographed both Luke Brugnara and his mother Vicki Brugnara at this residence.

2  *See* Attached photograph.

3      4. During my investigation into this criminal matter, I learned of numerous threats defendant

4  Luke Brugnara made to individuals and that the defendant has previously failed to follow court

5  orders:

6      **A. Threats to Deputy City Attorney and Principal Witness.** From February 1999
   through September 2000, Luke Brugnara ("Brugnara") made threats against Deputy City
7  Attorney Thomas Lakritz, who was in charge of regulatory cases against Brugnara for
   violating San Francisco regulations at Brugnara's buildings in San Francisco and then
8  threatened the City's primary witness. *See* Attachment A at p. 2, 8.

9      • Specifically, in February 1999, Brugnara told Lakritz that he was "going to get" Lakritz.
   *Id.* at p. 8. Brugnara stated that he was worth over one hundred million dollars and that
10     he never forgot anyone or anything and the he "would eventually get" Lakritz. *Id.*

11     • Later, in July 1999, while Brugnara was in court, he grabbed and threatened the City's
   principal witness in the case, San Francisco Fire Inspector Terry Smith, by stating, "I'll
12     take you on any time" and "I will get you." Brugnara stated that he was worth two
   hundred million dollars and he would get Inspector Smith and Lakritz. *Id.* at p. 9. While
13     Lakritz tried to assist Inspector Smith, Brugnara told Lakritz, he "would eventually get"
   me. *Id.* This incident was witnessed by several attorneys who came to investigate the
14     noise. *Id.*

15     • On September 22, 2000, Mr. Lakritz served Brugnara in court with an Order to Show
   Cause re: Contempt. As Brugnara walked away, he raised his index finger to his throat
16     and moved his index finger across his throat several times as if to indicate slitting the
   throat. *Id.* at pp. 2, 4, 10.

17

18     • Later on September 22, 2000, as Brugnara began to leave the courtroom, he walked past
   Lakritz and glared at him stating, "You're dead." *Id.* at pp. 10, 13. These threats were
19     reported to the San Francisco Police Department. *Id.* at p. 10.

20     • On September 28, 2000, San Francisco Investigator witnessed Brugnara make a gesture
   in which he raised his index finger to his throat and moved his index finger across his
21     throat several times as if to indicate slitting the throat. *Id.* at pp. 2, 4, 10.

22     • Mr. Lakritz perceived Mr. Brugnara's threats as real and serious. *Id.* at p. 13. Mr.
   Brugnara's threats to City Attorney Lakritz escalated over time. *Id.* at p. 11.

23     • On November 13, 2000, the City of San Francisco received a restraining order
   preventing Brugnara from assaulting, battering, following or stalking Mr. Lakritz, or
24     coming within 100 yards of Mr. Lakritz's work place or residence. *Id.* at pp. 5-6, 14-15
   (Order).

25

26     **B. Threats to Receiver of Brugnara's Properties and Violation of Court Order.** On
   September 5, 2000, Brugnara physically threatened the Receiver appointed by San Francisco
27 County Superior Court in the hallway outside Superior Court stating, "Do you know what
   it's like to get your ass kicked!" *See* Attachment B at p. 2. The judge ordered Brugnara not
28 to communicate with the Receiver except through counsel. Brugnara had notices given to

1   his tenants stating that the Receiver was a trespasser and forbidding rent to be paid to him
2   in violation of the Order Appointing Receiver and had his agent contact tenants demanding
    they pay rent to him and threatening repercussions at a later date if they did not. *Id.*

3   **C. Threats to His Mistress, Her Former Husband and Violating Restraining Order.**

4   • Kristi Riggs began a relationship with Luke Brugnara in June 1999. *See* Attachment C
      at p. 22. They lived together and conceived a son, Stephen. *Id.* at p. 15, 22. Initially,
5     Riggs did not know Brugnara had a wife and children. *Id.* During their relationship,
      Brugnara physically and verbally threatened Riggs and physically hurt her; he had her
6     followed by a private investigator. *Id.* at pp. 15, 22, 27. Riggs is afraid of Brugnara
      because he told her he has an arsenal of unregistered guns; she knows he was arrested
7     for carrying a concealed and unregistered firearm. *Id.* at 22-24. He told her he had shot
      a dog in the head because it was barking. *Id.* Brugnara's former employee Mohamad
8     told Riggs that Brugnara asked him to kill her but Mohamad refused. *Id.* Mohamad told
      Riggs that Brugnara asked Mohamad if he knew anyone else who would kill Riggs for
9     a few thousand dollars. *Id.* Brugnara told Mohamad he had found a place near the
      casting ponds at Golden Gate Park where he intended to bury Riggs' body. *Id.*

10  • Riggs' former husband told the police that Brugnara had threatened him saying if he told
11    Brugnara's wife about Brugnara's relationship with Kristi Riggs, "The police won't help
      you ... you'll be on the bottom of the Bay." *Id.* at 2.

12  • Three weeks before the birth of their son, in March 2000, Riggs went into pre-term labor.
13    Brugnara went to the hospital where the doctors were trying to stop the labor because the
      baby's lungs were not developed. *Id.* at p. 25. Brugnara became verbally abusive to the
14    doctor and threatened to pull the intravenous line out of Riggs' arm. *Id.* The doctor
      ordered Brugnara to leave and threatened to call security. *Id.*

15  • On March 22, 2000, Brugnara threatened Riggs' former husband. *Id.* at p. 26. Brugnara
16    was irate when he learned that Riggs' former husband had driven Riggs home from the
      hospital the day after she had given birth to Brugnara's son. *Id.* at pp. 1, 2. Brugnara
17    threatened to "break some fucking necks." *Id.* Riggs sought and obtained an Emergency
      Protective Order. *Id.* at p. 1. Right before this Riggs had filed a petition in Superior
18    Court to establish Brugnara as Stephen's father to obtain child support from Brugnara
      and this angered him. *Id.* at pp. 2, 22.

19
20  • In July 2000, Brugnara tried to suffocate Riggs. *Id.* at p.26.

21  • In late October 2000, Riggs told Brugnara she did not want to see him anymore. *Id.* at
      p. 15. For the next two weeks Brugnara left her angry, demanding messages on Riggs'
22    answering machine. *Id.* Police officers listened to 18 of the recorded phone calls. *Id.*
      Two of the calls are as follows:

23      • October 30, 2000, 10:04 a.m. – "If you don't return my call there will be
          consequences. This is bullshit for not calling me." *Id.* at 16.

24
25      • October 30, 2000, 11:21 a.m. – "Call me in 30 minutes. If not, I'm going to expect
          the worst and that's not good for you....I'm expecting the worst. This will not benefit
          anyone, you or the baby. Call me by 11:51." *Id.*

26
27  • Riggs is fearful of Brugnara who has told her he could have one of his illegal alien
      employees take care of her and no one would know who did it. *Id.* at 17.

28

                                              3

- On November 4, 2000, Brugnara called Riggs and said, "I've never seriously threatened to kill anyone, but if you fuck with me, I'll kill you." *Id.* at pp. 17, 26. Riggs called and reported the threat to the police. *Id.*

- On November 22, 2000, Brugnara violated the restraining order by having his employee Mohamad contact Riggs. *Id.* at p. 6-9. Riggs stated that Mohamad called her and when she told him it was a violation of the restraining order he said, "Bullshit come down to 490 Post Street and meet Luke..." *Id.* at p. 10. Mohamad threatened to kill her. *Id.* Riggs reported the violation and was fearful for her life and afraid to leave her home. *Id.* at 9.

- On May 18, 2001, Brugnara went to Riggs apartment and began yelling at her 3 year old daughter, in front of his infant son, "I'm not going to have my son raised with any Jew. You're a Jew (indicating the 3 year old daughter) and your father's a Jew!"

- In June 2001, Brugnara pulled Riggs out of her bed by her cheeks. *Id.* at 24.

