United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

LUKE D. BRUGNARA,

    Defendant.

                                               /

No. CR 08-00222 WHA

**AMENDED ORDER DENYING MOTION TO REVOKE DETENTION ORDER**

      The essence of the matter is this: numerous detention hearings have been held in this matter. After promising to abide by whatever stringent conditions that the Court might impose, defendant Luke D. Brugnara was released to a halfway house and then violated one or more of those conditions. The magistrate judge revoked release and defendant is back in custody. This order affirms the magistrate judge's refusal to release defendant again. Now follow the details.

      This is a motion to revoke the most recent detention order by Magistrate Judge Nat Cousins. This latest detention stems from the hearing on September 24, 2014, in which Magistrate Judge Cousins found clear and convincing evidence that defendant had violated Conditions Number 3 and Number 8 of his release — by (1) using a telephone to send calls, and (2) contacting a witness outside of the presence of defense counsel of record, CJA Attorney Erik Babcock (Dkt. No. 358). Magistrate Judge Cousins further found that defendant is unlikely to abide by any condition of release, and therefore remanded defendant to custody.

By way of background, defendant has previously pled guilty to two sets of convictions, one for false tax returns and the other for Endangered Species Act violations and false statements to a government agent (*see* CR 08-00222; CR 08-00236). Since then and while on supervised release, defendant has been charged with the pending mail-and-wire fraud indictment in the present action, as well as a Form 12 violation, after he allegedly asked an art dealer in New York to send artwork worth many millions of dollars to him in San Francisco upon the implicit representation that he would pay for them and had the means to do so. Once, however, the artwork was delivered to his garage in San Francisco, he told the art dealer that the shipment had been a "gift" by her to him. Some of that artwork has since been seized from the garage, but one crate remains missing.

\*     \*     \*

This order recognizes that it is unusual to detain a white-collar criminal defendant. This defendant presents the rare exception. In this prosecution (pending since May 27, 2014), defendant has had more than fifteen different hearings before the undersigned judge and the magistrate judges of this district. For purposes of procedural history, this order now recounts each of the hearings held herein bearing on the issue of defendant's detention.

*First*, at the hearing on May 30, 2014, Magistrate Judge Jacqueline Scott Corley ordered defendant detained after finding that he had failed to show by clear and convincing evidence that he was not a danger to the community (CR 14-00306, Dkt. Nos. 6, 7). Because defendant was (and still is) on supervised release at the time he was charged with the pending indictment, he bore the burden of establishing by clear and convincing evidence that he was not a danger to the community. *See* Fed. R. Crim. P. 32.1(a)(6); 18 U.S.C. 3143. On that issue, Magistrate Judge Corley found that defendant had "a history of doling out threats of violence — [with] several individuals [having] obtained restraining orders against him" — and that he had not shown that he was amenable to complying with the rules of a halfway house or other conditions of his release — given his courtroom demeanor at this hearing and his prior admission to two counts of failing to truthfully answer inquiries by the probation officer while on supervised release (*see* CR 08-00222, Dkt. No. 231).

2

*Second*, on June 11, 2014, defendant appeared before Magistrate Judge Cousins to request pretrial release (CR 14-00306, Dkt. Nos. 12, 15). That request was denied after Magistrate Judge Nat Cousins confirmed that defendant was not amenable to supervision, based again on defendant's courtroom demeanor at that hearing and his persistent habit of putting aside his lawyer and arguing his own case, usually to his detriment (despite repeated admonishments to cease).

*Third*, beginning on June 16, 2014, the undersigned judge conducted a three-day evidentiary hearing on the alleged Form 12 violation (*see* CR 08-00222, Dkt. Nos. 307, 310, 311). For this hearing, there was testimony from several witnesses over the course of more than thirteen hours regarding the artwork that was supposedly sent to defendant as a "gift." Defendant had agreed to purchase the artwork for approximately eleven million dollars, according to the victim. Defendant had also prepared a financial statement in anticipation of a loan, stating that he had an art collection worth five hundred million dollars. (At the same time, he has represented that he is too cash-poor to hire a lawyer and therefore deserves CJA counsel.) The hearing also covered an earlier state civil action in which defendant had been accused of fraud and the state court judge found that defendant's "fraudulent acts were patently clear" in that matter (although the damages were too speculative to award) (*id.* Dkt. No. 311 at 46:21–54:1). Following the evidentiary hearing, which included substantial testimony from defendant himself, the Form 12 proceeding has since been held in abeyance at defendant's request. The undersigned judge, however, made it clear that he would consider the evidence, pro and con, as relevant to the ongoing issue of pretrial detention.

