IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUKE D. BRUGNARA,<br><br>Defendant.<br>_____ / | No. CR 08-0222 WHA<br>No. CR 14-0306 WHA<br><br>**ORDER FINDING THAT DEFENDANT HAS FORFEITED THE RIGHT TO SELF-REPRESENTATION AND DENYING HIS MOTION AGAIN TO REPRESENT HIMSELF** |

**INTRODUCTION**

The offender represented himself at a twelve-day jury trial, wherein a jury convicted him on six counts and acquitted on three, and wherein his misbehavior surely set new all-time records. After conviction, the offender informed the Court that he wanted to be represented by counsel for all purposes for the duration of the proceedings. Counsel were appointed to represent him and advisory counsel were phased out. Now, the Court has received several filings directly from the offender, indicating his intent to reinstate his *pro se* status and seeking reinstatement of his advisory counsel. By reason of his contumacious and disruptive behavior during trial, this order holds that the offender has forfeited his right to self-representation and will remain represented by newly-appointed counsel for the duration of the proceedings in Case Nos. 08–CR–222 and 14–CR–306. Going forward, the offender shall not be allowed to represent himself in any manner and shall not speak in court except for allocution or sworn testimony. His newly-appointed counsel shall speak for him.

**STATEMENT**

A grand jury returned a superseding indictment charging Luke Brugnara with wire fraud, mail fraud, false statements, and escape. The offender went through three CJA attorneys before eventually turning down a fourth and moving to represent himself. After a two-day *Faretta* hearing, the offender was found to have knowingly and voluntarily waived his right to counsel (Dkt. No. 390). Even so, the undersigned judge appointed two CJA attorneys, Attorney James Stevens and Attorney Richard Tamor, to serve as advisory counsel. Despite being competent, despite having advisory counsel, and despite receiving wide latitude as a *pro se* defendant, the offender attempted to derail the trial at every turn.

Indeed, shortly before trial, the offender laid out his trial strategy to his mother. Specifically, in a jail call to his mother three weeks before trial, the offender stated (Tr. 853–54):

> I'm going to bring up everything in court. I'm going to bring up everything. And they may say, oh you can't hear that. But once it comes out of my mouth, it's already out of my mouth and the jury hears it. That's the other reason they don't want me to go pro se. I'm going to say everything I need to say, believe me.

At the final pretrial conference, after the above comment came to the Court's attention, the offender was admonished not to do the things listed in the call to his mother, and he assured the Court he would behave. In fact, however, at trial, he did just what he told his mother he would do — and worse:

- Despite admonishment, Brugnara's opening statement included numerous "facts" that would not be shown by the evidence.
- During the government's direct examination of witnesses, Brugnara persisted in making improper speaking objections and argumentative objections. For example, he would object to the relevance of a question and how it related to the victim "trying to sell me the fake art."
- Despite admonishment, Brugnara's cross-examination of government witnesses was riddled with speeches framed as prologues to questions.

2

- When the Court tried to make a ruling and as the Court was announcing its ruling, Brugnara regularly interrupted the judge usually more than once in mid-sentence to argue with every phrase in the ruling.

- Brugnara regularly violated the rules of evidence and repeatedly failed to lay proper foundation and, instead, resorted to bullheadedly reading hearsay statements in unadmitted documents out loud as if they were in evidence — including statements specifically excluded on motions in limine.

- Brugnara's cross-examination questions, after the prologue, included, "Would it surprise you?" or "Are you aware?" followed by some "fact" not in evidence and not likely ever to get in evidence. He used these phrases thirty times during the cross-examination of two government victim witnesses, even though the Court had admonished him not to do so on multiple occasions.

- When the government attorneys rose to make objections, Brugnara regularly interrupted them, as he did with the judge, in mid-sentence so that they could not make their record and the proceedings came out disjointed despite the best efforts of the judge to maintain clarity and decorum. As the trial progressed and Brugnara misbehaved, the Court made specific orders for him to cease this recurring behavior, which orders he violated repeatedly.