- On July 13, 2001, Riggs told Brugnara she did not want any further contact with him. *Id.* at p. 24. Brugnara began leaving phone messages and coming to Riggs' apartment. *Id.*

- On August 15, 2001, while Riggs' was at Brugnara's mother's home, meeting his brother Eric, Luke blocked her car, and screamed, "Get out of the car right now! I want to talk to you!" *Id.* at p. 23. Riggs was afraid and locked her car and Luke began beating on her car window with his cell phone. *Id.* Riggs put her car in reverse and drove to the police department while Brugnara followed her in his car. *Id.* He flipped his middle finger at her and screamed, "Cunt!" *Id.* Luke then returned to his mother's home and threatened his brother Eric with a metal rod. *Id.* Luke left Riggs' a message on her phone in a loud and threatening voice stating, "..., I told you to stay the fuck away from my mother. Stay the fuck away from my mentally retarded brother.... Cunt! Now you are going to have to deal with the consequences. I don't give a fuck about you, Bitch! Fuck you! Fuck you! *Id.* at pp. 22-23.

- In February 2001, Brugnara came into Riggs' apartment and made a gash high on the wall with his keys and low on the wall, stating that the high gash, "is your life with me" and the low gash, "is your life without me -- now you can always be reminded of what your life is without me."

**D. Threats Against His Brother and Violating Restraining Order.** Luke asked his brother Eric to work out a settlement with Kristi Riggs because she was suing him for child support for their son Stephen, and Luke was not able to contact her as there was a stay away order. *See* Attachment D at p. 3. Eric became friends with Riggs. *Id.* at pp. 3-4. In June 2001, Brugnara told Eric to stop seeing Riggs. *Id.* at p. 4. When Eric refused Luke began leaving him threatening messages. *Id.*

- When Riggs made affirmative attempts to end the relationship and only wanted child support, Brugnara stated "No Deal, She'll suck my dick when I say suck my dick!" *Id.* at 3.

- On December 20, 2001, Eric sought a restraining order. *Id.* at pp. 1, 5.

- On January 4, 2002, Luke left Eric a message threatening physical violence. *Id.*

4

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page25 of 59
Case: 10-10286   07/22/2011   Page: 19 of 20   ID: 7656   5   DktEntry: 27-9

Case3:08-cr-00236-MMC   Document64   Filed03/04/10   Page10 of 12

- On August 15, 2001, Luke went to his mother's home and told Eric, "I'll fucking kill you. No one fucks with my life." Their mother tried to intervene and Luke grabbed a metal bar, threatened Eric with it, stating he "would fucking kill" Eric. *Id.*

- After Eric obtained a restraining order Luke contacted Eric at his home in violation of the order. *Id* at p. 5. Their brother Aleo, who is a federal agent, told Luke he was violating the restraining order. *Id.* Luke stated, "You little faggot, I'll kick your ass too."

- Thereafter, Luke was arrested for violating the restraining order. *Id.* at pp. 5-6.

- Luke told Eric in a phone message, "You better be sleeping with one eye open. I'm looking for you. I have already been by twice, and I will find you. This is going to get physical." *Id.*, at p. 6.

E. **Failing to Comply With Court Order.** On June 3, 2000, the Superior Court of the State of California found Brugnara guilty of contempt for willingly failing to comply with a Preliminary Injunction requiring Brugnara to abide by medical waste and fire alarm regulations at his 490 Post Street, San Francisco property. *See* Attachment E at pp. 2, 5, 23-24, 33. Brugnara had intentionally made false statements materially affecting the health and safety of the public, *id.* at p. 8; had commingled medical waste with trash, *id.* at p. 11-12, stored it improperly, *id.* at pp. 9-10, 17; disposed of it improperly using an unlicensed waste hauler, *id.* at p. 14, in a manner that constituted a public nuisance. *Id.*, at p. 17. All of this despite having a net worth of over $31 million dollars. *Id.* at 25.

F. **Carrying a Concealed Weapon.** On May 11, 1989, Brugnara was arrested for possession of a loaded, concealed firearm after having failed to appear. *See* Attachment F at pp. 2, 3. Brugnara pled guilty to Carrying a Concealed Weapon on Person. *Id.* at p. 4.

G. **Extortion.** On February 20, 1991, a complaint was made by Mrs. Konstin that Luke Brugnara was extorting money from her and her husband. *See* Attachment G at p. 2.

5

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page26 of 59
Case: 10-10286   0  /2/2011   Page: 20 of 20   ID: 7656   5   DktEntry: 27-9

Case3:08-cr-00236-MMC   Document64   Filed03/04/10   Page11 of 12

● On August 15, 2001, Luke went to his mother's home and told Eric, "I'll fucking kill you. No one fucks with my life." Their mother tried to intervene and Luke grabbed a metal bar, threatened Eric with it, stating he "would fucking kill" Eric. *Id.*

● After Eric obtained a restraining order Luke contacted Eric at his home in violation of the order. *Id* at p. 5. Their brother Aleo, who is a federal agent, told Luke he was violating the restraining order. *Id.* Luke stated, "You little faggot, I'll kick your ass too."

● Thereafter, Luke was arrested for violating the restraining order. *Id.*, at pp. 5-6.

● Luke told Eric in a phone message, "You better be sleeping with one eye open. I'm looking for you. I have already been by twice, and I will find you. This is going to get physical." *Id*, at p. 6.

E. **Failing to Comply With Court Order.** On June 3, 2000, the Superior Court of the State of California found Brugnara guilty of contempt for willingly failing to comply with a Preliminary Injunction requiring Brugnara to abide by medical waste and fire alarm regulations at his 490 Post Street, San Francisco property. *See* Attachment E at pp. 2, 5, 23-24, 33. Brugnara had intentionally made false statements materially affecting the health and safety of the public, *Id.* at p. 8; had commingled medical waste with trash, *Id.* at p. 11-12, stored it improperly, *Id.* at pp. 9-10, 17; disposed of it improperly using an unlicensed waste hauler, *id.* at p. 14, in a manner that constituted a public nuisance. *Id.* at p. 17. All of this despite having a net worth of over $31 million dollars. *Id.* at 25.

F. **Carrying a Concealed Weapon.** On May 11, 1989, Brugnara was arrested for possession of a loaded, concealed firearm after having failed to appear. *See* Attachment F at pp. 2, 3. Brugnara pled guilty to Carrying a Concealed Weapon on Person. *Id.* at p. 4.

G. **Extortion.** On February 20, 1991, a complaint was made by Mrs. Konstin that Luke Brugnara was extorting money from her and her husband. *See* Attachment G at p. 2.

I declare under the penalty that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 22 day of February 2010, at San Francisco, CA.

SA STEVE MARTINS, IRS CI

5

Case3:08-cr-00222-WHA Document158 Filed03/22/11 Page27 of 59

# EXHIBIT I

JOSEPH P. RUSSONIELLO (CABN 44332)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

MAUREEN C. BESSETTE (CABN 2468254)
THOMAS NEWMAN (NYSBN 4256178)
Assistant United States Attorneys
    1301 Clay Street, Suite 340S
    Oakland, CA, 94612
    Telephone: (510) 637-3691
    Facsimile: (510) 637-3724
    E-mail: maureen.bessette@usdoj.gov

Attorneys for United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR08-00236-MMC |
| | ) | |
| Plaintiff, | ) | UNITED STATES' OPPOSITION TO |
| | ) | RECONSIDERATION |
| v. | ) | |
| | ) | Date: April 9, 2010 |
| LUKE D. BRUGNARA, | ) | Time: 10:30 a.m. |
| | ) | The Honorable Joseph C. Spero |
| Defendant. | ) | Courtroom #A |
| | ) | |

This matter is set for hearing on April 9, 2010, before the Honorable Joseph C. Spero. The defendant has filed a repetitious motions to reconsider the order detaining him, proposing commitment in a half-way house but offers no new evidence to support this proposal. The government opposes the request.

As a separate matter, Dr. Kessler's report is not yet prepared nor has he met with the defendant. Dr. Kessler was ill on April 2, 2010. Thus the parties do not yet have his report.

# I. FACTUAL BACKGROUND

Prior to this filing, the government identified seven individuals that the defendant threatened. Two were officers of the court carrying out their official duties; the third was an individual with whom the defendant had a relationship. Those threats were left on voicemail messages and transcribed into police reports submitted to the Court. As the Court has noted, these events took place several years ago.

In January 2010, the defendant threatened two witnesses in the federal cases. The government now submits evidence that the defendant has repeatedly threatened numerous other individuals, including: teachers, a coach, a Pastor, and families at his children's school. (*See* Ring Decl. ¶ 6, Exh. C (TRO); Gallo Decl. ¶ 3, Exh. A).

According to the Pastor at a St. Vincent de Paul, the defendant's threatening conduct resulted in dismissal from the archdiocese. (Ring. Decl. Exh. B). The defendant's threatening behavior was ongoing over a period of two years and focused on numerous individuals. (Ring Decl. ¶ 3, Exhs. B & C). Some time prior to October 2008, the defendant "forced a parent off the road onto the sidewalk with his car" and has a "reputation for carrying weapons."[1] (Ring Decl. Exh. C, p. 12).[2] In an October 17, 2008 application for a temporary restraining order, the school's principal stated the order was necessary for the "safety and well-being of all students

---

[1] The school principal also asks the defendant to be restrained from approaching the school because of his "extremely aggressive and threatening behavior." The principal further stated that "Parents have come to me out of fear for their own safety and the safety of their students", as the defendant has "demonstrated erratic behavior and is potential danger to anyone associated with the school." She described the defendant as "volatile," "abusive," and states that he is "so unstable that there is a likelihood" he "will harm me as the principal" because she is "personally afraid for [her] safety and well-being." *Id.*

All of this information was provided to the defense at the last hearing, but remains unexplained.

[2] Page references are to those listed by PACER.

and staff", and specifies three employees that "need[] protection." (Ring Decl. Exh. C, p. 8). In response to the question "did the person commit any acts of violence," the "yes" box is checked and an incident is described in which the defendant "threw a bottle of water at the coach" and was "screaming threats and obscenities." Id.

That coach describes the same incident in a police report dated October 15, 2008. (Gallo Decl. Exh. A). Like the Ring declaration, the coach notes that the defendant made "threats towards [him]." (See Ring Decl. ¶ 6, Exh. C (TRO); Gallo Decl. ¶ 3, Exh. A). Combined with the school principal's application for the TRO, these events give rise to three more people who signed declarations under penalties of perjury stating the defendant threatened them – the Pastor, a school principal, and a soccer coach aside from the other teachers who were threatened.

These documents detail numerous instances in which the defendant was warned, but failed to correct his actions. (See Ring Decl. ¶ 6, Exhs. B & C). Moreover, these events occurred after the defendant was arraigned and admonished by this court that, as a release condition, he not commit any state or local crime.

## II. LAW

Defendant has again asked for release and styled his motion as one for "reconsideration." Reconsideration is warranted to correct manifest errors of law, to consider the import of newly discovered evidence, or to take account of intervening changes in law. *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999). None of these conditions are present here, and the defendant does not argue otherwise. A motion for reconsideration is not to be used to simply relitigate already-decided matters or to argue new legal theories. *Kona Enterprises v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

This Court has already ordered the defendant detained based on a finding that he failed

1    to meet his burden of demonstrating he is not a danger. As reasoned in *United States v. Flores*,

2    856 F. Supp. 1400, 1405 (E.D. Cal. 1994), "[b]asic notions of fairness work to preclude the

3    reopening of a judicial detention/release decision unless the party can demonstrate, at the least,

4    good cause for" doing so. "A rule that would not discourage a party for failing to acquire

5    readily available evidence for presentation the first time is a rule that encourages piecemeal

6

7    presentations. Judicial efficiency is not served by such a practice." *Id.* at 1406.

8    Further, defendant's initial submission to this Court – to broaden his release conditions –

9    was materially false. In order to explain his past misconduct, the defendant has made gross

10   misstatements of fact in his filings with this Court. Specifically, while it is true the defendant

11

12   wanted to be released to Las Vegas because his family was there, it is materially false to state (or

13   even imply) he had some imminent business transaction related to property in Las Vegas that he

14   does even own.

15

16   In addition, "new" evidence means evidence that was not previously available.[3] In this

17   case, the defendant has submitted no new evidence. As noted above, defendant's evidence is

18   neither new nor truthful. The only "new" facts are those submitted by the government. This

19   evidence establishes an ongoing pattern, which occurred over the past 10 years to the recent past

20

21   of threatening people, even after being warned repeatedly. The remaining evidence shows

22   another repeated pattern of submitting false documents to lenders, and false statements to this

23   Court and the bankruptcy court. As related to false documents, the government provided the

24

25   [3]"Courts have interpreted this provision strictly, holding that hearings should not be
     reopened if the evidence was available at the time of the initial hearing." *United States v. Ward*,
26   63 F. Supp. 1203, 1206 (C.D. Cal. 1999); *see also United States v. Dillon*, 938 F.2d 1412, 1415
     (1st Cir. 1991)(affirming denial of motion to reopen detention hearing where "new" information
27   included affidavits from defendant's family and friends, because such information was available
     at first hearing); *United States v. Wittenmyer*, 2001 WL 968406, *3 (D.Kan. 2001); *United States
28   v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)(testimony of family and friends is not new evidence).

1  Court with evidence in the form of a judicial decision showing that the defendant knew this type

2  of misconduct was wrong – his real estate license was revoked.  Despite that decision 15 years

3  ago, the defendant has never stopped.  Nor has the filing of these cases affected him.

4

5      As a simply matter, defendant has again failed to demonstrate by clear and convincing

6  evidence that he is not a danger.  18 U.S.C. § 3143(a).  Thus, detention is appropriate.  *United*

7  *States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  At this point, the defendant has

8  threatened numerous individuals from 2000 to the present.  He has also engaged in a continuous

9  pattern of economic crimes that has actually harmed individuals and demonstrated a willful

10  defiance for this Court's orders, committing a number of these offenses *after* being charged here.

11

12  Simply put, defendant has failed to produce any new evidence warranting his release and, in

13  fact, the "new" evidence submitted by the government shows he is a danger and should be

14  detained.

15

16                              Respectfully submitted,

17

18                              JOSEPH P. RUSSONIELLO
                                United States Attorney

19

20                              _____/s/_____

21                              THOMAS NEWMAN
                                Assistant United States Attorney

22

23

24

25

26

27

28

## Main Identity

From:        <Sflycoon1@aol.com>
To:          <kmulhern@svdpsf.com>
Cc:          <jring@svdpsf.org>; <RKane1089@aol.com>; <bharvey@SVDPSF.COM>; <healym@sfarchdiocese.org>
Sent:        Friday, October 17, 2008 5:43 PM
Subject:     Re: A message from Father John K. Ring

Attn> John Ring

I have received your letter this afternoon taped to my door at my house and am shocked and surprised by its contents. I disagree with your statements and claims made in your letter, however will not address them specifically in this letter.

I will address the fact that you do not have the right to expel my four children from the school. My children are good students of the school and are not subject to expulsion under California Law. I have spoken to my attorney, Bob Kane and he would like the name and phone number of your attorney to resolve this matter regarding ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as students. According to my attorney, my children have rights under the Laws of California and are allowed due process and to be treated fairly.

It is unfortunate that you are so angry as to the comments I made in my email to you about your disobedience of the Pope's Orders regarding administering the Sacraments to Pelosi that you would try to maliciously and vindictively take it out on four innocent children. Everyone in your parish is scared of you and no one tells you to your face or by letter what they really think, as I did in my letter because they know you are vindictive and retaliatory (as you did to Mr. Romano who supported your church for over 30 years to his innocent son). I could go on and on with another 100 examples, but what is the point, as you will not ever change.

Have your attorney contact ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ this weekend so my children may continue school without harassment on Monday. I do not think it is productive for us to communicate directly any further, please contact my attorney Bob Kane immediately.

Luke Brugnara

---

New MapQuest Local shows what's happening at your destination. Dining, Movies, Events, News & more. Try it out!

Case3:08-cr-00322-WHA   Document158   Filed03/22/11   Page34 of 59
Case5:10266   Doc 2/2011   Page: 8 of 18   ID: 76361   DktEntry: 27-10
e3:08-cr-00236-MMC   Document85-5   Filed04/07/10   Page4 of 16



*Saint Vincent de Paul Youth Club*

St. Vincent de Paul Youth Club
2350 Green Street
San Francisco, California, 94123
October 13, 2008

Mr. Luke Brugnara
224 Sea Cliff Avenue
San Francisco, California, 94121

Dear Mr. Brugnara,

I am writing to you regarding your behavior during the St. Vincent de Paul – St. Peter San Francisco 4th grade soccer game played on Saturday, October 11, 2008. Your words and actions during this game certainly were not in accord with the De Paul Youth Club Code of Conduct, CYO Code of Conduct, and the Archdiocese of San Francisco Code of Christian Conduct, which you have received.

You willfully chose to disregard the Codes of Conduct that are in place to provide for the safety and well-being of every participant in a De Paul Youth Club and CYO Athletic event when you chose to confront the coach during the game, use profanity, and rip apart a jersey. Behavior such as this is deplorable and has no place at any athletic contest or event.

You were forewarned in a letter to you dated December 21, 2007, "that any future displays of behavior such as you displayed on December 15th will result in your not being able to attend any future De Paul Youth Club activities." Due to your willful disregard of the Codes of Conduct and the above warning you are now suspended from attending any De Paul Youth Club activities. You may not attend any practices or games that are affiliated with the De Paul Youth Club, whether they are held at St. Vincent de Paul or elsewhere. You may not be in the St. Vincent de Paul gym while De Paul Youth Club activities are taking place. If you choose to violate this suspension you will be contacted by Father Ring to discuss your future at St. Vincent de Paul ... wish to discuss this decision you are to contact Father Ring and make an ... ... all De Paul

Sincerely,

Jenifer Spinale                                    Daniel Curran
Athletic Director                                  Asst. Athletic Director

Case3:08-cr-00222-WHA Document158 Filed03/22/11 Page35 of 59
Case: 10-10286 03/22/2011 Page: 6 of 8 DktEntry: 27-10
Case3:08-cr-00222-MMC Document85-5 Filed04/07/10 Page6 of 16

**CH-120**  **Notice of Hearing and Temporary Restraining Order**

*APPEAL ONLY*

Clerk stamps date here when form is filed.

① Name of person asking for protection:
Barbara J. Harvey

Address (skip this if you have a lawyer). (If you want your address to be private, give a mailing address instead):
2438 21st Avenue

City: San Francisco  State: CA  Zip: 94116
Your telephone number (optional): (   )
Your lawyer (if you have one): (Name, address, telephone number and State Bar number):

ENDORSED
FILED
San Francisco County Superior Court
OCT 17 2008
GORDON PARK-LI, Clerk
BY E.J. LACSON  Deputy Clerk

Fill in court name and street address:
Superior Court of California, County of
SAN FRANCISCO TRIAL COURTS
400 MCALLISTER STREET
SAN FRANCISCO, CA 94102

② Name of person to be restrained:
Luke Brugnara

Description of that person:
Sex: ☑M ☐F  Height: 6'2"  Weight: 230  Race:

Court fills in case number when form is filed.
Case Number: CCH-08-568551

③ **Notice of Hearing**
A court hearing is scheduled on the request for orders against you to stop harassment:

Hearing Date: 10/31/08  Time: 9:00am  Name and address of court if different from above:
Dept.: 28  Rm.: 28

If you do not want the court to make orders against you, file Form CH-110. Then go to the hearing and tell the court why you disagree. You may bring witnesses and other evidence. If you do not go to this hearing, the court may make restraining orders against you that could last up to 3 years.

④ **Court Orders**  *HEARING ONLY*
The court (check a or b):
a. ☑ Has scheduled the hearing stated in ③. No orders are issued against you at this time.
b. ☐ Has scheduled the hearing stated in ③ and has issued the temporary orders against you specified on page 2. If you do not obey these orders, you can be arrested and charged with a crime. And you may have to go to jail, pay a fine of up to $1,000, or both.

**This is a Court Order.**

Notice of Hearing and Temporary Restraining Order (CLETS)
(Civil Harassment)  CH-120, Page 1 of 4

me: *Barbara I. Harvey*

Case Number: SL8551

**Other Protected Persons**

List of the full names of all family or household members protected by these orders:

## Instructions for the Protected Person

**To the person in ①:** *(Write the name of the person in ① ):*

**⑪ Service of Order on Law Enforcement**

If the court issues temporary restraining orders, by the close of business on the date the orders are made, you or your lawyer should deliver a copy of this Order and any proof of service forms to each law enforcement agency listed below.

Name of Law Enforcement Agency: *San Francisco Police Department*    Address (City, State, Zip): *850 Bryant St. S.F. CA 94103*

Fix 5/5

**⑫ Service of Documents**

You must have someone personally deliver to the person in ② a copy of all the documents checked below:

a. ☒ CH-120, *Notice of Hearing and Temporary Restraining Order (CLETS)* (completed and file-stamped)
b. ☐ CH-100, *Request for Orders to Stop Harassment* (completed and file-stamped)
c. ☒ CH-110, *Answer to Request for Orders to Stop Harassment* (blank form)
d. ☒ CH-145, *Proof of Firearms Turned In or Sold* (blank form)
e. ☒ CH-151, *How Can I Answer a Request for Orders to Stop Harassment?*
f. ☐ Other *(specify):*

You must file with the court before the hearing a proof of service of these documents on the person in ②.

**⑬ Time for Service** *(check a, b, or c)*

a. ☒ A copy of the documents listed in ⑫ must be served in person to the person in ②
   at least 5 days before the hearing.
b. ☐ A copy of the documents listed in ⑫ must be served in person to the person in ②
   at least 2 days before the hearing.
c. ☐ A copy of the documents listed in ⑫ must be served in person to the person in ②
   at least _____ days before the hearing.

**⑭ ☐ No Fee for Filing**

Filing fees are waived.

**This Is a Court Order.**

Case3:08-cr-00222-WHA Document158 Filed03/22/11 Page37 of 59
Case: 10-10286 02 /2011 Page: 11 of 18 ID: 7656/ 5 DktEntry: 27-10
Case3:08-cr-00206-MMC Document85-5 Filed04/07/10 Page8 of 16

**00** **Request for Orders to Stop Harassment**

Clerk stamps date here when form is filed.

ENDORSED
F I L E D
Superior Court of California,
County of San Francisco

OCT 16 2009

GORDON PARK-LI, Clerk
BY: PARAM NATT
Deputy Clerk

① name *(person asking for protection)*:

Your lawyer *(if you have one)*: *(Name, address, telephone number, and State Bar number)*:

Fill in court name and street address:

Superior Court of California, County of

SAN FRANCISCO TRIAL COURTS
400 MCALLISTER STREET
SAN FRANCISCO, CA 94102

② Name of person you want protection from:

*Luke Brugnara*

Describe the person: Sex: ☒ M ☐ F Weight: *220*

Court fills in case number when form is filed.

-568551

Zip: 9412[

City: State: Zip:

③ Besides you, who needs protection? *(Family or household members)*

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|---|---|---|---|---|
| | F | 45 | ☐ Yes ☐ No | *Employer* |
| | F | 52 | ☐ Yes ☐ No | *Employee* |
| | F | | ☐ Yes ☐ No | *Employee* |
| | | | ☐ Yes ☐ No | *Employee* |

☐ Check here if you need more space. Attach a sheet of paper and write "CH-100, Item 3—Describe Protected Persons" at the top of the page.

④ Why are you filing in this court? *(Check all that apply)*.

☒ The person in ② lives in this county.

☒ I was hurt (physically or emotionally) by the person in ② here.

☒ Other *(specify)*: *Safety and well-being of all students and staff of*
*Saint Vincent de Paul school*

⑤ How do you know the person in ②? *(Describe)*:

*As principal of Saint Vincent de Paul School, I know Mr. Luke Brugnara and his family. I am also aware of his extremely aggressive and threatening behavior. Parents have come to me out of fear for their own safety and the safety of their students.*

**This is not a Court Order.**

Judicial Council of California, www.courtinfo.ca.gov
Revised July 1, 2007, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.8

**Request for Orders to Stop Harassment**
(Civil Harassment)

CH-100, Page 1 of 4

Case Number:

Describe how the person in ② has harassed you:

a. Date of most recent harassment: *10/11/08*

b. Who was there? *Our fourth grade boys soccer team, our fourth grade parents our coaches and St. Peter fourth grade boys, parents, coaches, Referees*

c. Did the person in ② commit any acts of violence or threaten to commit any acts of violence against you?
☒ Yes   ☐ No *as the principal of the school*

*If yes, describe those acts or threats:* *He threw a bottle of water at our coach, walked on the field during the game screaming threats and obscenities. He traumatized my students - they were afraid to return to school*

d. Did the person in ② engage in a course of conduct that harassed you and caused substantial emotional distress? ☒ Yes   ☐ No

*If yes, describe:* *Since this event to have rec'd letters from him. He refused to abide by our demand and the demand of CVD to stay away from sporting events and our students. He said he could do whatever he wanted*

e. Did the conduct of the person in ② described above seriously alarm, annoy, or harass you? ☒ Yes   ☐ No *see attached sheet*

☒ Check here if you need more space. Attach a sheet of paper and write "CH-100, Item 6—Describe Harassment" at the top of the page.

## ⑦ Check the orders you want ☑

**Personal Conduct Orders**

I ask the court to order the person in ② to not do the following things to me or anyone listed in ③:

a. ☑ Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, destroy personal property, keep under surveillance, or block movements.

b. ☑ Contact (either directly or indirectly), or telephone, or send messages or mail or e-mail.

The person in ② will also be ordered not to take any action to get the addresses or locations of any protected persons, their family members, or their caretakers unless the court finds good cause not to make the order.

## ⑧ ☑ Stay-Away Orders

I ask the court to order the person in ② to stay at least (specify): _____ yards away from me and the people listed in ③ and the places listed below: (Check all that apply):

a. ☑ My home
b. ☑ My job or workplace
c. ☐ My children's school or child care
d. ☑ My vehicle
e. ☑ Other (specify) *Anywhere on Saint Vincent & Paul Parish Property*

If the court orders the person in ② to stay away from all the places listed above, will that person still be able to get to his or her home, school, or job? ☒ Yes   ☐ No

*If no, explain:*

This is not a Court Order.

Revised JULY 1, 2007

**Request for Orders to Stop Harassment**
(Civil Harassment)

CH-100, Page 2 of 4

Case3:08-cr-00222-WHA Document158 Filed03/22/11 Page39 of 59
Case: 10-10266 Document: 2/2011 Page: 13 of 18 ID: 7656 DktEntry: 22-10
Case 3:08-cr-00222-EMC Document85-5 Filed04/07/10 Page10 of 16

| | Case Number: |
|---|---|

**Others to Be Protected**

Should the other people listed in ③ also be covered by the orders described above?

☒ Yes     ☐ No     ☐ Does not apply

If yes, explain: _Luke Brugnara is a potential danger to anyone in or around Saint Vincent de Paul School_

⑩ **Order About Guns or Other Firearms**

I ask the court to order the person in ② to be prohibited from owning, possessing, purchasing, or receiving, or attempting to purchase or receive firearms and to sell or turn in any guns or firearms that he or she controls.

⑪ ☐ **Other Orders**

I ask the court to order the person in ② to (specify): _to contact Rev. John K. Ring two days in advance if Mr. Brugnara ~~once~~ wishes to meet with any school employee._

⑫ ☐ **Temporary Orders**

Do you want the court to make orders now on the matters listed in ⑦, through ⑪ that will last until the hearing? ☒ Yes ☐ No

If yes, explain why you need these orders right now: _Mr. Brugnara had demonstrated erratic behavior in the past and is a potential danger to anyone associated with Saint Vincent de Paul School_

☐ Check here if you need more space. Attach a sheet of paper and write "CH-100, Item 12—Temporary Orders" at the top of the page.

⑬ **Delivery of Orders to Law Enforcement**

My lawyer or I will give copies of the orders to the following law enforcement agencies:

a. Name of Agency: _San Francisco Police Department_

Address: _850 Bryant Street_

City: _San Francisco_    State: _CA_    Zip: _94103_

b. Name of Agency: _____

Address: _____

City: _____    State: _____    Zip: _____

⑭ ☐ **Other Court Cases**

Have you ever asked any court for other restraining orders against the person in ②? ☐ Yes ☒ No

If yes, specify the counties and case numbers if you know them: _____

This is not a Court Order.

Revised July 1, 2007

**Request for Orders to Stop Harassment**    CH-100, Page 3 of 4

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page40 of 59
Case: 10-10286   DktEntry: 27-10
Case3:08-cr-00222-WHA   Document35-6   Filed04/07/...   Page11 of 16

Case Number:

☑ **Time for Service**

You must have your papers personally served on (notify) the person in ② at least 5 days before the hearing, unless the court orders a different time for service. *(Form CH-135 explains "What Is Proof of Service?" Form CH-130 may be used to show the court that the papers have been served.)* If your papers cannot be served at least 5 days before the hearing and you need more time, explain why:

_____

_____

(16) ☐ **No Fee for Filing**

I ask the court to waive the filing fee because the person in ② has used or threatened to use violence against me, has stalked me, or has acted or spoken in some other way that makes me reasonably fear violence. I am asking for a restraining order to stop this conduct.

(17) ☒ **No Fee to Serve Orders**

I ask the court to order the sheriff or marshal to serve (notify) the person in ② about the orders for free because:

a. ☒ My request for orders is based on stalking; or
b. ☐ My request for orders is based on a credible threat of violence; or
c. ☐ I am entitled to a fee waiver.

*(If you are requesting free service of the orders based on a fee waiver, you must complete and file the Application for Waiver of Court Fees and Costs (Form FW-001).)*

(18) ☐ **Lawyer's Fees and Costs**

I ask the court to order payment of my:

a. ☐ Lawyer's fees
b. ☐ Out-of-pocket expenses

The amounts requested are:

| Item | Amount | Item | Amount |
|------|--------|------|--------|
| | $ | | $ |
| | $ | | $ |

☐ *Check here if you need more space. Attach a sheet of paper and write "CH-100, Item 18—Lawyer's Fees and Costs" at the top of the page.*

(19) **Additional Relief**

I ask the court for additional relief as may be proper.

(20) Number of pages attached to this form, if any: _____

Date: _____

Lawyer's name _____     Lawyer's signature _____

I declare under penalty of perjury under the laws of the State of California that the information above and on all attachments is true and correct.

Date: 10/12/06

This is not a Court Order.

Revised July 1, 2007

...quest for Orders to Stop Haras...   ...nt     CH-100, Page 4 of...

TELEPHONE NO.: FAX NO. (Optional):

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA. 94102
BRANCH NAME:

PLAINTIFF/PETITIONER: Harvey V.

DEFENDANT/RESPONDENT: Brugnara

CASE NUMBER:

## DECLARATION

Mr. Brugnara has told me that under no circumstance was I to keep his son afterschool. If we did, he would come in and remove him by force, if necessary. I am very intimidated by Mr. Brugnara. When he is upset, he screams and yells as well as making threats. In the past, I know he threatened to have teachers fired, he has made threats to sue schools if he don't have his way. He forced a parent off the road onto the sidewalk with his car because her son called his son fat.

Mr. Brugnara is of a volatile nature. He can be abrasive. He screams at school personell & parents causing students to fear coming to school. His reputation for carrying weapons is well known and I honestly feel that he is so unstable that there is a likelyhood that he will harm me as the principal of the school. He has enrolled his students in 5 parochial schools and he has caused fear everywhere he has been. I am personally afraid for my safety and well being. If you have any doubts, please google "Luke Brugnara" and you will learn volumes about this dangerous man.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 10/16/08

☑ Attorney for  ☐ Plaintiff/ ☑ Petitioner  ☐ Defendant
☐ Respondent  ☐ Other (Specify):

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
MC-030 (Rev. January 1, 2006)

DECLARATION

1

2      I, Reverend John Ring, declare as follows:

3          1.      I am Pastor of St. Vincent de Paul Parish in San Francisco, and have held this

4    position since January, 1988. St. Vincent de Paul Parish runs a parochial K-8 school. Over the

5    course of these years, I have become familiar with Archdiocesan school policy. I make this

6    declaration upon facts within my personal knowledge and if called upon to testify in this action, I

7    can and would competently testify thereto.

8

9          2.      As Pastor, I am responsible for the affairs of the School and the safety of our school

10   community. As set forth in the 2008/2009 Parent/Student Handbook (a true and correct copy of

11   which is attached hereto as Exhibit A), St. Vincent de Paul is a private, co-educational elementary

12   school operating under the auspices of the Archdiocese of San Francisco. It is an express condition

13   of enrollment that students and the parents/guardians of a student shall conform themselves to

14   standards of conduct that are consistent with the Christian principles of the school, as determined by

15   the school in its discretion, and as reflected in the Code of Christian Conduct Covering Students

16   and Parents/Guardians.

17

18         3.      As set forth in the School Handbook Contract, substantiated acts of misconduct

19   violative of the Code of Christian Conduct will result in disciplinary action up to, and including,

20   dismissal and expulsion; discretion for these disciplinary measures is reserved to the school and

21   Pastor, again, as a matter of contract. I invite the Court to familiarize itself with these policies, to

22   provide appropriate context to the actions of Luke Brugnara which are described in the police report

23   and other materials which are in my possession and which will be made available to the Court at

24   any hearing of this matter.

25

26

27

28
                                               -2-
       DECLARATION OF REVEREND JOHN RING IN SUPPORT OF OPPOSITION TO EX PARTE
            APPLICATION FOR MANDATORY INJUNCTIVE RELIEF

1       4.    On Saturday, October 11, 2008, I became generally aware of the most recent — and I

2   must add, flagrant — violation of the Code of Christian Conduct by Mr. Brugnara, involving a 4th

3   grade soccer game, the lack of playing time for Mr. Brugnara's 9-year old son, and Mr. Brugnara's

4   

5   very public inappropriate behavior towards the coach, his own son and third parties. I am informed

6   and believe that last Wednesday, October 15, 2008, the coach (Mr. Gallo) sought and obtained a

7   temporary restraining order against Mr. Brugnara for his own protection, San Francisco Superior

8   Court Action No. CCH-08-568541.

9       5.    On the afternoon of October 17, 2008, after considerable deliberation with and

10  consultation from school administrators, and upon my own prayerful reflection, I decided that the

11  then-present circumstances required my directing Mr. Brugnara not to come to St. Vincent de Paul

12  

13  Parish and to move his children to another school. A copy of my October 17, 2008 letter to Mr.

14  Brugnara is attached as Exhibit B. This deliberative process was independent of any consideration

15  of the fact that the Brugnara family has not paid any of its tuition bills for the current school year,

16  other than a flat $500 deposit last Spring. This process was independent of my consideration of the

17  

18  fact that the Brugnara family has not signed or returned the CYO Athletics Parent Code of Conduct,

19  as they did the previous year.

20      6.    In light of Mr. Brugnara's threats against me and other members of our parish and

21  school staff (copies of correspondence exchanged between Parish officials and Mr. Brugnara are

22  attached hereto in Group Exhibit C attached hereto), I have asked our counsel to prepare an

23  application for a restraining order against Mr. Brugnara preventing him from contacting any of our

24  parish employees or from visiting our parish campus at Green and Steiner Streets here in San

25  

26  Francisco.

27  

28  

-3-

DECLARATION OF REVEREND JOHN RING IN SUPPORT OF OPPOSITION TO EX PARTE
APPLICATION FOR MANDATORY INJUNCTIVE RELIEF

1    I declare under penalty of perjury under the laws of the State of California that the

2 foregoing is true and correct.

3    Executed this 21st day of October 2008, in San Francisco, California .

4

5

6            REVEREND JOHN RING

7

8 *H:\JPC\St. Vincent de Paul\DeclarationRevJohnRingSupportingOppositionExParteApplicationMandatoryInjuntiveRelief.DOC*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

             -4-

**DECLARATION OF REVEREND JOHN RING IN SUPPORT OF OPPOSITION TO EX PARTE
APPLICATION FOR MANDATORY INJUNCTIVE RELIEF**

# EXHIBIT J

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page46 of 59
Case: 10-10266   02/2/2011   Page: 2 of 2   ID: 76561   DktEntry: 27-11
Case3:08-cr-00222-WHA   Document92   Filed03/09/10   Page1 of 1

1

2

3

4                  UNITED STATES DISTRICT COURT

5               NORTHERN DISTRICT OF CALIFORNIA

6                   SAN FRANCISCO DIVISION

7   UNITED STATES OF AMERICA,          )   No. CR08-0236 MMC; CR08-0222 WHA

8           Plaintiff,                 )   [PROPOSED] ORDER GRANTING
                                       )   GOVERNMENT'S MOTION TO
9       v.                             )   REMAND DEFENDANT

10  LUKE BRUGNARA,                     )

11          Defendant.                 )

12                                     )

13  _____)

14      Having read and considered the papers filed by the parties in connection with the above-

15  entitled matter, and considered the arguments and proffers of counsel at the detention hearing,

16  this Court finds that defendant Luke Brugnara has failed to prove by clear and convincing

17  evidence that he is not a danger to any person or the community.  Therefore, this Court

18  GRANTS the Government's Motion to Remand Defendant, and defendant is hereby ORDERED

19  detained.

20

21  DATED:  03/09/10

22                                         _____
                                           HON. JO...
                                           United Sta...             ...Court Judge
                                                 Judge Joseph C. Spero

23

24

25

26

27

28

[PROPOSED] ORDER
CR08-0236 MMC; CR08-0222 WHA

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page47 of 59

# EXHIBIT K

1  JOSEPH P. RUSSONIELLO
   United States Attorney
2  BRIAN STRETCH
   Chief, Criminal Division
3  THOMAS M. NEWMAN
   Assistant United States Attorney
4  9th Floor Federal Building
   450 Golden Gate Avenue, Box 36055
5  San Francisco, California 94102
   Telephone:   (415) 436-6805
6  Fax:          (415) 436-6748

7  Attorneys for the United States of America

8                 UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,

12          Plaintiff,                    No. 08-222-WHA

13      v.                               DECLARATION OF
                                         WILLIAM NELSON
14  LUKE D. BRUGNARA,

15          Defendant.

16

17      I, William Nelson, pursuant to 28 U.S.C. § 1746, declare and state as follows:

18  I am a shareholder in the firm Piercy, Bowler, Taylor & Kern ("PBTK"), which is an accounting

19
    firm located in Nevada.
20

21      2.    In late 2000, Luke Brugnara engaged PBTK when he was applying for a gaming

22  license.  PBTK was hired to review Mr. Brugnara's financial records, including his tax

23  returns. In 2001, Mr. Brugnara also requested that we prepare his 2000, and future tax returns.

24      3.    From late 2000, until about March 2001, PBTK requested copies of final
25
    records from Mr. Brugnara. This included requests for information related to properties Mr.
26
    Brugnara sold.  For example, on February 28, 2001, a fax was sent to Mr. Brugnara requesting:
27

28

a.   "Estimated net income or loss for 2000 that will be reported on your tax returns."

b.   "Estimated net income or loss that you will have in 2001 that will be reported on your tax return, including the sale 490 Post;"

4.   On March 1, 2001, Mr. Brugnara responded in writing noting an "Estimated Net Income/Loss for 2001", that included the "Sale of 490 Post." Mr. Brugnara estimated "$12,5M gain" and estimated "$2.5M" tax on the sale. Mr. Brugnara also provided "Net Income/Loss" for 2000. In this amount, Mr. Brugnara included $7.2 million gain from the sale of "814 Mission" and $2.4 million gain from the sale of "939 Market." Mr. Brugnara stated the total gain was "$9.6M" and estimated "$1.96M tax."

5.   On March 2, 2001, PBTK sent Mr. Brugnara an additional letter asking for information about his statements that he earned $7,200,000 from the sale of 814 Mission Street and $2,400,000 from the sale of 939 Market Street to determine his tax liability.

6.   Mr. Brugnara sent a response on March 3, 2001. In his response he stated that he purchased 814 Mission Street in "December 1993" and sold the property in "January 2000." Mr. Brugnara also stated he purchased the property for "$2.8M" and sold the building in 2000 for $12M". Mr. Brugnara provided certain costs to support the realized gain of $7.2 million. Mr. Brugnara also stated that he purchased "939 Market" Street in "May 1993" for "$2.5M" and sold the property in "January 2000" for "$8M." Mr. Brugnara provided costs to support the realized gain of $2.4 million.

7.   Prior to receiving these amounts, on February 16, 2001, PBTK advised Mr. Brugnara that the sale or exchange of any property is reported on a tax return on, for example, a Schedule D, Form 4797, or Form 6252.

*Declaration of William Nelson,*
*Case No. 08-222-WHA*                              -2-

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed on ___15___ day of April, 2010, at Las Vegas, Nevada.

3

4

5                                                    William Nelson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT L

1
2
3
4
5
6 IN THE UNITED STATES DISTRICT COURT
7
8 FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10 UNITED STATES OF AMERICA,
11          Plaintiff,                    No. CR 08-0222 WHA
12     v.
13 LUKE D. BRUGNARA,                      ORDER DENYING
                                          DEFENDANT'S MOTION TO
14          Defendant.                    WITHDRAW GUILTY PLEA
15 _____/
16
17                       **INTRODUCTION**
18     Defendant Luke Brugnara moves to withdraw his guilty plea. For the following reasons,
   the motion is DENIED.
19
20                        **STATEMENT**
21     Defendant Luke Brugnara has pled guilty *twice*. After the first plea, the Court let him
22 withdraw the plea. On the eve of trial, he pled guilty again. Now he moves to set the second
   guilty plea aside. Sufficient cause has not been shown to allow it.
23
24     On April 3, 2008, defendant, a real-estate businessman, was indicted for filing false tax
25 returns for the calendar years 2000, 2001 and 2002 in violation of 26 U.S.C. 7206(1). At his
26 initial appearance on April 17, 2008, he was represented by Attorney Harris Taback and
27 released on his own recognizance. Shortly thereafter Attorney Taback withdrew and was
28 replaced by Attorney Kenneth Wine. Attorney Taback, however, continued on as counsel of
   record for defendant in a separate criminal prosecution before Judge Chesney, No. 08-CR-0236,
   in which defendant faced charges of knowingly taking and attempting to take a threatened

United States District Court
For the Northern District of California

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page53 of 59
Case: 10-10286   ⊙   '2/2011   Page: 3 of 9   ID: 76561'   DktEntry: 27-13
Case3:08-cr-00222-WHA   Document112   Filed05/03/10   Page2 of 8

1   species (steelhead fish) in violation of the Endangered Species Act and making false statements

2   to a California Department of Fish and Game officer.

3       Because the present action was a complex tax prosecution with a large amount of

4   discovery, Attorney Wine asked for and received additional time to prepare in August 2008 and

5   again in September 2008 (Dkt. Nos. 11, 14). Trial was eventually set for June 15, 2009.

6   Defendant was out of custody.

7       On the eve of trial, defendant pleaded guilty pursuant to a Rule 11(c)(1)(C) plea

8   agreement. The plea was taken on May 15, 2009. Soon after the trial date was vacated,

9   however, he fired Attorney Wine and on June 9 asked for a CJA lawyer to aid him in rescinding

10   his plea agreement. By that point, it was impossible to reinstate his previous trial date both

11   because the calendar spots had been taken by other matters and because new counsel would

12   have needed time to prepare anew. Again, at all times, defendant remained out of custody.

13       Instead of obtaining CJA counsel, defendant re-engaged Attorney Taback to represent

14   him in this action and to move to vacate the plea. At the hearing on that motion, the Court

15   made clear that it was concerned how much time Attorney Taback would need to "come up to

16   speed on a tax case" to prepare for trial if defendant's motion were granted, given the complex

17   nature of the action and the previous continuances that had been given to Attorney Wine

18   (Brugnara Suppl. Br. Exh. 3 at 10–11). Attorney Taback assured the Court that if a new trial

19   date were set in mid- to late-February 2010, "that would give me enough, five or six months or

20   so to get on top of this case and satisfy my responsibilities to various other clients that I have to

21   service as well" (*id.* at 30). All agreed that the plea colloquy had been adequate. It was

22   doubtful that grounds to withdraw were shown but an order allowed him to withdraw his plea

23   on September 2, 2009. This was done in reliance on Attorney Taback's express and unqualified

24   assurance that he would try the case in February 2010 and the motion was not merely a delay

25   tactic. Trial was promptly set for February 2010, later continued to March 1.

26       Despite his prior assurances, Attorney Taback moved to withdraw as counsel of record

27   in October 2009. In support of the motion, Attorney Taback declared under oath that he was

28   retained and paid specifically to prepare and file a motion to withdraw defendant's guilty plea

1    and, if that motion were not granted, to represent defendant at sentencing. He stated under oath

2    that after the motion to withdraw defendant's guilty plea was granted, he entered another

3    written contract with defendant to be paid a trial fee and monies needed for investigation and

4    trial preparation. He further declared, however, that no additional payments of any kind were

5    provided by defendant since that date (Taback Decl. 2–3).

6        Criminal Local Rule 44-2 states that an attorney who wishes to withdraw must show

7    good cause, and that "[f]ailure of the defendant to pay agreed compensation may not necessarily

8    be deemed good cause." The motion to withdraw was denied on the grounds that the only

9    reason Attorney Taback wished to withdraw was because of his client's alleged failure to pay.

10   Although Attorney Taback claimed in his motion that defendant's failure to pay had created an

11   irreconcilable conflict between them, at a hearing on November 3, 2009, defendant did not

12   agree and in fact agreed that he "loved" his attorney (Brugnara Suppl. Br. Exh. 1 at 7). When

13   asked by the Court whether he wanted Attorney Taback to continue to represent him, defendant

14   answered, "Absolutely. I have no problem with Mr. Taback" (*ibid.*). Attorney Taback's motion

15   to withdraw was also denied in No. 08-CR-0236. It was quite clear that defendant was happy

16   with Attorney Taback's representations and that only Attorney Taback was unhappy because he

17   was having to work for free, or so it appeared to him the time. Eventually, they evidently

18   worked out their differences.

19       On January 22, 2010, defendant was arrested on a complaint for threatening to kill

20   witnesses in No. 08-CR-0236 which was set to begin trial on January 26. On January 26,

21   shortly before jury selection began, defendant pleaded guilty to all charges in that matter. *Later*

22   *that day, he again pleaded guilty in the present matter to Counts 1–3.* The government agreed

23   to dismiss Count 4. The government also agreed that defendant should be released from

24   custody on January 28, 2010, and that the United States Attorney's Office for the Northern

25   District of California would not file any additional tax charges related to this investigation or

26   known to exist at that time (Brugnara Suppl. Br. Exh. 8 at 5–6). Sentencing was set for May 4,

27   2010.

28

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1    On January 28, 2010, defendant was released subject to conditions agreed upon by

2    defendant and the prosecution in both this matter and in No. 08-CR-0236, including that (1) his

3    mother Vicki Brugnara act as his custodian, (2) he reside 24 hours a day, 7 days a week at his

4    mother's residence in San Francisco, (3) he have electronic monitoring, (4) he not leave his

5    mother's residence except that with approval from Pretrial Services he was permitted to leave

6    for medical reasons and to visit his attorneys, Pretrial Services, and court (Dkt. No. 73).

7    On March 2, 2010, defendant was allowed to substitute Attorneys Brian Getz and Eric

8    Krebs for Attorney Taback in both this matter and in No. 08-CR-0236. Three days later,

9    defendant was remanded to custody for violating the terms of his pretrial release (Dkt. No. 88).

10    Specifically, on February 8, 2010, federal agents had observed and photographed defendant and

11    his mother at an unauthorized location — a residence he owns in San Francisco — without

12    approval from the Court or Pretrial Services.

13                                   ANALYSIS

14    Federal Rule of Criminal Procedure 11(d)(2)(B) provides that a defendant may withdraw

15    a guilty plea after its acceptance but before sentencing if the defendant shows "a fair and just

16    reason for requesting the withdrawal." "Fair and just reasons for withdrawal include inadequate

17    Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other

18    reason for withdrawing the plea that did not exist when the defendant entered his plea." *United*

19    *States v. Garcia*, 401 F.3d 1008, 1012 (9th Cir. 2005). Defendant does not contend that the

20    Rule 11 colloquy was inadequate. Nor does he assert the discovery of new evidence.

21    Defendant asserts four reasons that he should be allowed to withdraw his plea for the

22    second time. *First*, he argues that he had an "irreconcilable and actual conflict" with Attorney

23    Taback at the time of his entry of plea. *Second*, he argues that he did not receive the "benefit of

24    his bargain" in exchange for his guilty plea because the terms of his plea agreement were

25    materially breached. *Third*, he argues that his plea application is null and void because the fifth

26    paragraph of the application was allegedly not executed in his own handwriting. *Fourth*, he

27    argues that at the time of his entry of plea, he was suffering from a manic episode due to his

28

United States District Court

For the Northern District of California

1   incarceration. These claims are without merit and do not offer fair or just reasons to allow him

2   to withdraw his plea.

3      Defendant has not shown that he was prejudiced by any deficiency on the part of

4   Attorney Taback. Inadequate assistance of counsel requires that defendant show that his

5   attorney's representation fell below the normal standard of representation and that this deficient

6   representation prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687-90 (1984). In

7   support of his argument that he had an irreconcilable and actual conflict with his attorney,

8   defendant relies entirely on the same evidence that was already rejected in Attorney Taback's

9   motions to withdraw in this matter and in No. 08-CR-0236. But at the November hearing on

10   that motion, defendant told the Court he was very pleased with Attorney Taback's

11   representation. Moreover, at the plea colloquy in January, defendant said that he was satisfied

12   with Attorney Taback's advice and counsel (Brugnara Suppl. Br. Exh. 2 at 11).

13      Defendant submitted a sworn declaration in support of his motion to again withdraw his

14   plea, but the declaration does not support his contention that Attorney Taback's representation

15   was somehow deficient. In his declaration, defendant stated that he was taken into custody on

16   January 22, 2010 (Brugnara Decl. at 1). He described at length the unpleasant conditions he

17   encountered in jail (Brugnara Decl. at 1–6). He then averred that when he met with Attorney

18   Taback before his trial began, he told Attorney Taback that he would sign anything to get out of

19   jail (Brugnara Decl. at 6). Attorney Taback told him that he could be released immediately if he

20   pleaded guilty (*Ibid.*). Defendant's sworn declaration therefore supports a finding that he

21   pleaded guilty on his own initiative, not due to the coercion or deficient representation of

22   Attorney Taback.

23      At the hearing on this motion, defendant made a lengthy statement but none of it was

24   under oath. No declaration from Attorney Taback was submitted. The record unequivocally

25   shows that Attorney Taback was prepared to provide an adequate defense for defendant.

26      Defendant's argument that the terms of his plea were somehow breached is also without

27   merit. Defendant argues that he did not receive the "benefit of his bargain" because he was

28   returned to custody even though the government agreed that he should be released prior to

Case3:08-cr-00222-WHA   Document158   Filed03/22/11   Page57 of 59
Case: 10-10286   0   2/2011   Page: 7 of 9   ID: 76561(   DktEntry: 27-13
Case3:08-cr-00222-WHA   Document112   Filed05/03/10   Page6 of 8

1   sentencing. But defendant's release before sentencing was explicitly subject to specified

2   conditions, and he was only returned to custody after violating one of them. Unconditional pre-

3   sentence release was not part of defendant's "bargain."

4        Defendant also argues that he did not receive the benefit of his bargain because the

5   Court stated during the colloquy that it would not accept any qualifications or conditions

6   regarding his plea. This argument is without merit because defendant entered an open plea after

7   agreeing to plead without any such qualifications or conditions. The Court repeatedly stated

8   during the colloquy that defendant did not have to plead guilty, but if he did, he would be

9   entering an "open" plea, meaning without conditions or limitations on his sentence. (*id.* at 4–5,

10  8, 13, 20–21). In response to defendant's innuendos that he wished to settle the entire affair, the

11  Court stated, "There is no settlement in front of me. I'm telling you that I — if you all think

12  you have some kind of a settlement, let's forget it and go to trial" (*id.* at 20). Defendant stated

13  that he understood (*ibid.*).

14       The plea application form stated regarding paragraph 5: "In the above space defendant

15  must set out in detail in his/her own handwriting what he/she did. If more space is needed, add

16  a separate page" (Brugnara Suppl. Br. Exh. 8 at 2). Defendant argues (without citing any

17  authority) that his plea application is void because in fact Attorney Taback wrote the paragraph

18  in question. This argument fails because defendant acknowledged the substance of paragraph 5

19  — including the acts he committed in connection with the charges against him — during the

20  colloquy (Brugnara Suppl. Br. Exh. 2 at 31–39). An application to plead guilty is a mere

21  supplement to ensure that any plea was voluntary and knowing. A plea application is not

22  necessary for defendant to enter an open plea.

23       Finally, defendant argues that his plea was involuntary because he was suffering from a

24  manic episode at the time. This contention is directly contradicted by defendant's statements at

25  the plea colloquy. The following exchange took place at the hearing (*id.* at 10):

26           Q. Are you thinking clearly today?

27           A. Yes.

28

6

1    Q. Are you under the influence of any medicine, alcohol, or

2    narcotic?

3    A. No.

4    Q. Are you being treated for any kind of mental illness?

5    A. No.

6    Q. Are you mentally ill?

7    A. No.

8    Moreover, by the stipulation of the parties, defendant was examined by Psychiatrist

9  David Kessler. Psychiatrist Kessler concluded that "on January 26, 2010, the defendant was not

10  impaired by any mental disorder from being able to understand the nature and consequences of

11  his decision or to cooperate rationally and meaningfully with counsel in preparing a defense"

12  (Kessler Decl. at 3).

13    Based upon all of the above, there is no credible basis for defendant's claim that his plea

14  was not knowing and voluntary due to his mood disorder. After reading the transcript of the

15  plea colloquy, the Court is convinced and so finds that defendant's plea was, indeed, knowing

16  and voluntary and that he was not impaired by any mental disorder that rendered his plea

17  incompetent.

18    The record clearly shows that defendant has repeatedly attempted to game the system in

19  this action for purposes of delay by changing attorneys and changing his plea multiple times.

20  He will not be permitted to do so any longer. Defendant's motion to withdraw his guilty plea is

21  DENIED. His sentencing shall go forward on MAY 4, 2010, AT 2:00 P.M., as previously

22  scheduled.

23

24    IT IS SO ORDERED.

25

26  Dated: May 3, 2010.

27    WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

28

Case3:08-cr-00222-WHA   Document159   Filed06/03/11   PageEntry: 27-93

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28