*Fourth*, Magistrate Judge Cousins held another hearing on June 27, 2014, after defendant moved for reconsideration of his detention (CR 14-00306, Dkt. Nos. 37, 38). Finding that "most of the arguments made in support of [defendant's] motion for reconsideration are not valid reasons to reopen a detention hearing under 18 U.S.C. [] 3142(f)," Magistrate Judge Cousins nonetheless continued the motion until transcripts from the Form 12 evidentiary hearings (which had occurred earlier) were made available.

3

*Fifth*, on June 30, 2014, the undersigned judge heard defendant's motion to revoke the magistrate judges' orders of detention and to be released from custody (*id.* Dkt. Nos. 39, 40). At that hearing, the undersigned judge tried to fashion stringent conditions of release to a halfway house so that the public would be protected from further economic crimes by defendant. But it became apparent that defendant would not honor any such conditions of release, given his persistent outbursts and interruptions against the repeated instruction of his counsel and the undersigned judge throughout the hearing. In fact, defendant was later physically removed from the hearing altogether by the United States Marshals. As such, and based on more than thirteen hours of testimony from the Form 12 proceeding — including defendant's false representations concerning his financial ability to pay and his intentions and treatment of the missing artwork — the undersigned judge found, by clear and convincing evidence, that defendant poses an economic danger to the community and that no set of conditions for release to a halfway house would protect the public from further economic harm by defendant.

Thereafter on July 9, 2014, counsel for defendant asked that defendant be released to a halfway house and promised (as did defendant) that he would abide by any stringent condition that the Court might wish to impose (*see id.* Dkt. No. 45 at 4–6).

*Sixth*, the next hearings on defendant's detention took place on August 13 and August 14, 2014 (*id.* Dkt. Nos. 69, 75, 76). There, the undersigned judge heard testimony from real estate agent Mark Levinson and defendant's wife, so as to determine what equity was available in a Sea Cliff house owned by Brugnara Property VI to secure a possible bond for defendant. For purposes of obtaining pretrial release, defendant asserted that there was sufficient equity in the Sea Cliff house. The government argued the opposite. In the end, however, defendant and his wife were unwilling to allow an independent appraisal of the value of the Sea Cliff house, and on that ground, the undersigned judge denied defendant's request for pretrial release at that point.

*Seventh*, on August 22, 2014, and after defendant and his wife gave up on their objection to the independent appraisal, the undersigned judge heard testimony from an appraiser who had evaluated the Sea Cliff house (*id.* Dkt. No. 92). Based in part on that testimony, the undersigned judge found that there was enough equity in the Sea Cliff house to secure a $500,000 bond for

4

1  defendant's pretrial release to a halfway house.  Pretrial Services then proposed a number of
2  conditions for release, with two of those conditions later modified so that defendant could
3  participate in mental health counseling and could be escorted to a convenient location for visits
4  with his children.  All conditions were discussed with the parties at this hearing.  Among other
5  items, the conditions included the following (*id.* Dkt. No. 93):

> 2. While at the halfway house, the defendant may only use a Geo halfway house telephone (either pay phone or office phone) in the presence of a member of the Geo staff and only for the purpose of communicating with his attorney of record, currently Mr. Erik G. Babcock, for cases 3:14-CR-0306 or 3:08-CR-0222.  He may not use any other telephones for any other purpose . . . .
>
> 6. The defendant shall be subject to global positioning system (GPS) location monitoring (LMON) and shall comply with all GPS LMON instructions . . . .
>
> 7. The defendant shall not engage in or attempt to engage in any financial transactions either directly or indirectly through third parties (e.g., his wife or other family members).  He may not submit any applications or requests for loans, personal or business.  He may not possess any credit cards, bank cards or any other financial access devices.  He may not possess checks of any kind (e.g., personal, business, travelers').  He may not have more than $20 in his possession at any time.
>
> 8. The defendant shall not have any contact, direct or indirect, with any victims or witnesses in this case unless in the presence of defense counsel of record.

19  *Eighth*, on August 25, 2014, Magistrate Judge Cousins oversaw defendant's bail hearing
20  and the actual issuance of his bond (*id.* Dkt. Nos. 93, 94).  There, defendant was admonished
21  once again as to each condition of release, including the ones already discussed at the August 22
22  hearing.  He was then released to a halfway house.
23  *Ninth*, on September 3, 2014 — approximately one week after August 25 bail hearing —
24  defendant appeared before Magistrate Judge Cousins after Pretrial Services reported that
25  defendant had failed to charge his GPS location monitoring device on several occasions, had
26  attempted to have a conversation with a witness (his girlfriend) before her deposition, and had
27  tried to meet with Attorney Babcock at the halfway house without prior approval from the
28  halfway house's staff (*id.* Dkt. No. 100, 101).  Nonetheless, in an effort to facilitate defendant's

1    access to Attorney Babcock, Magistrate Judge Cousins modified the conditions of release so that
2    defendant could walk to and meet with Attorney Babcock at the federal courthouse, with
3    advance notice and approval by Pretrial Services. All other conditions remained unchanged,
4    however, and defendant was again "strongly admonished to comply with his conditions of
5    release."

6    *Tenth*, and later on September 3, 2014, defendant requested that the undersigned judge
7    modify the conditions of release so that defendant could call his wife, civil attorney Robert
8    Kane, and other criminal defense counsel (e.g., Attorney John Keker) that he may potentially
9    hire. The request to call the wife and Attorney Kane were denied, but the undersigned judge
10   permitted defendant to call Attorney Keker that same day to discuss possible representation (*id.*
11   Dkt. No. 102).

12   *Eleventh*, at the hearing on September 9, 2014, and following defendant's claims that he
13   was having trouble calling and meeting with Attorney Babcock or other potential new criminal
14   defense counsel, the undersigned judge further modified the conditions of release so that
15   defendant could make an unlimited number of calls on the halfway house's phone to Attorney
16   Babcock and potential new criminal defense counsel, and have in-person meetings with Attorney
17   Babcock in a closed room at the halfway house (*id.* Dkt. Nos. 105, 136). Moreover, on
18   September 10, 2014, the undersigned judge issued an order permitting defendant to have a cell
19   phone so that he could only use that phone to call Attorney Babcock and potential new defense
20   counsel (*id.* Dkt. No. 109). (The latter condition was soon rescinded, as laid out below.)

21   *Twelfth*, on September 12, 2014, the undersigned judge conducted a four-hour
22   evidentiary hearing after the government reported unauthorized calls made by defendant on the
23   halfway house's phone to his wife, Attorney Kane, and others (*id.* Dkt. Nos. 118, 122, 142). In
24   response, defendant claimed that he was being made to wait for hours to use the halfway house's
25   phone and having trouble meeting with Attorney Babcock in the halfway house's conference
26   room, due to the facility's policy that the room's door cannot be completely closed.

6

At the evidentiary hearing, three professionals from the halfway house testified that defendant had threatened them about how "the judge is going to shut [the halfway house] down" and how they would get fired if defendant was not given immediate access to the halfway house's phone (this was never denied). In reality, the undersigned judge never said such comments. The professionals further testified as to how they tried to accommodate defendant's persistent and relentless requests to use the halfway house's phone and to use the conference room for attorney meetings. Based on such testimony, as well as defendant's own testimony, the undersigned judge found that the claims of defendant having to wait for hours for the halfway house's phone and having trouble meeting with his attorney were false or exaggerated at best, and that in fact, defendant had violated the conditions of release by calling his wife and Attorney Kane when there was no permission to do so. While defendant was not remanded to custody at that point, the undersigned judge was firmly of the view that he had been misled by the defense and so stated, and therefore vacated and rescinded the September 10 order that had permitted defendant a cell phone. All matters dealing with pretrial release were then referred to Magistrate Judge Cousins. At this point, defendant still remained at the halfway house.

In parallel with the above hearings was defendant's motion to disqualify the entire United States Attorney's Office in this district, alleging that he was the victim of a vendetta and prosecutorial misconduct by three Assistant United States Attorneys, including the present prosecutor in this action. On September 16, 2014, the undersigned judge held a nearly two-and-a-half hour evidentiary hearing with testimony from defendant and three other individuals (*id.* Dkt. No. 133). The undersigned judge also reviewed approximately a thousand pages of the Bureau of Prisons' files on defendant, after he claimed that an AUSA had provided false information to the Bureau regarding his custody designation for his earlier conviction, resulting in him being placed in the wrong type of facility and then being attacked "by three Nazi skinheads for playing chess with blacks." After reviewing all of the record, the undersigned judge found that defendant's motion to disqualify the entire United States Attorney's Office in this district "was utterly without merit and was anchored in falsehoods and wild surmise" (*id.* Dkt. No. 157).

7

1           *          *          *

2    This order now turns to Magistrate Judge Cousins' latest detention order on September

3 24, 2014. Now, defendant moves for review of that order under Section 3145(b) of Title 18 of

4 the United States Code, which states (emphasis in original):

> **(b) Review of a detention order.** — If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

9 The issue thus presented is whether there is clear and convincing evidence that defendant

10 violated Conditions Number 3 and Number 8 of his release — by (1) using a telephone to send

11 calls, and (2) contacting a witness outside of the presence of Attorney Babcock (*see* CR 14-

12 00306, Dkt. No. 93). If such a violation is found, the undersigned judge must also determine

13 whether defendant is unlikely to abide by any condition or combination of conditions of release.

14 18 U.S.C. 3148(b). A de novo standard of review applies here. *United States v. Koenig*, 912

15 F.2d 1190, 1191 (9th Cir. 1990).

16    This is what the record shows. At the September 24 hearing, Pretrial Services Officer

17 Allen Lew testified that on September 19, 2014, he told defendant to meet with him after

18 defendant had finished meeting with Attorney Babcock at 5:00 PM that day. Then, shortly after

19 5:00 PM, Officer Lew realized that defendant had not yet come by his office, and at

20 approximately 5:11 PM, he went to the attorney's lounge of the federal courthouse to see if

21 defendant was still meeting Attorney Babcock there. Upon walking into the lounge, Officer Lew

22 heard defendant's voice from a closed conference room, and when Officer Lew knocked,

23 defendant opened the conference room's door. Attorney Babcock was gone, and defendant told

24 Officer Lew that Attorney Babcock had left five to ten minutes earlier. In addition, Officer Lew

25 observed that the conference room's phone was off of its cradle, with the receiver down on the

26 table. According to Officer Lew's testimony, defendant explained to him that he had used the

27 phone to leave a message for Attorney Kane and that "Judge Alsup had permitted [defendant] to

28

United States District Court
For the Northern District of California

use a phone without any direct supervision or permission," based on the September 9 hearing before the undersigned judge (CR 14-00306, Dkt. No 156 at 66:1–22). This was untrue.

In the week following September 19, the government subpoenaed the call records for the conference room's phone. Those records list thirteen pages of calls spanning a number of days, to Attorney Babcock's cell phone as well as the phone numbers of defendant's girlfriend-witness, his wife, Attorney Kane, and others. Often, the records show a pattern of a call placed from the conference room's phone to Attorney Babcock's cell, immediately preceding or following another call made to defendant's girlfriend-witness or wife, clearly indicating that Attorney Babcock was away when defendant made such calls.

Here is an example. The call records list two calls made at 4:16 PM and 4:17 PM on September 19, from the conference room's phone to Attorney Babcock's cell number. The records next list a third call at 4:17 PM that same day — lasting approximately 51 minutes — from the conference room's phone to the cell number of defendant's girlfriend, whom the government had earlier deposed in this action prior to her return to Russia. At minimum, the clear inference from those three calls is that defendant had called his girlfriend outside of the presence of his counsel, since he had called Attorney Babcock's cell phone less than a minute before, despite having been warned that he was barred from contacting witnesses in this action.

Defendant has also testified about the conference room's phone, but only as to what happened when Officer Lew walked in on him on September 19. Below is defendant's testimony (*id.* Dkt. No. 156 at 77:6–83:9) (emphasis added):

> I was in the process of making a call to Bob Kane's office, who is my attorney civilly. *He's also a criminal appellate attorney who handled the appeal in WHA 0222*. So he's my civil attorney and my criminal appellate attorney.
>
> \*   \*   \*
>
> *I complied with the Judge's orders exactly as my interpretation of them were*. My understanding of Judge Alsup's order when Mr. Lew wasn't present [at the September 9 hearing] was that I was allowed to call any attorney and that I be allowed unfettered access to call my attorneys and to meet with my attorneys, including Bob Kane. And then the order was modified to allow me to have a cell phone with limited use between 9:00 to 5:00, and then he pulled that back to the prior order. And the prior order was to be able to call my attorneys. So when I was

9

> preparing to call Bob Kane, I was in my understanding in compliance with Judge Alsup's order that was currently in effect that I could phone my attorneys. And further to that, you know, I only made a few calls from the halfway house.

This order finds defendant's interpretation of the September 9 hearing to be unreasonable and incorrect. At that hearing, the undersigned judge modified the conditions of release so that defendant could make an unlimited number of calls *on the halfway house's phone* to Attorney Babcock and potential new criminal defense counsel (*id.* Dkt. No. 136 at 17:20–23). There was never permission to use any phone that defendant happens to find. Furthermore, Attorney Kane has already submitted a notice dated July 9, 2014, stating that he is *not* counsel of record in the CR 08-00222 action (Dkt. No. 320). (That appeal is long since over anyway.) The call records also do not indicate any attempted call from the conference room's phone to Attorney Kane's phone when Officer Lew found defendant, providing little, if any, support to defendant's story that he was in the process of calling Attorney Kane at that time.

Nonetheless, defendant argues in his present motion that the calls from the conference room's phone to his girlfriend-witness on September 19 should not have resulted in his detention because he has an ongoing relationship with the girlfriend, who gave birth to his son a couple of months ago. Defendant further contends that the girlfriend was a witness "in only a very tangential way," and that because her deposition testimony has already been taken, "[s]he is no longer a witness in this case" (CR 14-00306, Dkt. No. 162 at 9).

This order disagrees. Of note, defendant does not deny calling his girlfriend from the conference room's phone, either in his testimony on this issue or in his present motion. Indeed, the call records show that at 4:17 PM on September 19, defendant called his girlfriend and talked to her for approximately 51 minutes in the conference room, just after defendant had tried to reach Attorney Babcock on his cell phone. This was a clear violation of Conditions Number 3 and Number 8, which state in relevant part that "defendant shall not have any contact, direct or indict, with any victims or witnesses in this case unless in the presence of defense counsel of record" (*id.* Dkt. No. 93). The conditions do not change simply because defendant's girlfriend has already been deposed.

10

1    Defendant counters that the call records should be disregarded because the government
2 knew that he was having attorney-client meetings in the conference room and nonetheless
3 subpoenaed the records for the conference room's phone. In defendant's view, this constituted a
4 prima facie case of "outrageous government conduct" that intruded on his attorney-client
5 relationship with Attorney Babcock and created substantial prejudice therewith (Br. 11).

6    This argument, however, does not take away from the fact that the records show a call to
7 defendant's girlfriend at 4:17 PM on September 19, *outside of the presence of Attorney Babcock*.
8 In other words, at least as to that call, there was no interference with the attorney-client
9 relationship when Attorney Babcock was not even in the conference room with defendant at that
10 point. Furthermore, Officer Lew has testified that defendant said he was using the conference
11 room's phone to call Attorney Kane, which in and of itself would be a violation of Condition
12 Number 3. Indeed, the undersigned judge has explicitly stated that defendant cannot call
13 Attorney Kane (*see, e.g.*, CR 14-00306, Dkt. No. 142 at 115:23–116:8).

14    Finally, defendant argues once more that he is not an economic danger. He points to two
15 witnesses — Tony Crossley and Frank Sanders — who testified in front of Magistrate Judge
16 Cousins as to their financial dealings with defendant before his indictment for tax evasion.
17 Having reviewed those witnesses' testimony, the undersigned judge agrees with Magistrate
18 Judge Cousins that such testimony is of little probative value, in light of defendant's more recent
19 convictions, his demonstrated proclivity to make up stories, his testimony in the present
20 prosecution, as well as the testimony from the Form 12 hearings. As articulated at the
21 September 12 hearing, the danger in letting defendant use a phone without restriction is that he
22 would make phone calls to commit further economic harm to the community (*id.* Dkt. No. 142 at
23 159:5–14).

             *          *          *

25    It must be pointed out that it was defendant's own agreement to be released to the
26 halfway house and to abide by stringent conditions therewith. For instance, in a reconsideration
27 motion submitted on July 9, 2014, by Attorney Babcock and Assistant Federal Public Defender
28 Brandon LeBlanc, defendant agreed that he should be released to a halfway house and that he "*is*

*amenable to stringent terms of supervision*, as demonstrated by his long history of compliance with both pre-trial and post-conviction supervision in the tax prosecution before this Court" (CR 14-00306, Dkt. No. 45 at 4–6) (emphasis added).

Later, in a response filed by Attorney Babcock on August 21, 2014, the defense wrote that it "wants to make it absolutely clear to the [C]ourt that [defendant] will abide by any conditions of release the [C]ourt ultimately sets," and that "however the [C]ourt ultimately rules on these objections [to the conditions], defendant agrees to abide by the specific conditions that are finally adopted by the [C]ourt." The defense further represented in that response that it "has no objection to the condition requiring [defendant] to reside at the halfway house and following all of [the halfway house's] rules and regulations" (*id.* Dkt. No. 88 at 2) (emphasis in original).

But once the undersigned judge released defendant to the halfway house (as he had agreed), probation began reporting problems concerning defendant's compliance with his conditions of release just over a week later, alleging, among other things, that defendant had failed to charge his GPS location monitoring device on several occasions and had attempted to have a conversation with his girlfriend before her deposition (*id.* Dkt. Nos. 100, 101).

There was still no remand at that point. Instead, the Court took seriously each of defendant's complaints regarding his access to the halfway house's phone, Attorney Babcock, and other potential criminal defense attorneys, and attempted to modify conditions several times to improve defendant's access while protecting the public from further economic danger.

In brief, despite his agreement to be released to the halfway house and to abide by stringent conditions therewith, defendant has failed to do so, and has since had repeated violations.

\*     \*     \*

Specifically, this order finds that on September 19, 2014, defendant used the conference room's phone in the attorney's lounge at the federal district courthouse to make a 51-minute call to his girlfriend-witness beginning at 4:17 PM. Attorney Babcock was not there, nor was any other attorney or person present.[*]

Having considered the record, the parties' briefing, and oral argument from both sides, this order finds that defendant has violated his conditions of release, with which he had previously agreed to comply, and that he is not amenable to supervision. To protect the community from further economic harm by defendant, such as fraud and con games, he should be in detention. *See United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992). The motion to revoke the latest detention order is therefore **DENIED**. This denial is without prejudice to defendant bringing a fresh motion before Magistrate Judge Cousins, proposing any further stringent conditions that might protect the public from further economic crimes by defendant. All such motions have been previously referred to Magistrate Judge Cousins.

**IT IS SO ORDERED.**

Dated: October 17, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[*] This paragraph is the additional material added to the order filed earlier today (Dkt. No. 415).