- In the presence of the jury, Brugnara hurled abusive insults at the prosecutors. He told AUSA Robin Harris in the presence of the jury "you dress like a Nazi" (Tr. 1824). On another occasion, addressing Attorney Harris while interrupting the Court, the offender said, "She should move to North Korea, your Honor.

3

I think, you know, she's dressed for it —" (Tr. 826). On another occasion in the presence of the jury, he stated (TR 771):

> She's interrupting me, your Honor. She is trying to play judge. Ms. Harris hasn't been appointed to be a judge. Apparently they don't think she is qualified to be a judge and she has been passed over for God knows how many years. Maybe she should sit down and let the judge be the judge and she can be prosecutor.

- After a Manhattan investment banker, Nick Barbato, testified and evidently disappointed Brugnara because, among other things, he contradicted Brugnara's theme that he was able to raise millions of dollars, Brugnara pitched into, as soon as the jury was absent, an extended top-of-his-lungs tirade, accusing the prosecutors of corrupting his star witness. This was the longest and loudest screaming performance ever seen and heard by this judge during sixteen years of service with the exception of the excused juror described below and in other orders.

- On one occasion, Brugnara's facial expressions, physical movements and demeanor seemed so hostile as to pose an immediate physical threat to the prosecutors, so much so that the Court felt compelled to ask the marshals to stand closer to the offender. (This was out of the presence of the jury.)

- When it came time for closing argument, Brugnara used his closing argument as another avenue to put his story in front of the jury. Although the offender had every right to exercise his Fifth Amendment privilege not to testify, he was not within his right to lay before the jury a closing argument of supposed facts that had never been supported by the evidence at trial.

- During jury deliberations, an issue arose concerning one juror who wound up having to be discharged for having engaged in juror

4

misconduct and having been dishonest about his criminal history during voir dire, among other things. The individual juror was brought into the courtroom for questioning. Beforehand, both the government and the defendant were explicitly told not to say a word and that only the judge would address the juror. Nevertheless, during the supplemental voir dire, Brugnara interrupted several times. The juror launched into a screaming political tirade about Nazis and communists. The offender clapped his hands at the juror to get his attention and yelling, "This isn't helping me."

- Finally, after the verdict was read, Brugnara launched into a personal attack on the judge, all in the presence of the jury and a packed courtroom, accusing the judge of prejudice and claiming that the judge had orchestrated the verdict.

Because of the numerous violations of district court orders, Brugnara was held in criminal contempt on fourteen occasions and sentenced to 471 days in custody over and above whatever sentence is imposed for the counts of conviction.

## ANALYSIS

A defendant has a constitutional right to represent himself. "Nonetheless, the right to self-representation is not absolute; the constitutional guarantee to a fair trial permits 'the trial judge to terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.'" *United States v. Johnson*, 610 F.3d 1138, 1144 (9th Cir. 2010) (quoting *Faretta v. California*, 442 U.S. 821, 834 n. 46 (1975)). "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Faretta*, 442 U.S. at 834, n. 46. "As with a defendant's right to be present, however, the right to self-representation does not overcome the court's right to preserve courtroom order." *United States v. Keiser*, 319 Fed. App'x 457, 458–59 (9th Cir. 2008) (citing *United States v. Mack*, 362 F.3d 597, 601 (9th Cir. 2004)).

The Court has exhausted all other avenues. The contempt power, used repeatedly, failed to rein in the misbehavior. Appointment of two CJA advisory counsel failed to guide the offender in a proper direction. The Court itself, out of the presence of the jury, explained proper procedure to the offender and he ignored the advice again and again. Cautionary instructions to the jury helped up to a point but that point was far exceeded. There is no plausible course other than to insist on the offender abide by what he himself requested after the verdict, appointment of free counsel for all purposes — no more *pro se* status.

**IT IS SO ORDERED.**

Dated: June 30, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE